UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

ALICE LOPEZ, as Administrator of the Estate
of WILLAM LOPEZ,

                                        Plaintiff,

-against-

THE CITY OF NEW YORK,  ASSISTANT DISTRICT
ATTORNEY TESS ALLEN, ASSISTANT DISTRICT
ATTORNEY LENI KLAIMITZ, Individually and as
Employees of the KINGS COUNTY DISTRICT
ATTORNEY'S OFFICE, DETECTIVE PATRICK
BOYLE, DETECTIVE PHILIP GRIMALDI, DETECTIVE
PHILIP KRUDIS, and DETECTIVE W.P. BUCKLY,
Individually and as Employees of the NEW YORK
CITY POLICE DEPARTMENT,

                                        Defendants.

------------------------------------------------------------------------X

Index No.: 1:14-cv-03743-BMC

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, ALICE LOPEZ, ("Plaintiff") by her attorneys, LAW OFFICES OF DENNIS J. KELLY,

P.C., complaining of THE CITY OF NEW YORK, ASSISTANT DISTRICT ATTORNEY TESS ALLEN,

ASSISTANT DISTRICT ATTORNEY LENI KLAIMITZ, Individually and as Employees of the KINGS

COUNTY DISTRICT ATTORNEY'S OFFICE, DETECTIVE PATRICK BOYLE, DETECTIVE PHILIP

GRIMALDI, DETECTIVE PHILIP KRUDIS and DETECTIVE W.P. BUCKLY, Individually and as

Employees of the NEW YORK CITY POLICE DEPARTMENT (Defendants), respectfully alleges,

upon information and belief, as follows:

## NATURE OF ACTION

1.      This is a civil action, pursuant to 42 U.S.C. §1983 and §1988, and state law,

seeking monetary damages for decedent, WILLIAM LOPEZ, due to his wrongful arrest,

prosecution, conviction, and 23.5 year imprisonment caused by the pervasive misconduct of

the Brooklyn District Attorney's Office ["BDAO"] and the New York City Police Department ["NYPD"].

2.     Decedent's conviction by jury in 1990 was overturned on March 20, 2013, by United States District Judge Nicholas G. Garaufis, who ordered the indictment dismissed with prejudice and that Plaintiff be freed. Judge Garaufis order was based upon compelling evidence that prosecutors in the Office of Brooklyn District Attorney Charles J. Hynes had wrongfully withheld a key witness's recantation, had knowingly coerced and relied on false testimony and argument at trial, had knowingly suppressed exculpatory and impeachment evidence, and had acted affirmatively to cover up such misconduct for 23.5 years. Judge Garaufis termed the prosecutors' misconduct "shameful" and Plaintiff's wrongful incarceration a "tragedy."

3.     This lawsuit seeks to hold the Defendant, CITY OF NEW YORK, liable for the above misconduct under the Federal Civil Rights Statute, 42 U.S.C. § 1983, and *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). The unlawful action of police detectives and prosecutors documented in this lawsuit resulted from affirmative or *de facto* municipal policies, practices and customs to violate the constitutional rights of criminal suspects and defendants, or from deliberate indifference by policy-making officials, acting on behalf of the City of New York, to such violations. As Plaintiff will demonstrate, both the NYPD and the BDAO, as a matter of policy, secretly coerced witnesses to give false and unreliable testimony through their misuse of subpoenas, material witness orders, and their powers of arrest and interrogation, unlawfully concealing exculpatory or impeachment evidence known as "*Brady*" material, and lied to or misled courts, defense attorneys, and criminal defendants in order to cover up their unlawful behavior. In the rare case where such misconduct was exposed, these agencies took no

disciplinary action against the offending employees, but instead praised and promoted them, thereby encouraging future constitutional violations to occur, including those directed against WILLIAM LOPEZ.

4.     The principal individual Defendants, who caused Decedent's unconstitutional conviction and orchestrated the subsequent 23.5 year cover up, acted pursuant to the unlawful municipal policy of District Attorney Hynes's Office. ADA's TESS ALLEN and LENI KLAIMITZ, (hereinafter referred to as "ALLEN" and "KLAIMITZ") engaged in a series of fraudulent, deceptive, and literally criminal acts, all caused by the consistent failure to adequately recognize and/or correct his Office's unlawful policies, in order to convict WILLIAM LOPEZ and make the conviction last.

5.     ALLEN and KLAIMITZ were caused to commit this course of misconduct by Hynes's history of indifference to such behavior by the Defendant ADA's and by other prosecutors in the office, and by Hynes's consistent public approval and ratification of such behavior during the prosecution of the case and during WILLIAM LOPEZ' 23.5 year incarceration.

6.     Hynes's defense of ALLEN and KLAIMITZ, and ratification of their unlawful behavior, his unwillingness to even investigate, let alone discipline, ALLEN and KLAIMITZ for their documented misconduct in Plaintiff's and other cases, was consistent with Hynes's pattern, throughout his almost 30-year tenure as District Attorney, of refusing to ever investigate or impose meaningful discipline on dozens of prosecutors found in court decisions to have engaged in misconduct, including deliberate misconduct. Exhibit A contains a list and descriptions of 56 cases in which courts found *Brady* and related discovery or due process

violations by Brooklyn prosecutors, but as to which Hynes conducted no meaningful internal investigation and imposed no disciplinary sanctions on the offending prosecutors.

7.      Hynes' overall deliberate indifference to the very types of constitutional violations that occurred in this case, together with his specific indifference to a history of apparent misconduct by ALLEN and KLAIMITZ, was so pervasive as to represent official policy, and therefore a substantial cause of their misconduct and the misconduct of other Hynes's employees. Their conduct was aimed at the Plaintiff, WILLIAM LOPEZ, and thus exposes Defendant, CITY OF NEW YORK, for whom Hynes was the chief policymaker in the management and administration of the DBAO, a city agency, to Federal Civil Rights liability under *Monell* for Plaintiff's damages.

8.      This lawsuit also seeks to hold accountable the BDAO for their misconduct, in an administrative capacity as Freedom of Information Law ("FOIL") officers, in covering up and withholding documents and information continually requested by Plaintiff over nearly 24 years which would have revealed KLAIMITZ, ALLEN'S, and the BDAO's Office's wrongdoing, and would have provided the basis to overturn Plaintiff's conviction.

9.      Finally, and equally importantly, Plaintiff seeks additional recovery against New York City homicide detectives who were assigned to his case, PATRICK BOYLE, PHILIP GRIMALDI, PHILIP KRUDIS, and W.P. BUCKLY, for coercing key witnesses to manufacture false evidence against Plaintiff, for suppressing exculpatory or impeachment evidence known as "*Brady* material*", and for initiating Plaintiff's malicious prosecution based upon allegations in a Criminal Court complaint they *knew* were false.   None of the misconduct of the District Attorney's office would have occurred had PATRICK BOYLE, PHILIP GRIMALDI, PHILIP KRUDIS,

and W.P. BUCKLY, in their zeal to "close" an unresolved, high-profile case, not manufactured a phony case against the Plaintiff, WILLIAM LOPEZ, and initiated his wrongful prosecution.

10.     Plaintiff, WILLIAM LOPEZ, is an extraordinarily intelligent and able individual who would have completed college and been earning a substantial salary, but for Defendants misconduct in causing his wrongful prosecution, conviction, and imprisonment. While incarcerated, he continued to renew his Operating Certificate for Large Tonnage Refrigeration Equipment in anticipation of returning to gainful employment. It was only when he was unable to register for, and attend, continuing education classes due to his incarceration that he lost certification. His pursuit of an Engineering Degree in the field of Heating, Ventilation, and Air Conditioning was lost along with his freedom. He seeks $24 million in actual damages and $100 million in punitive damages, for the egregious misconduct that deprived him of the joys of raising his daughter and of living as a free person.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

11.     This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

12.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

14.     On or about June 12, 2013, Plaintiff served upon Defendant, CITY OF NEW YORK, timely notice of the present claims pursuant to New York General Municipal Law § 50-e.  A hearing pursuant to New York General Municipal Law § 50-h was held on August 27, 2013.

15.     This action has been commenced within one year and ninety days of the accrual of Plaintiff's causes of action.

16.     Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

## THE PARTIES

17.     Plaintiff, WILLIAM LOPEZ, is a citizen and resident of the State of New York and of the United States, and resides within the Eastern District of New York.

18.     Defendant, CITY OF NEW YORK, of which the County of Kings is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

19.     Defendant, TESS ALLEN, at all relevant times, was an Assistant District Attorney in Kings County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of her employment. She is sued in her individual and her official capacities.

20.     Defendant, LENI KLAIMITZ, at all relevant times was an Assistant District Attorney in Kings County, was employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and her official capacities.

21.     Defendant, PATRICK BOYLE, at all relevant times, was a Detective/Police Officer, employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances,

customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

22.    Defendant, PHILIP GRIMALDI, at all relevant times, was a Detective/Police Officer, employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

23.    Defendant, KRUDIS, believed to be Detective PHILIP KRUDIS, and identified in Defendant Boyle's DD-5's as Detective Krudis, B.S.H.S., at all relevant times, was a Detective/Police Officer, employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

24.    Defendant, Sergeant W. P. BUCKLY, identified in Defendant BOYLE's DD-5's as W. P. BUCKLY, at all relevant times, was a Detective/ Sergeant/Police Officer, employed by the City of New York, acted toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and acted within the scope of his employment. He is sued in his individual and his official capacities.

25.    Similarly, the NYPD is an agency of the CITY OF NEW YORK. Detectives and police offices employed by the NYPD are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

26.     Similarly, the BDAO is an agency of the CITY OF NEW YORK.  Assistant District Attorneys employed by the BDAO are agents and employees of the City of New York, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Crime, Initial Investigation, Plaintiff's Indictment, and Prosecution

27. In 1989, the scourge of the crack epidemic had overtaken New York City. In fact, by 1989, Brooklyn alone was the fifth most violent municipality per capita in this country. A New York Times article captures the devastation –

> Looking back over the last three years, in which crack use in New York City has grown to epidemic proportions, Bronx Borough President Fernando Ferrer found a metaphor. He said it was like a balloon filled with water: "When it's squeezed on one end, it expands in another."
>
> Despite the more than $500 million spent by the city in the last fiscal year on drug-related enforcement alone - more than twice the amount in fiscal 1986 -the presence of crack is more pervasive, more violent and more insidious in its effect on New Yorkers, particularly the poor.
>
> These things have happened in the last three years:
>
> * Crack has contributed to the city's soaring homicide rate. From 1987 to 1988, the number of murders in New York rose 10.4 percent. Drugs, the police say, in particular crack, played a role in at least 38 percent of the 1,867 murders last year, compared with a generally constant rate of 20 percent for years. Crack more than tripled the number of cocaine users in the city since 1986. According to New York State statistics, there were 182,000 regular cocaine users in New York City in 1986. That number grew, according to city officials, to an estimated total of 600,000 in 1988, most addicted to the cocaine derivative. City officials did not say what the frequency of use was among the 600,000 regular cocaine users.
>
> * Crack contributed to a tripling of cases in which parents under the influence of drugs abused or neglected their children. In 1986, 2,627 such cases were reported, according to the City Human

Resources Administration. In 1988 the number rose to 8,521. Much of the increase was because of crack, said Human Resources Administrator William J. Grinker. Consequently 73 percent of the deaths in abuse and neglect cases in 1987 resulted from parents abusing drugs, up from 11 percent in 1985, according to the statistics.

* Crack accounted for much of the surge in prisoners entering the city's correction system. In 1985 the city jail population was almost 10,000. Much as a result of crack use and related crimes, the current jail population is almost 18,000, correction officials say. Business Is Still Brisk

Police statistics indicate that despite an increase in arrests, crack business remains brisk. From July to December 1987, there were 13,601 felony and misdemeanor crack arrests in New York. In the most recent period for which statistics are available - between January and October 1988 - there were 31,223 arrests.

"When the crack issue is examined in its entirely, there is no question that the past three years of crack trafficking and abuse have had a more deleterious effect on the quality of life in New York than any other drug episode in history," concludes a recent study by the Federal Drug Enforcement Administration.

28.     Defendant Hynes promises to address the issue. He says "I resolutely told the audience at my swearing in that I would reduce crime in two years. My wife said I was nuts. But I didn't take this job to sit back. I've never been reactive. So my first job was finding the reason for the crime, and to me, it was obvious: it was drug-related. Drug-related crime had exploded the criminal justice system. The engine, of course, was crack." He continues - "Crack and its associated crime wave had created an explosion in the number of assistant district attorneys, police and prison beds. Just to give you an example, there were 129 assistant district attorneys in this office when I left in 1975. There were 440 when I came back. ...It was out of control. Looking at the way in which government was responding, the more people they brought into this—the more cops, the more assistant D.A.s, the more judges, the more everything—crime rates proportionately seemed to rise. It was nuts."

His motive seems reasonable. His methods were less so.

He recalls a conversation with the New York Governors office – his words "I'll give you the names of 100 people in Attica [Correctional Facility], and you can write them a letter and ask them if they think I'm touchy-feely. I tell you, I throw the key away on sociopaths and people who are drug profiteers, and I have no interest in their early bed-wetting or any other sad story. I'll tell them, - This is the plea, you're going to prison, and if you don't like it, then go to trial". He spoke of people like WILLIAM LOPEZ and the many others he wrongfully incarcerated – "The easiest thing we do is put people in jail. That is not a difficult thing, if you've got your prosecutors trained well. The real challenge is to keep public safety at a level that is acceptable to the people you represent, and I believe that fundamentally you do that by recidivism reduction. Every time you reduce recidivism you knock down another layer of crime problems". It was almost a year later that WILLIAM LOPEZ was wrongfully arrested and convicted. By that time, Defendant Hynes had put in place the policies that led to the deprivation of his civil rights.

29.     During all relevant times, Elvin Zorilla was a crack dealer operating out of an apartment located at 3053 Brighton Fifth Street, Brooklyn, New York. Daisy Flores was paid to assist Mr. Zorilla.

30.     On August 31, 1989, two men entered the apartment in order to rob Mr. Zorilla. One of the perpetrators shot Mr. Zorilla in the abdomen with a shotgun, killing him.

31.     Police Officers William Tobin and James Potts arrived at that location in response to a radio run at 03:16 of a signal 10/10 (man shot). They conducted an initial investigation, established a crime scene, and submitted a report that includes "Case active...Further investigation by 60 pct. squad".

32. That investigation, by New York City Police Officers and King's County Assistant District Attorney's, began that same day with two witnesses identifying WILLIAM LOPEZ as a drug dealer. Annie Burnell was in the precinct on an unrelated matter. She was interviewed by A.D.A. Klaimitz and P.O. Boyle, and was asked "… do you know William Lopez and Eugene Lopez?" …, and "How do you know them?" To which she replied – "Well, I bought drugs from both of them and from the area".

33. Edgardo Rodriguez was in a holding cell after an unrelated robbery. He was interviewed at the 060 precinct and stated that – "WILLIAM LOPEZ is a drug dealer on Brighton 3 and Brighton 5 Streets…". Mr. Rodriguez described him as 6'2" tall; he was/is 5'7" tall. Clearly, Rodriguez was not familiar with Mr. Lopez and his statements should be/were discounted accordingly.

34. Whether 1) the investigators based their assumptions on the statements made by the witnesses, which is highly unlikely since both just happened to be in the precinct and have since been discredited - or 2) they had independent suspicions, which were used to cause knowingly false statements. This scenario is more likely because WILLIAM LOPEZ has alleged that his brother sublet his apartment to drug dealers and that Detective Boyle was "relentlessly badgering and harassing us" as a result. The investigators had targeted WILLIAM LOPEZ and EUGENE LOPEZ to take the fall for the murder.

35. The investigators were determined to follow the lead of the Kings County District Attorney, and rid the streets of anyone they suspected was dealing drugs. It was the path of least resistance – find your targets, get the evidence to fit, and avoid finding exculpatory evidence.

36. In his initial conversation with WILLIAM LOPEZ, Defendant Boyle does not ask his suspect where he was at the time of the murder. The people who were with WILLIAM LOPEZ and can verify his whereabouts are not interviewed. Lydia Rivera has since produced a sworn affidavit that she was with LOPEZ at the time of the murder and that she was not interviewed. Helen Guido said, "I can attest with absolute certainty that William could not have committed the crime...". She was not interviewed.

37. On September 5, 1989, Defendant BOYLE received a phone call from an attorney who said he had a client named Cesar Diaz who would like to talk about the murder. The response was less than enthusiastic – Defendant BOYLE made an appointment for September 7, 1989 – a full week after the murder. When Diaz did not show up for the appointment, the NYPD Officer waited four more days to act. His response was to leave a message date September 11, 1989 on the attorney's answering machine. Two days later, a follow up call to the attorney at 10:45 a.m. netted an address and phone number. The phone number was met with negative results. After lunch, at 1:30 pm, Defendant Boyle and Detective Williams were able to investigate and left a business card at Cesar Diaz' address. It was now a full two weeks after the murder. No meaningful attempts to contact the witness or possible suspect are documented.

38. Finally, the apartment where the murder took place was rented by Howie Sachs. He was placed at the scene of the murder by Chapman and even implicated as a suspect  -"he witnessed the crime while "main-lining" cocaine, and was the guy who rifled through the victims pockets at the crime scene." He was never interviewed. It was clear that the fix was in. After all, it was Defendant Hynes who said, "The easiest thing we do is put people in jail. That is not a difficult thing, if you've got your prosecutors trained well."

39. Daisy Flores witnessed the murder. She testified that, after shooting Zorilla and rifling through his pockets for drugs and cash, the killers demanded money and threatened her life. This gave her a clear look at the perpetrators. She indicated that she did not know the perpetrators, but described the man who had the shotgun as a "dark, tall, dark, black" man who appeared drug-crazed, and approximately 6"3" tall. A Sprint report is published at 0327. It read "CONF SHOTTING (sic) HOMICIDE---LOOKING FOR 2 MALE BLACKS---ON FOOT TOWARDS OCEANVIEW AVE". Since Daisy Flores is the only witness at the crime scene, any identification or description of the perpetrators had to come from her.

40. Daisy Flores is taken to the 060 Squad to give her statement. She views photos with negative results.

41. At this point, the conflicting testimony begins; the Defendants threaten Ms. Flores with jail time if she will not positively identify WILLIAM LOPEZ as the killer. When that didn't work, she was threatened with what eventually made her succumb – deportation. Her description of the perpetrators to BOYLE is not of two black males, as expressed at the crime scene; it is of two males, Hispanic.

42. Daisy Flores is interviewed a second time. She is again shown a photo array. In spite of the witnesses' description to the officers at the scene of a tall, dark suspect, the photo array includes a picture of a 5'7" Hispanic male, WILLIAM LOPEZ. The picture of Mr. Lopez is circled. Daisy Flores does what she is told. She points to the photo with a circle around it. According to BOYLE'S erroneous and unlawful report, WILLIAM LOPEZ is positively identified by the witness as "the one in the ring", an identification that is beyond suggestive.

43.     A third interview is conducted that same day. Defendant ADA Klaimitz joins in the investigation. She questions the witness about the events leading up to the murder. When the witness reports that the murder scene was the first time she saw the perpetrators, the trained and seasoned prosecutor does not ask the witness to describe them.   The two conspirators, knowing that the witness had never seen WILLIAM LOPEZ, only seek to replicate the false and lawless identification.

44.     During trial, it became clear why the A.D.A. did not seek a description of the perpetrators on the day of the murder. After A.D.A. Allen persisted in seeking permission from Justice Demarest to attempt to elicit an identification from Flores during trial (see Tr. Trans. at 223-26), Justice Demarest ordered A.D.A. Allen to instruct Flores that she was not to offer any identification of a person in the courtroom (Id at 226). Justice Demarest stated: "This ruling is the identification by this witness, she has clearly testified unequivocally, and I see her looking around and saw her look at the defendant, I don't think there's any question that she cannot recognize him. The identification is suppressed in any way, shape or form." (Id at 225)

45.     A second witness is threatened with incarceration and the inability to obtain the highly addictive substance that they craved, unless WILLIAM LOPEZ is positively identified as the killer. Annie Burnell was a crack addict who lived in the vicinity of the crime scene. It is unclear why or how the Defendants targeted Ms. Burnell. She is described in Defendant Boyle's DD-5 as "a witness in this case ... present at the 060 squad".

46. The statement taken by Defendant investigators BOYLE and KLAIMITZ describes WILLIAM LOPEZ dropping a sawed off shotgun – that had the words "pump shotgun" written on it - out from the front of his pants and telling three black males walking by "it's done".

47. Annie Burnell, the witness who just happened to be present at the 060 squad, was then shown the same photo array as Ms. Flores. Under the threat of incarceration, and in dire need of crack cocaine, she positively identified WILLIAM LOPEZ.

48. The Defendants, having "found" a witness who saw a suspect in a murder case drop the same type of weapon used in the murder, and at that very moment telling three other people, "it's done", need to get this on tape.

49. Defendant KLAIMITZ continues the investigation and takes a statement on recording tape # A891748. The witnesses' description is less convincing and inconsistent with Defendant Boyle's statement. The clarity of her statement to Defendant BOYLE – "Lopez dropped a sawed off shotgun from the front of his pants onto the floor", becomes - "I don't know if he laid it there – I don't know" when questioned by Defendant Klaimitz. No questions about the three black males who walked by; no questions about Lopez stating "It's done". Burnell states "Mareno and Black, they're both dead". Defendant Klaimitz, knowing the testimony was fabricated, does not even follow up on the sensational claim of two murder victims. She proceeds to get the identification of WILLIAM LOPEZ on tape. Annie Burnell was never contacted by police or the District Attorney's office again.

50. When tracked down years later by a private investigator appointed by Judge Garaufus, Annie Burnell became angry when she was shown the statements she was purported to have made. She said that the statements put forth by Defendants BOYLE and KLAIMITZ were an outright lie. She denied saying anything remotely similar.

51. Edgardo Rodriguez was arrested for an unrelated robbery on August 31, 1989, and brought to the 060 squad. He was interviewed by P.O. Boyle as part of his investigation of the

Zorilla murder. BOYLE'S signed report claims that Mr. Rodriguez knew WILLIAM LOPEZ from the neighborhood, described him as 6'2", and said he is "usually armed with a shotgun".

52. Several of BOYLE'S unlawful and erroneous reports are signed in a box labeled "Supervising Signature" by Defendant Sgt. BUCKLY, despite inaccuracies and contradictions with previous reports.

53. Defendants now have three witnesses who have signed statements identifying WILLIAM LOPEZ as 1) A drug dealer who is usually armed with a sawed off shotgun 2) the man who possessed a shotgun that day and 3)the man who fired the shotgun at the decedent.

54. On September 5, 1989, five days after the shooting, WILLIAM LOPEZ enters the 060 squad after hearing he was being sought. He does so voluntarily and without assistance of counsel. P.O. Boyle conducted an interview, but DID NOT ARREST HIM FOR THE MURDER.

55. The seemingly clear presence of probable cause is belied by the fact that WILLIAM LOPEZ is not arrested for murder. The Defendants know that the testimony was fabricated – no probable cause exists.

56. Daisy Flores was sober, face to face with the shooter, and spoke to him as he pointed a gun to her head. She had previously described the killer as 6'3", tall, dark, and black. During pre-trial testimony, she was unable to identify anyone, despite being face to face with the actual killers. Indeed, Justice Demarest found that "it appeared not possible [that] this defendant could have committed the crime based upon [Flore's] description".

57. Annie Burnell was a crack addict who, immediately upon her release, disavowed her statements implicating WILLIAM LOPEZ, and refused to appear at trial, telling the District Attorney that she wanted nothing to do with the case.

58.     Edgardo Rodriguez had described WILLIAM LOPEZ, a man he swore was "known to him from the area" as 6'2" tall. ; he was/is 5'7" tall. Clearly, Rodriguez was not familiar with Mr. Lopez and his statements should be/were discounted accordingly.

59.     Meanwhile, the coordinated attack against WILLIAM LOPEZ continued. It included an attempt to implicate his brother, Eugene Lopez, in the murder.

60.     Annie Burnell was coerced, by threat of incarceration and denial of crack cocaine, into identifying Eugene Lopez as 1)a drug dealer and 2)present at the time she saw WILLIAM LOPEZ drop a shotgun out of his pants. She is reported to have positively identified him from a photo array.

61.     She would later recant this testimony, but not in time for Eugene Lopez to avoid being arrested the following day.  While Eugene Lopez was in custody, he was placed in a line-up for Daisy Flores. She was unable to identify Eugene Lopez.

62.     The case against Eugene Lopez had crumbled both because of the failure to identify and the lack of a match to the initial description of the perpetrators (dark, tall, dark, black) - and he was released. The focus returned to WILLIAM LOPEZ.  But more "evidence" would be needed to secure a conviction.

63.     That "evidence" came on September 29, 1989. It was now nearly a month after the murder, and pressure had begun to build for an arrest. Several prostitutes had been arrested. They were processed, booked and released. All except one, Janet Chapman, aka Janet Chamber, aka Foster, aka Chaplan, among other false names (hereinafter Chapman), was known to frequent the area that included the crime scene. Defendants BOYLE and KRUDIS told her the same thing that Daisy Flores, Annie Burnell, and Edgardo Rodriguez were told – If you

do not identify WILLIAM LOPEZ as the killer, you will face prosecution, incarceration and be denied crack cocaine. The Defendants had found a vulnerable witness to threaten, intimidate, and coerce.

64.     Chapman was a crack-addict with a $200.00 a day habit that she financed through prostitution. She signed a statement saying that she knew WILLIAM LOPEZ as "Billy", and that he fired the shot that killed Mr. Zorrilla, rifled through his pockets, and left. She was shown a photo array and is reported to have positively identified WILLIAM LOPEZ.

65.     Because getting a prostitute addicted to crack to testify at trial is more difficult than eliciting a statement in exchange for freedom and crack cocaine - on October 10, 1989, the Defendants prepared and forwarded a wanted card on Janet Chambers. She was picked up within days, and incarcerated until after the trial in order to assure her testimony.

66.     On October 11, 1989, based on the false and coerced testimony of Flores, Burnell, Rodriguez, and Chapman; and the deliberate and systemic failure to investigate witnesses who Defendants KLAIMITZ AND BOYLE knew would provide exculpatory information, including Lydia Rivera, Helen Guido, Howie Sacks, and Cesar Diaz, the Defendants obtained a Takeout Order on WILLIAM LOPEZ. This was executed on October 17, 1989, and a line-up was conducted. Two named witnesses were not summoned to view the lineup. Howard Sachs was never even interviewed; Daisy Flores was not asked to view the lineup despite being face to face with the killers at the scene; only the crack addict and prostitute – the one who was promised leniency – only Janet Chambers was asked to view the lineup. She positively identified WILLIAM LOPEZ, who then heard a large cheer coming from the next room.

67.     On October 20, 1989, as a result of the false and coerced testimony, and the unlawful actions of the District Attorney's office and the New York City Police Department, WILLIAM LOPEZ was arrested and charged under Kings County Indictment Number 14536/89, with two counts of murder in the second degree (P.L. § 125.25(1), [3]) and one count each of robbery in the first degree (P.L. § 160.15(4)), criminal possession of a weapon in the second degree (P.L. § 265.03), and criminal possession of a weapon in the third degree (P.L. §265.02(4)).

68.     The scheme to convict Mr. Lopez was not yet complete. According to Defendant Allen's testimony in an August 1, 2013 hearing, Janet Chambers was targeted for a probation violation and kept incarcerated in order to assure her availability to testify at trial.

69.     The prosecution, including Defendant ALLEN, offered her a bargain whereby she would receive a sentence of time served on her V.O.P. charge if she testified against LOPEZ consistently with the statements made at the police station.

70.     On October 10, 1990, just two days before the murder trial of WILLIAM LOPEZ, a Probation Hearing for CHAPMAN was held. A.D.A. ALLEN and Ms. Chapman's counsel were present. During that hearing, Defendant ALLEN was asked if Chapman's testimony, consistent with her previous testimony, would gain the promise of one year-executed. She replied "Yes, your Honor". To which, Judge Curci replied "That is the contract". To confirm, Judge Curci later asked "The plea is predicated be she giving testimony in a homicide case, is that right Miss Allen?" Defendant Allen replied "That is right".  At this point, here appears to be no doubt that a deal was in place and that Chapman had notice.

71.     A second hearing was held on October 12. It was brief. There is nothing on the record except an acknowledgement that there was a discussion held at the bench, off the record. There was no mention of the deal, and the record was sealed.

72.     However, during an October 15 hearing, Defendant ALLEN, in an attempt to obfuscate and avoid having to disclose the "contract" to the jury, in violation of the Defendant's civil rights, denies a conversation ever took place. An incredulous Judge asks for clarification and the pettifogging continued – Defendant ALLEN acknowledges the conversation, but explains it away to the court by saying she "thought it was a bad idea" - "it was never discussed with her", and finally "She showed no awareness of any condition" (pg. 96).

73.     Defendant ALLEN would later represent to the Court that a deal was not in place for Chapman (see Trial Tr. (Dkt. 59-2) at 403). Chapman would confirm Defendant ALLEN's representations from the stand (see Trial Tr. (Dkt. 59-2) at 490). The jury convicted WILLIAM LOPEZ under the assumption that no deal was in place. A deal was, in fact, in place.

74.     In an August 1, 2013 hearing, Defendant Allen was asked whether there was any cooperation agreement between the KCDA office and Ms. Chapman in exchange for her testimony. She replied –"No. That was not the practice of the office." Later in the hearing she would elaborate "It wasn't our practice to go into trial with agreements because that would have tainted our witnesses."

75.     Her denial would unravel. When asked if she recalled whether there was a promise made contingent on truthful testimony, she responded "I don't recall whether we had that conversation". The follow up question – Maybe you did and maybe you didn't – was answered with "Correct".

76. After Ms. Chapman testified against WILLIAM LOPEZ, Defendant Allen wrote a letter to the Department of Probation on her behalf. On or about November 10, 1990, Ms. Chapman pled guilty to a parole violation in return for a reduced sentence of one year; the very same sentence that Defendant Allen told the court was not discussed, not offered, a bad idea, could have been offered, and withdrawn.

77.     Janet Chapman would later recant her testimony and provide statements that tell a credible story of misconduct -

> I Jannet (sic) Chapman of sound mind and judgement (sic) do hereby confess that my testimony relevant to the trial of the People vs. William Lopez was not true. William Lopez was not present at the scene of the crime. The D. A. forced me to testify on behalf of the state under due ress (sic) and the constant threat of going to jail if I did not cooperate with the D.A. office. Let me say again William Lopez is completely innocent he was never at the scene of
> the crime. (First Chapman Statement (Hr'g Exs. at 237).)
>     Janet Chapman of sound of mind, and judgement (sic)  do hereby confirm that my testimony given on 10/16/90 for the murder trial of the PEOPLE V. WILLIAM LOPEZ. . . was not true and William Lopez is completely innocent. . . . Wiliam Lopez was not at the murder scene and never had anything to do with the murder. The district attorney's representative promised to
> arrange my early release in exchange for a statement that I saw William Lopez carrying a
> shotgun-type weapon near the scene of a shooting murder. Although I never saw anything such as the assistant district attorney suggested, I readily agreed to make the statement because I wanted to get out of jail. I attended William Lopez's trial and testified against him when I know my every word was pure fabrication. I immediately felt guilty for telling a lie that placed a man in prison, but I was frightened of being sent back to jail on other charges or for perjury; therefore, I kept quiet for a time and only confided in a few close friends. Each person who heard the story of my lie was horrified. I reached the point where I could no longer live with the lie constantly weighing down on my conscious. I must also reveal that the district attorney told me never to tell anyone that we cut a deal about my testimony in

> exchange for my freedom. Even when I took the stand at the trial,
> I lied about the deal and testified that no promises had been
> made to me.

78. WILLIAM LOPEZ was convicted by the testimony of a witness that was coerced to lie in exchange for her freedom by the King's County District Attorney's office and the New York City Police Department.

79. While she in prison, Janet Chapman confided in a fellow prisoner, Earline Cafield, about what really happened and her false testimony. She told two very different stories about who murdered Mr. Zorilla.

80. First, that Zorilla had exchanged crack for oral sex, and that the girl's boyfriend came over and shot Zorilla out of jealousy; that it was a guy named Howie with a Jewish last name that rifled through Zorilla's pockets.

81. Second, Chapman claimed that Zorilla was lured to the crack den by Chapman herself so that he could be robbed; and that Howie did the killing.

82. On October 12, 1990, Earline Cafield wrote to the District Attorney's office to inform them of this information. The Defendants failed to make this information available to the Defense Counsel until after the trial.

83. A time stamp on the Cafield letter indicates that the letter was received by the Richmond County District Attorney's office on October 19, 1990. As per American Bar Association Standards for Criminal Justice, Prosecution Function, Standard 3-3.11(a)(3d ed. 1993): A prosecutor should not intentionally fail to make timely disclosure to the defense, at the *earliest feasible opportunity*, of the existence of all evidence or information which tends to

negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused (*emphasis added*).

84.    The Rules of Professional Conduct (22 NYCRR   1200.0), Rule 3.8(b) reads as follows: A prosecutor or other government lawyer in criminal litigation shall make *timely disclosure* (*emphasis added*) to counsel for the defendant or to a defendant who has no counsel of the existence of evidence or information known to the prosecutor or other government lawyer that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence, except when relieved of this responsibility by a protective order of a tribunal. <u>People v Robinson</u>, 34 Misc. 3d 1217(A), 1217A (N.Y. City Crim. Ct. 2011).

85.    After receiving the exculpatory material, but prior to producing it, Defendant Allen conducted an investigation in order to determine the validity of the information received from Earline Cafield. The Kings County District Attorneys office conducted "a number" of interviews. ADA Tim Koller discovered that the writer underwent a CPL 730 exam. They discovered that Earline Cafield had a history of violence. They discovered the results of the CPL 730 exam. They investigated whether there existed reports of incidents in the Rikers Island penitentiary and found that Chambers was confronted in the 9th floor pens by an incarcerated girlfriend. Finally, they discovered that Janet Chapman was aware of Earline Cafield's "history of violence". All of this investigating is done without questioning Chapman. She was incarcerated, so she was available. The Defendants simply chose not to.

86.    The material was not disclosed at the earliest feasible opportunity. The King's County District Attorney's Office decided to investigate the letter before disclosing it to the

defense, as required. This all occurred at a most crucial time – on the day WILLIAM LOPEZ was convicted, in the days after, and while he was awaiting sentencing.

87.     As a result of the failure to disclose, the defense was unable to make meaningful use of the Cafield letter.

88.     To make matters worse, the King's County District Attorney's Office took the time to make a determination that "Janet Chamber's in court testimony should not be upset by a letter from a source as unreliable as Earline Cafield." And "Even if the prosecution had valid reasons to consider [the] witness to be unreliable, it should nonetheless have provided the defense with this important exculpatory information which was clearly Brady material." Further, "[i]t is for the trier of fact, and not the prosecutor to decide the credibility of witnesses." *People v Jackson*, 168 Misc 2d 182, 1995.)

89.     During trial, the only witness to place WILLIAM LOPEZ at the scene was Janet Chapman, a crack-addicted prostitute who admitted being awake for 48 hours on a binge, including ingesting 12 vials of crack in the two hours prior to the murder.

90.     Fingerprints were taken at the scene. None of the fingerprints at the scene that matched WILLIAM LOPEZ.

91.     On October 19, 1990, WILLIAM LOPEZ was convicted, after a jury trial, of murder in the second degree (P.L. § 125.25(3)) and criminal possession of a weapon in the second and third degree (P.L. §§ 265.03 and 265. 02(4)).

92.     On November 2, 1990, the prosecutor provided to defendant's trial counsel, William Lupo, a copy of the October 12, 1990 letter containing exculpatory evidence written by Earline Cafield.

93.     On or about November 10, 1990, Ms. Chapman pled guilty to a parole violation in return for a reduced sentence of one year; the very same sentence that Defendant Allen told the court was not discussed, not offered, a bad idea, might have been offered, and withdrawn.

94.     Shortly after her release, Chapman spoke to Eugene Lopez and "apologized for having to testify the way she did against [LOPEZ] and that Officer Boyle of the NYPD had pressured and threatened her into testifying, and had held her in custody for three weeks until she testified.

95.     Cesar Diaz was finally tracked down. He testified that he was in the crack-house at the time of the shooting and, when shown a photo of WILLIAM LOPEZ, said he was certain that LOPEZ was not the shooter.

96.     Helen Guido produced a signed and notarized affidavit in which she swore that LOPEZ was with her the night of the murder, she was able and willing to testify at trial, and that no one had interviewed her about her knowledge.

97.     Lydia Rivera produced a signed and notarized affidavit in which she swore that LOPEZ was with her the night of the murder, she was able and willing to testify at trial, and that no one had interviewed her about her knowledge.

98.     On November 26, 1990, Supreme Court Justice Demerast adjudicated the defendant a second felony offender and sentenced him to concurrent terms of imprisonment of twenty-five years to life on the murder conviction, seven and one-half to fifteen years on the second degree weapon-possession conviction, and three and one-half to seven years on the third-degree weapon-possession conviction (Demarest, J., at trial and sentence).

99.    Fast Forward 23.5 years to the Order demanding William Lopez' release from incarceration. Judge Garaufis declares "LOPEZ has been wronged by the State of New York. This wrongdoing has ranged from an overzealous and deceitful trial prosecutor; to a series of indolent and ill-prepared defense attorneys; to a bewildering jury verdict; and to the incomprehensible Justice Demarest, who so regrettably failed time and time again to give meaningful consideration to the host of powerful arguments Lopez presented to her. The result is that a likely innocent man has been in prison for over twenty-three years. He should be released with the States apology".

100.    This order followed a long and harrowing history of Appeals and requests, described below; all necessitated by the knowing and deliberate actions of the Defendants.

101.    On or about September 18, 1992, Defendant, with the assistance of counsel, perfected the appeal of his judgment of conviction to the Appellate Division, Second Department (hereinafter the "Appellate Division"). Defendant raised six issues: (a) sufficiency of the evidence; including promises of leniency for witnesses. (b) prejudicial error in the prosecutor's summation; (c) error in the trial court's charge; (d) error committed by the trial court when it permitted the prosecution to allegedly change its theory of the case in summation; (e) ineffective assistance of counsel at sentencing when appellate counsel, who was unfamiliar with the case, represented defendant; and (f) denial of a fair trial due to the prosecutor's opening and the court's charge, which were allegedly inconsistent with the evidence adduced at trial.

102.    On October 12, 1993, the Appellate Division unanimously affirmed Defendant's judgment of conviction. People v. Lopez, 197 A. D .2d 594 (2d Dep't 1993). On November 3,

1993, Defendant, with the assistance of counsel, filed a motion in the Appellate Division for rehearing, reconsideration and renewal.

103.    On January 19, 1994, the Appellate Division denied Defendant's motion for rehearing. *People v. Lopez*, Docket No.90-09694, Decision & Order on Motion (2d Dep't Jan. 19, 1994).

104.    On November 1, 1999, since his Appellate Counsel failed to file a Notice of Appeal, Defendant, pro se, submitted a motion to the Court of Appeals, pursuant to C.P.L. § 460.30, requesting permission to file a late appeal.

105.    On May 4, 2000, the Court of Appeals, dismissed Defendant's C.P.L. § 460.30 motion as untimely. *People v. Lopez*, Mo. No. 291, Decision (2000) (Kay, C.J.).

106.    By papers dated August 21, 2001, Defendant, pro se, submitted an application for a Writ of Error Coram Nobis. Defendant claimed that he had been denied effective appellate representation because counsel did not file an application for leave to appeal to the Court of Appeals.

107.    On December 24, 2001, the Appellate Division denied Defendant's application for a Writ of Error Coram Nobis. *People v. Lopez*, 289 A.D.2d 510 (2d Dep't 2001).

108.    By application filed pro se on July 5, 2002, in the United States District Court for the Eastern District of New York (hereinafter "the district court"), Defendant sought a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254.

109.    By memorandum and order dated April 21, 2004, the District Court dismissed Defendant's application as time barred. *Lopez v. Miller*, 02-CV-3988 (NGG), Memorandum and Order (E.D.N.Y.Apr. 21, 2004).

110. On May 20, 2004, Defendant filed a pro se motion for reconsideration wherein he argued that his petition contained a claim of actual innocence, which provides an exception to the one year statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act of 1996.

111. By memorandum and order dated September 13, 2005, the District Court vacated its order denying Defendant's application as time barred and assigned counsel to represent Defendant regarding his claim of actual innocence. *Lopez v. Miller*, 02-CV-3988(NGG), Memorandum & Order (E.D.N.Y. Sept. 13, 2005).

112. By letter motion dated October 9, 2009, Defendant, with the assistance of counsel, asked the District Court to issue an order holding Defendant's petition for a writ of habeas corpus in abeyance while Defendant exhausted his state court claims of actual innocence stemming from newly discovered evidence.

113. By order dated October 29, 2009, the District Court granted Defendant's Motion to Stay and Hold Defendant's Petition in abeyance. *Lopez v. Miller*, 02-CV-3988 (NGG), Order (E.D.N.Y. Oct. 29, 1999).

114. On May 6, 2010, Defendant filed, with the assistance of counsel, to vacate his judgment of conviction pursuant to C.P.L.§ 440 .10 (1) (d) , (g) , and (h). Defendant claimed (1) that he was denied effective assistance of counsel by counsel's failure to investigate Defendant's claimed alibi defense and failure to investigate a letter wherein an inmate (Earline Cafield) claimed that the identifying witness (Janet Chapman) recanted her testimony; (2) that he is actually innocent; (3) that Janet Chapman's recantation is newly discovered evidence; and

(4) that Chapman's testimony was perjurious and, thus, denied Defendant his constitutional right to due process of law.

115.    On December 8, 2010, Justice Demarest, without conducting a hearing, issued an order denying LOPEZ' Motion to Vacate Judgment. (N.Y. Sup. Ct. (Dkt. 59-6)).

116.    An application for leave to appeal was denied on April 7, 2011 (N.Y. App. Div. Decision & Order on Appl. (Dkt 59-6).

117.    An application with the New York Court of Appeals for a Certificate to Appeal the decision pursuant to C.P.L. § 460.20 was dismissed on June 30, 2011.

118.    An Amended Petition for Writ of Habeas Corpus was filed on November 25, 2011. (Am. Pet. (Dkt. 54)), and Granted on January 16, 2013.

119.    On March 20, 2013, Judge Garaufis took the extraordinary measure of releasing LOPEZ from any form of State custody, dismissing the pending indictment, barring N.Y. from retrying him, and expunging LOPEZ' conviction and all references to him in the public record.

### The Law Regarding FOIL Requests

120.    The Freedom of Information Law (FOIL) requires New York governmental agencies, including a District Attorney's Office, to permit the public to inspect and copy *every* record they hold, excepting only those records that fall within one of ten narrowly defined grounds for withholding records. Once a witness in a criminal case testifies in a criminal case testifies in open court, or if records pertaining to that witness were required to be disclosed to a defendant as written *Brady* or *Rosario* material, such records must also be disclosed to that defendant under the FOIL.

121.    The FOIL also requires agencies to designate both Records Access and Appeals Offices.  The Records Access Officer receives and responds to FOIL requests.  He may grant access to the records or, if the records are exempt from disclosure, withhold the records and explain his reasons for doing so in writing.

122.    The person making the request may then administratively appeal to the agency's Appeals Officer, who is required to overturn the denial and grant access if the records do not properly fall within the grounds for denying access.

123.    Both the Records Access Offices and the Appeals Officer are prohibited by law from denying a request by falsely claiming that a requested record does not exist.  Indeed, it is a violation of the New York Penal Law to intentionally prevent the public from inspecting records requested under the FOIL.  *See* Penal Law § 240.65.

124.    At the same time, as representatives of the District Attorney's Office, FOIL officers have a continuing constitutional obligation to disclose material exculpatory evidence that the Office should have disclosed at trial under *Brady*.

125.    If the Appeals Officer upholds the Records Access Officer's denial of a FOIL request, the requester may then commence a civil lawsuit, under Article 78 of the New York Civil Practice Law and Rules, to challenge the agency's decision.  However, New York law requires courts hearing such lawsuits to defer to an agency if it claims that the requested records could not be located.  In other words, the entire system assumes and relies upon the truthfulness and honesty of the Records Access and Appeals Officers.

126.    Foil requests by Plaintiff include, but are not limited to, seeking information on any negotiations, deals, or agreements between Janet Chapman and the BDAO, requests for

criminal rap sheets for Janet Chapman, and for unsealing documents, all of which were denied throughout WILLIAM LOPEZ's appeals process in a successful effort to continue their actions toward Plaintiff under color of statutes, ordinances, customs, and usage of the State of New York and the City of New York, and resulted in the continued incarceration of WILLIAM LOPEZ.

## FIRST CAUSE OF ACTION

### Malicious Prosecution Under State Law

127.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 97 of this Complaint.

128.    By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceeding against WILLIAM LOPEZ.

129.    The criminal proceedings resulted in a conviction.

130.    There was no probable cause for the commencement or the continuation of the criminal proceedings.

131.    The Defendants acted with actual malice.

132.    Defendant CITY OF NEW YORK is liable under the principle of *respondeat superior.*

## SECOND CAUSE OF ACTION

### Intentional Infliction of Emotional Distress Under State Law

133.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 103 of this Complaint.

134. Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff at least until his release from prison in 2013.

135. Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause Plaintiff severe emotional distress.

136. Specifically, Defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, while acting in an investigative or administrative capacity, coerced witnesses into making false statements to be used against Plaintiff, created false official records to be used against Plaintiff, initiated or caused the initiation and continuation of false and unfounded criminal charges against Plaintiff while lacking probable cause to do so, abused judicial process in order to gain unlawful custody of and to coerce witnesses to make false statements against Plaintiff and commit perjury at Plaintiff's trial, *Brady, Giglio* and *Rosario* material before, during, and after trial, attempted to cover up and conceal their misconduct, and repeatedly and continually lied to and defrauded every court that reviewed Plaintiff's conviction concerning the existence of evidence favorable to Plaintiff and their past misconduct.

137. Plaintiff suffered severe emotional distress as a result of, and that was proximately caused by, the Defendant's aforementioned actions.

138. By virtue of the foregoing, Plaintiff suffered the actual damages identified below.

139. Defendant CITY OF NEW YORK is liable under the principle of *respondeat superior.*

### THIRD CAUSE OF ACTION

### Abuse of Process Under State Law

140.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 110 of this Complaint.

141.    Defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, employed regularly issued criminal legal process against Plaintiff.

142.    Specifically, actions include but are not limited to, issuing improper "office" subpoenas, unauthorized by law, commanding witnesses to appear at the BDAO; on October 10, 1989, the Defendants prepared and forwarded a wanted card on Janet Chambers; obtaining an improper material witness warrant; obtained an unlawful, invalid court "order" on October 11, 1989 - Defendants obtained a takeout order on WILLIAM LOPEZ;  lied to the court in order to obtain orders to produce an incarcerated witness at the BDAO; and served a Take Out Order on October 17, 1989, when it was not Judicially signed on October 24, 1989.

143.    The material witness warrant and purported "order" to remand Janet Chapman, and the order to produce WILLIAM LOPEZ, were obtained through the use of false representations of fact and purpose in "affirmations" or affidavits.

144.    Defendants used such process to obtain a collateral objective outside the legitimate ends of the process used, namely, to gain unlawful, coercive custody of the aforementioned individuals, who otherwise had no obligation to appear at the DBAO and had

refused or failed to do so, in order to intimidate them into giving false statements against Plaintiff which the Defendants knew, believed, and intended would later be used in court against Plaintiff at the criminal trial, and which were so used.

145.    Defendants did so with intent to do harm to Plaintiff, with actual malice, and without excuse or justification.

146.    By virtue of the foregoing, Plaintiff was caused the actual and special damages identified below.

147.    Defendant CITY OF NEW YORK is liable under the principle of respondeat superior.

### FOURTH CAUSE OF ACTION

### Actual and Constructive Fraud Under State Law

148.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 118 of this Complaint.

149.    Defendants made representations of material "fact" which were false, and known to be false by Defendants, for the purpose of inducing other parties, including Plaintiff, to rely upon such false representations, and the other parties did so rely, in ignorance of the falsity of such representations, thereby causing Plaintiff's injuries alleged below.

150.    Specifically, Defendants made, caused to be made, acted in concert or conspired to make, and/or aided or abetted one another to make, representations as to material facts which were false, and known to be false by Defendants, to wit, the representations by P.O. Grimaldi in his sworn Criminal Court complaint, the false affirmations and affidavits of BOYLE and ALLEN which were caused to be made and submitted to the court, the false records ALLEN

and/or BOYLE caused to file with the D.A's office, Police Department, and Probation Department claiming that witnesses had been threatened, and false representations by KLAIMITZ.

151.    Furthermore, Defendant's made various representations of material facts to Plaintiff, to BDAO supervisors, and/or to courts, regarding the following documents or categories of documents related to Plaintiff's criminal prosecution:

(a)    Material witness applications, warrants, and orders;

(b)    Applications and orders to produce witnesses;

(d)    Subpoenas and/or warrants to compel witnesses to appear at the BDAO;

(e)    Documents containing or evidencing promises to the benefits provided Janet Chapman;

(f)    Communications to the Probation Department concerning threats to witnesses;

(g)    Department of Probation records pertaining to Janet Chapman and her violations of probation;

(h)    BDAO records concerning Chapman's cooperation, benefits she requested, was promised, or received, and records reflecting her possible motive, bias or interest in testifying; and/or

(i)    Statements by witnesses relevant to the subject matter of their direct testimony ("*Rosario*" material) and/or their motive, bias or interest in testify ("*Brady*" material).

152.    The aforementioned statements, made by the Defendants personally and/or at their direction, were known by them to be false or misleading or were made with deliberate indifference to their truth or falsity or to their misleading nature.

153.    The statements were made by Defendants (or at their direction) for the purpose of inducing other parties, including various courts, Defendants' supervisors, and/or Plaintiff, to

rely upon such false representations, and such parties rightfully did so rely, in ignorance of the falsity of such representations, and to Plaintiff's detriment.

154. The Defendants employed by the BDAO had a fiduciary, confidential, and special relationship with, and duty to Plaintiff, arising our of their special status under the law as officers of the court, the absolute deference and trust that courts give to their factual representations concerning the possession or control by the BDAO of *Brady* material, their strict legal duty under the Constitution and the laws of the United States and the State of New York to fully and accurately disclose such material, and Plaintiff's entitlement to rely upon the accuracy and the completeness of such disclosures, to make accurate and complete disclosures so that Plaintiff would not be misled as to the existence or non-existence of such materials and whether to file legal actions for redress of violations of his Constitutional rights.

155. Plaintiff was entitled to rely, and foreseeably did rely, upon Defendants to faithfully carry out their aforementioned duties and on Defendants' factual representations.

156. Defendants' aforementioned conduct caused or perpetuated the Plaintiff's injuries and damages alleged, by knowingly willfully, intentionally, recklessly, and/or negligently depriving him, or delaying his acquisition, of information to which he was legally entitled and by causing him to believe that such information did not or might not exist, and, as a result, by causing him to delay for many years the filing of his State "440" motion to vacate his conviction and his successful Federal motion for a writ of habeas corpus.

157. Defendant CITY OF NEW YORK is liable under the principle of *respondeat superior*.

### FIFTH CAUSE OF ACTION

### Negligent Misrepresentation Under State Law

158.  Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 128 of this Complaint.

159.  Defendants had a duty, as a result of their special relationship with Plaintiff, to give Plaintiff and others correct information.

160.  Defendants made false representations to Plaintiff and others that Defendants should have known were incorrect, including, but not limited to, the false representation that the BDAO did not possess the records Plaintiff had specifically requested.

161.  Defendants' false representations were made for the purpose of inducing other parties, including Plaintiff, other prosecutors, and various State and federal courts, to rely upon such false representations.

162.  Defendants knew that the information supplied in their representations were desired by Plaintiff, and others, for a serious purpose, specifically, to challenge Plaintiff's murder conviction and sentence to life imprisonment and/or to comply with or rule upon Plaintiff's request for access to *Brady* material.

163.  Plaintiff and others, including prosecutors, and various State and Federal courts, intended to rely and act upon Defendants' representations, and did in fact reasonably rely on those representations, in ignorance of the falsity of such representations.

164.  Defendants; aforementioned conduct caused or perpetuated Plaintiff's injuries by causing the wrongful continuation of his criminal conviction, his imprisonment, and his related damages, by causing him to incur substantial legal fees, by depriving him of the

employment income he would have been able to earn had he not been convicted and imprisoned, and by depriving him, or delaying his acquisition, of information favorable to his defense to which he was entitled under the Constitutions and the laws of the State of New York and the United States and which was necessary for him to successfully litigate his motions to vacate his conviction.

## SIXTH CAUSE OF ACTION

### 42 U.S.C. §1983; Denial of Due Process and a Fail Trial Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments

165.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 135 of this Complaint

166.    Defendants knowingly and willfully manufactured, or caused the manufacturing of, a false written statement, which they prepared and improperly compelled or induced Janet Chapman to sign under "oath", accusing Plaintiff of participation in the robbery and murder of Elvin Zorilla.

167.    Defendants knowingly and willfully manufactured, or caused the manufacturing of, a false written statement and improperly compelled or induced Annie Burnell to sign under "oath", accusing Plaintiff of possessing a sawed off shotgun shortly after the shooting and telling unidentified parties that "it's done".

168.    Defendants knowingly and willfully manufactured, or caused the manufacturing of, a false written statement, which they prepared and improperly compelled or induced Daisy Flores to sign under "oath", accusing Plaintiff of participation in the robbery and murder of Elvin Zorilla.

169.    Defendants knowingly and willfully manufactured, or caused the manufacturing

of, a false written statement, which they prepared and improperly compelled or induced

Edgardo Rodriguez to sign under "oath", accusing Plaintiff of carrying a sawed off shotgun.

170.    They knew that the statements would, and caused the statements to, be relied

upon by the BDAO and the court as a basis to arrest Plaintiff, to formally initiate his

prosecution, to hold him for trial without bail, and to compel witnesses to give testimony

consistent with their statements at the trial itself.

171.    Defendants thereafter knowingly swore to a false Criminal Court complaint

initiating the criminal prosecution of Plaintiff, and causing Plaintiff to be held without bail.

172.    The aforesaid conduct, which Defendants committed in concert with and in aid

of each other, and/or in in concert or conspiracy with others named and unnamed, operated to

deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

> (a)    Not to be arrested, indicted, prosecuted, detained, convicted, or
> imprisoned based upon false, fabricated, manufactured,
> misleading, or inherently unreliable "evidence"  including  the
> statements and testimony of witnesses who have been
> improperly influenced, coerced, or manipulated to provide such
> statements and testimony, in violation of the Due Process and
> Fair Trial Clauses of the Fifth, Sixth, and Fourteenth
> Amendments of the United States Constitution.

> (b)    Not to be deprived of his liberty absent probable cause to believe
> he has committed a crime, in violation of his rights under the Fourth
> and Fourteenth Amendments to the United States Constitution; and

> (c)    To timely disclosure of all material evidence favorable to the defense
> pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), *Giglio v. United
> States,* 405 U.S. 150 (1972), and their progeny, and the Due Process and
> Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the
> United States Constitution.

173.    The following violations of Plaintiff's Federal Constitution rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, his loss of liberty and detention without bail, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

174.    The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendants' employment and authority.

175.    Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

176.    By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## SEVENTH CAUSE OF ACTION

### (42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth and Fourteenth Amendments; Malicious Prosecution, Abuse of Process, and Deprivation of Liberty Under the Fourth, Fifth, Sixth and Fourteenth Amendments; Defendants City of New York et al.)

177.    Plaintiff' repeats and re-alleges each and every allegation contained in paragraphs 1 through 147 of this Complaint.

178.    Knowing that any colorable cause to continue the prosecution had evaporated, BOYLE, GRIMALDI, KURDIS, W.P. BUCKLY, ALLEN and KLAIMITZ, in their capacity as investigators or "witnesses", acted in concert and conspired with others, named and unnamed, to use any means, no matter how unlawful or coercive, to gain custody of uncooperative witnesses, Janet

Chapman and Annie Burnell, in order to intimidate them into falsely accusing Plaintiff of the charged crimes.

179.    These illegal and unconstitutional means included, but were not limited to:

(a)    Abusing judicial process by misusing the court's subpoena power to compel witnesses to appear at Defendants office;

(b)    Abusing judicial process by deceiving the court into issuing "orders to produce" and material witness orders purportedly authorizing Defendants to take custody of prospective witnesses in violation of the "oath" requirement of the Fourth Amendment as well as the State Criminal Procedure Law, by submitting purportedly sworn "affirmations and "affidavits";

(c)    Personally attesting to "facts" which they knew were untrue in order to deceive the court into issue orders authorizing them to take custody of such witnesses;

(d)    Seizing Janet Chapman, a drug addict, and holding her in jail and then in Defendant's custody without lawful authority;

(e)    Causing Janet Chapman's release to be illegally administratively revoked by the Defendants so that he/she would be imprisoned and made vulnerable to coercion, and

180.    These lawless actions foreseeably caused the aforementioned witnesses to manufacture false evidence which Defendants then used to continue Plaintiff's malicious prosecution, without probable cause, and to bring about his false conviction at trial.

181.    To cover up their criminally coercive tactics, Defendants, again in their capacity as "investigators," and/or complaining witnesses, acted in concert with others in the BDAO to manufacture false documents, and to file them with the BDAO, the NYPD, and the N.Y.C. Probation Department, representing that Janet Chapman and Annie Burnell's reluctance to cooperate or flight has been cased by threats they or their family members had received from

Plaintiff or his family when Defendants and their accomplices well knew that there had been no such threats.

182.     Defendants provided false statements in a successful effort to cover up their previous misconduct in coercing witnesses, deceiving the court, defense, and jury; withholding *Brady* and *Rosario* material to oppose Plaintiff's meritorious motion to overturn his conviction. Defendants then memorialized these false statements in a sworn affirmation knowing it would be used to defeat Plaintiff's motion to overturn his conviction, and it was so used, causing Plaintiff to serve additional years in prison.

183.     Additionally, Defendants, acting in an investigative or administrative capacity, had a duty to Plaintiff to carry out the Office's ongoing obligation, pursuant to the Due Process Clause of the Constitution and *Brady v. Maryland,* 373 U.S. 83 (1963), to disclose, upon Plaintiff's request, documents and information favorable to Plaintiff with respect to his criminal prosecution and conviction.   Nevertheless, acting in concert with others, said defendants knowingly, willfully, recklessly, and/or with deliberate indifference to their Constitutional and statutory obligations, failed to disclose said document and information to Plaintiff, thereby substantially delaying Plaintiff's efforts to overturn his wrongful conviction and prolonging his prosecution and imprisonment.

184.     The aforesaid conduct operated to deprive Plaintiff of his rights under the Constitution and Laws of the United States:

> (a)     Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, or manipulated to provide such statements and testimony, in violation of the Fourth and Fourteenth Amendments, and the due Process and Fair

Trial Clause of the Fifth, Sixth and Fourteenth Amendments, to the United States Constitution;

(b)   Not to be deprived of his liberty absent probable cause to believe he has committed a crime, a violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)   To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963), *Giglio v. United States,* 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

185.   The following violations of Plaintiff's federal constitutional rights by the Defendants, together with their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the continuation of Plaintiff's malicious prosecution without probable cause, his wrongful conviction, his subsequent imprisonment, the defeat and delay of his efforts to overturn his wrongful conviction, and his other injuries and damages.

186.   The foregoing violations of Plaintiff's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the Defendant's employment and authority.

187.   Defendants committed the foregoing violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, negligently, and/or deliberate indifference to Plaintiff's constitutional rights or to the effect of such misconduct upon Plaintiff's constitutional rights.

188.   By reason of the foregoing, the Defendants are liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for compensatory and for punitive damages.

## EIGHTH CAUSE OF ACTION

### (*Monell*/42 U.S.C. § 1983: Claim Against Defendant City of New York for the Actions of the NYPD)

189.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 159 of this Complaint.

190.    The foregoing violations of Plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant, CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

191.    Prior to Plaintiff's arrest, policymaking officials of the NYPD, were deliberately indifferent to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

       (a)      The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, drug dealers, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;

       (b)      The determination of probable cause to make an arrest; and

       (c)      The continuing duty of police investigators to reserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ("*Brady* material") favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general

credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witnesses has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady.*

192.    With respect to "a" and "c" in the preceding paragraph, prior to Plaintiff's arrest and the initiation of his prosecution in 1989, the NYPD provided no training at all.

193.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant CITY OF NEW YORK, including but not limited to, The New York City Police Commissioner, who knew (or should have known):

      (a)    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases:

      (b)    that such issues either present police employees with difficult choices of the sort that instruction, training, and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

      (c)    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

194.    The aforementioned policymaking officials had knowledge of the notice alleged in the preceding paragraph based upon, among other circumstances:

      (a)    credible allegations, many substantiated by judicial decisions findings, that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony (see Ex. B) appended

hereto and incorporated herein by reference, listing some of these
decisions);

(b)     civil lawsuits, some of which resulted in substantial civil settlements,
credibly alleging that police had falsified, exaggerated, or withheld
material evidence, or conducted searches or arrests without probable
cause (*see* Ex. A appended hereto and incorporated herein by
reference, listing some of those lawsuits);

(c)     numerous decisions of the United States Supreme Court, the United
States Court of Appeals for the Second Circuit, the New York Court of
Appeals, and the New York Appellate Division, discussing the difficult
issues that regularly arise under *Brady* as well as the probable cause
requirements of the Fourth Amendment;

(d)     judicial decisions directly criticizing the NYPD for failing to train and
supervise officers in their *Brady* obligations and for failing to adopt
adequate *Brady* disclosure policies, *see Carter v. Harrison,* 612 F. Supp.
749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and
Recommendations of then Magistrate Shira A. Scheindlin), and putting
the NYPD on notice that the City could be held liable for its failure to
adequately train police officers and investigators regarding their
obligations to provide truthful testimony and to disclose evidence that
favors criminal defendants under *Brady, see Walker v. City of New York,*
974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison, supra;*

(e)     formal reports of the N.Y.C. Comptroller's Office and the Bar Association
of the City of New York criticizing the NYPD and the N.Y.C. Law
Department for failing to follow up substantial civil settlements for police
misconduct with disciplinary or other remedial actions; and

(f)     the inherent obviousness of the need to train, supervise and discipline
police officers in such obligations to counteract the pressure of officers
and the powerful incentives they have to close cases and to obtain
arrests and convictions.

195.    Under the principles of municipal liability for federal civil rights violations, the

City's Police Commissioner (or his authorized delegates), had final responsibility for training,

instructing, supervising, and disciplining police personnel with respect to the investigation and

prosecution of criminal matters, including constitutional requirements governing the

interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

196. The Police Commissioners, personally and/or through his authorized delegates, at all relevant times had final authority, and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

197. During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Plaintiff, WILLIAM LOPEZ, which he knowingly and intentionally breached, or to which he had deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

198. The aforesaid policies, procedures, regulations, practices and/or customs of Defendant, CITY OF NEW YORK and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Department of Plaintiff's rights under the Constitution and laws of the United States.

199. By virtue of the foregoing, Defendant, CITY OF NEW YORK is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

## NINTH CAUSE OF ACTION

### *Monell*/42 U.S.C. § 1983 Claim Against Defendant City of New York for Actions of the BDAO

200.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 170 as if fully set forth herein.

201.     At the time of Plaintiff's original prosecution, and continuing until the Federal Court's dismissal of Plaintiff's case and his release from prison, District Attorney Charles J. Hynes, as the manager and chief administrator of the BDAO, a City agency, maintained a policy, custom and/or practice of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Kings County, including, but not limited to, abuse of process, manufacturing of false evidence and testimony through improper coercion of witnesses, *Brady* violations, reliance on false or misleading evidence and argument at trial ("the policy"), and covering up the same.

202.     This policy began with his induction as District Attorney and continued through all relevant times.

203.     The policy permits, encourages, or acquiesces in the commission of constitutional violations of the rights of suspects and defendants by prosecutors, detective-investigators, and NYPD detectives working with the D.A.'s Office, particularly in high profile or serious cases where arrest and conviction is most desired by the Office. The policy led directly to the violations of Plaintiff's constitutional rights before and during his trial, his wrongful conviction, and the subsequent cover-up of police and prosecutors' wrongdoing, which greatly prolonged Plaintiff's wrongful imprisonment and other damages.

204.    More specifically, it was the policy of Hynes to directly encourage, or be indifferent to and thereby indirectly encourage prosecutors, detective-investigators, and NYPD detectives working with them to abuse lawful process to gain custody of vulnerable witnesses in order to coerce them into giving inherently unreliable or false testimony favorable to the prosecution.   The above law enforcement officials would use the following illegal tactics to coerce witnesses:

(a)    Issuing unauthorized and unlawful "office" subpoenas to compel witnesses to attend interviews at their office, despite numerous judicial decisions making clear that such process was unlawful;

(b)    Lying to courts about their need and entitlement for material witness warrants, thereby obtaining authorization to bring purportedly recalcitrant witnesses directly to court for appointment of counsel and a judicial hearing, only to then detain the witness and hold them, where they would threaten, intimidate, or cajole them into "cooperating" and remaining in their custody until completing their testimony at trial;

(c)    Misleading courts to issue orders allowing them to take custody of incarcerated witnesses  and interview them at the D.A.'s office in the presence of the witnesses' counsel, only to then interrogate such witnesses without notifying their counsel;

(d)    Causing the New York State Division of Parole and the State Department of Corrections to illegally revoke the release of prisoners so that prosecutors could gain custody of them with indefinite imprisonment unless they "cooperated" by testifying favorably for the prosecution; and

(e)    Coercing witnesses who have been arrested on unrelated charges to "cooperate" by exploiting their drug withdrawal and dependency, holding them prisoner while threatening to interrogate them indefinitely, and threatening harsh prosecution and imprisonment while simultaneously holding out a carrot stick of leniency and monetary reward.

205.    It was Hynes's policy as well to tolerate, and thereby encourage, violations of his Office's constitutional obligation to make timely disclosure to the defense of exculpatory or impeachment information known as *Brady* material.   His deliberate indifference to such

violations created an "anything goes" atmosphere that caused such violations to continue, including in Plaintiff's case.

206. In this regard, prosecutors and investigators were permitted and/or encouraged to refrain from making any record of false or inconsistent out-of-court statements of prospective prosecution witnesses in order to avoid creating "*Rosario* material" that would have to be disclosed to the defense under State law, even though this policy also resulted in prosecutors ultimately not disclosing the same information as *Brady* material. Indeed, under the Office's "riding" policy, prosecutors were permitted and even encouraged to make a record of statements that tended to inculpate a suspect or defendant, while ignoring statements that were inconsistent with their belief about the suspect's or defendant's guilt.

207. Hynes's prosecutors were permitted and/or encouraged to withhold recantation evidence, as well as statements and evidence, including 911 tapes, tending to prove a defendant's innocence, unless they "believed" such evidence, thus depriving the defense and the jury of vital information, required to be disclosed under *Brady* that was necessary to evaluate witnesses' credibility and defendants' guild or innocence.

208. Prosecutors, in violation of *Brady*, were permitted and/or encouraged to refrain from disclosing material witness applications, order, and proceedings, relocation assistance promised or provided to witnesses, and other pressure tactics, promises, or rewards used to influence witnesses.

209. Prosecutors were permitted and/or encouraged not to comply with the Office's ongoing *Brady* obligations after trial, to resist defendants' efforts to obtain disclosure to appeal, during collateral attacks on convictions, or through FOIL requests, and to even lie to or mislead

courts in affidavits and testimony, all in order to cover up the original misconduct and defeat defendants' efforts to expose misconduct and overturn wrongful convictions.

210.    While prosecutors were told in theory to comply with their *Brady* obligations, they were not told there would be negative consequences to them if they failed to comply, and in fact, there was no compliance or negative consequences.

211.    Hynes had no employee handbook, manual, or other document setting forth any disciplinary process for such misconduct, or potential sanctions for them.

212.    Despite dozens of court decisions, 56 of which are listed in Ex. H, finding that prosecutors had wrongfully failed to disclose evidence actually or potentially favorable to the defense that should have been disclosed under *Brady, Rosario*, or statutorily-mandated discovery procedures, or otherwise had engaged in conduct that misled the court, jury, and/or defense, none of the prosecutors involved were disciplined.  They were not fired or suspended, fined, or demoted.  Notations were not placed in their personnel files.  They were not reported to outside disciplinary bodies.  To the contrary, in opposing defendants; efforts to overturn their convictions in such cases, Hynes almost always defended the propriety of his assistants' behavior, thereby ratifying it or at least signaling his tolerance of it – just as he did in Plaintiff's case – and such personnel continued to receive raises, bonuses, and promotions.

213.    A number of case handle by Hynes's office during the time period of Plaintiff's prosecution evidence the above policies and patterns of misconduct by Hynes's staff and Hynes's approval or toleration of such behavior.

214.    Early in his tenure, Hynes communicated to his employees his views about witness coercion and abusing court process by vigorously defending his Office's murder

conviction obtain in *People v. Russ,* 79 N.Y.2d 152 (1992). The case was built on the testimony of two teenage girls who, before trial, recanted their statements to police and to the grand jury. When one of the girls, Ms. Lawrence, testified that she had not seen the defendant commit the crime and then, in the midst of being challenged by the prosecutor, invoked her Fifth Amendment right against self-incrimination, the following astounding events occurred, according to the New York Court of Appeals' opinion:

> [T]he prosecution interrupted Lawrence's midafternoon testimony and obtained a continuance. Lawrence, then 17 years old was (1) arrested; (2) charged with perjury; (3) taken in handcuffs crying and threatened with 2 to 7 years in prison; (5) removed to Central Booking for fingerprinting; (6) held until 5:00 A.M. the next morning without sleep; (7) moved to a precinct lockup; and (8) returned to court at 9:00 A.M. where she was kept in handcuffs except for her time on the stand. Lawrence's post arrest and post incarceration testimony, tended to inculpate defendant by describing his role in the mugging, resulted immediately in the perjury charges being dropped. She was only then released from police custody. (79 N.Y.2d at 177)

215.    In reversing the conviction, the Court condemned the "egregious" behavior of the BDAO in "legally" coerce[ing Lawence's] testimony." *Id.* (citing *Rochin v. California*, 342 U.S. 165, 172 (1992) (conduct that "shocks the conscience"). That the jury heard what had occurred and could judge the witness's credibility was "not adequate," the Court's emphasized. "Experience has taught that such reliance offers only chilly comfort to prejudiced defendants, no less than to innocent victimized witnesses, and to maintenance of the integrity of the criminal justice process". *Id.*

216.    Shortly after the *Russ* decision, prosecutors under Hynes showed that they would take their lead from Hynes, not the Court of Appeals, in *People v. Ruddy Quezada,* police detectives working with the BDAO secretly arrested the prosecution's principal witness, Sixto

Salcedo, on a material witness order the BDAO had obtained. Instead of taking him to court, they kidnapped him, and held him with his wife incommunicado at the Marriott Hotel at LaGuardia Airport, where they threatened him with prison unless he conformed his trial testimony to his grand jury testimony. Neither the material witness order, the detention at the hotel, nor the other coercive threats to this witness was disclosed to the defendants, who were convicted.

217.    Years later, Salcedo recanted his trial testimony, and other witnesses emerged showing that the defendant, contrary to the People's case, had not committed the shooting. When Quezada, in 2003 moved in State court to vacate his conviction, the trial prosecutor, who was still in the office, ADA Ephraim Shaban, presented the sworn testimony of the detective, Thomas Buda, to deny that any material witness order had been obtained, that Salcedo had been arrested, or that he had been held at a hotel, and argued that Salcedo's "false" allegations of coercion undermined the credibility of his recantation. *See People v. Quezada*, 16 Misc.3d 1113(A) (Sup. Ct., Kings Co. 2007) (Gerges, J.). The people were successful. The court denied the defendant's motion, leave to appeal was denied, and it appeared he would never be able to challenge his conviction, since he already had lost a federal habeas corpus petition and by law had the right to bring just one.

218.    However, in a highly unusual decision, the United States Court of Appeals directed that the Federal District Court permit Quezada to pursue his second habeas petition. *See Quezada v. Smith,* 624 F.3D 514 (2D Cir. 2010).

219.   Just as in Plaintiff Lopez' case, Quezada's attorneys sought discovery, and the BDAO then had no choice but to reveal facts that it had been falsely denying, through knowingly reliance on perjury, for over twenty years.

220.   Shortly after the trial in the *Quezada* case, the same judge who had presided, Justice Abraham G. Gerges, denounce the practice of the BDAO to misuse the court's subpoena process to coerce witnesses. In a decision published July 7, 1994, Justice Gerges, in still another murder case being prosecuted by the BDAO, condemned a homicide ADA for serving a subpoena on a witness on a day there would be no testimony "in the hope that it would coerce the witness into consenting to be interviewed prior to testifying," found this to be "unprofessional conduct" under numerous prior court decisions outlawing the practice, and admonished the BDAO that the "practice should not be replicated." *People v. Neptune*, 161 Misc.2d 781, 785, 615 N.Y.S.2d 265, 267 (Sup. Ct., Kings Co. July 7, 1994) (emphasis added) (quoting *People v. Natal,* 75 N.Y.2d 379, 385 (1990)).

221.   Immediately thereafter, in another murder case prosecuted by Hynes's bureau, *People v. Brian Bond,* Ind. No. 13991/91, the assigned ADA defied Justice Gerges and the decisions of the Court of Appeals and the Appellate Division upon which his decision had been based.   ADA Stan Irvin and detective-investigators working under his direction illegally subpoenaed all prospective witnesses to their Office to coerce them to submit to office interviews before testifying at the trial. Without disclosing to the court the impropriety of his subpoenas, Irvin then obtained material witness orders authorizing the arrest of any witness who failed to comply with the subpoenas.

222.    One witness, a crack addict named Carmen Green, had told police detectives and detective-investigators that she had not seen the incident in question at all.   When BDAO detective-investigators found her, they noted that she was too 'impaired" to comply with the subpoena. They knew as well that she was under investigation for, and feared, that she and her children would be arrested for dealing drugs out of her apartment.   Obtaining a material witness warrant authorizing Green to be taken "forthwith" to court, where an attorney would be appointed for her, Irvin had her brought to his Office, where he and the detectives threatened her with incarceration and interrogated her on and off for eight hours.   Only after she agreed to remain in their custody "voluntarily" did they finally bring her to court, after midnight, so that a judge could sign an order ratifying her "consent" to be detained until the conclusion of her testimony.

223.    The prosecutor, ADA Irvin, then violated the BDAO's *Brady* obligations by not disclosing to the defense Green's prior statements denying having seen the shooting, her eight hour unlawful interrogation, her "impairment" on drugs, the threats to arrest her and her family, and promises to relocate her at public expense.   Nor did he disclose the statements of her other family members that she was not present during the shooting, or that they, too, had been promised, and did receive, relocation assistance.   Bond was convicted, in December, 1994, of murder.

224.    During an evidentiary hearing held in 1998 concerning Bond's subsequent motion to vacate his conviction due to *Brady* and related constitutional violations, an unapologetic ADA Irvin testified that it was the Office's *regular practice* to pick up witnesses on

material witness warrants and, instead of bringing them directly to court "forthwith" as such warrants direct, to forcibly take them for interrogation to the D.A.'s Office.

225.    In 2000, the New York Court of Appeals vacated Bond's conviction due to the Office's failure to disclose Green's statements denying having seen the homicide. The Office's Appeals Bureau had argued, on behalf of District Attorney Hynes, that it had no obligation to disclose statements that, in its view, were "untrue".

226.    In August and September, 1994, during the BDAO's investigation of an NYPD Detective, Zaher Zahrey, on corruption allegations, detectives working under the supervision of ADA Charles Guria obtained court orders to produce a prospective witness, Sidney Quick, who was a crack addict and a career criminal, for interviews on the condition that his attorney would be present, but then, with Guria's approval, interrogated him without notifying his attorney.

227.    In March, 1995, after Quick had been sent upstate to serve his sentence, detectives, with Guria's approval, again met with Quick without his attorney, and, through a combination of coercion and excessive promises of speedy release, caused him to adopt a story they suggested to him, implicating the target of their investigation, which they knew from other evidence was false. They tape recorded this meeting and gave the tape to Guria, who listened to it, heard the coercion and improper promises, and heard the encouragement of Quick to adopt a false story. Remarkably, rather then condemn the detective's tactics, he told them that Quick's statements were "promising."

228.    In or about January, 1996, detectives working directly under Guria's supervision arrested several other individuals in the hope of turning them into State's witnesses, took them

to remote locations instead of to court, and illegally interrogated them in violation of their right to counsel and to prompt arraignment.

229.    Because none of Quick's false story could be corroborated, which is a prerequisite for prosecution under New York, but not Federal law, Guria and his colleagues obtained Hynes's approval to recommend the case to federal authorities for prosecution. However, in doing so, they do not disclose the tape, the improper interrogation tactics used with Quick, or numerous of Quick's prior inconsistent statements.  When Quick inadvertently disclosed to the Federal prosecutor that he had been taped, Brooklyn ADA's delayed disclosing the tape for several weeks to ensure that the federal authorities went ahead with the high-profile indictment and publicly committed themselves to the case.  Zahrey ultimately was acquitted, but not until he had spent nearly nine months in pretrial confinement.  (Guria was then appointed as the Chief of the BDAO's Civil Rights Bureau.)

230.    Also in 1994, Hynes ratified the misconduct of his Office in the Sami Leka murder prosecution.  Leka was convicted, in March, 1990, early in Hynes's tenure as District Attorney, of murdering a relative on a Brooklyn street.  Shortly after the conviction Leka moved to vacate his conviction because the prosecution had actively suppressed from the defense its knowledge that an off-duty police officer's observation of the shooting from his apartment window was flatly inconsistent with the People's proof at trial, which consisted of a highly questionable identification testimony of two traumatized passersby, and had suppressed two other witnesses' potentially exculpatory statements.  Not only did the BDAO vigorously oppose the defendant's motion and appeal; *Hynes* wrote Leka's new defense counsel that he had *"personally* reviewed the facts and circumstances: of the case and "Mr. Leka's due process

rights as a defendant were *amply* and *ably protected*" (emphasis added).  However, in 2001, the United States Court of Appeals vacated Leka's conviction, finding that the BDAO had actively "suppressed" exculpatory evidence, decrying one of its arguments as "ridiculous", and concluding that the evidence the prosecution had suppressed would have had a "seismic impact" upon the results of the trial.  *Leka v. Portuondo*, 257 F.3d 89 (2.d Cir. 2001).  With the only two identification witnesses having recanted their testimony, the DBAO was forced to dismiss the case and Leka, an apparently innocent man, was released after serving 12 years in prison."

231.     Hynes has been on notice over the years, beginning before the Plaintiff's trial, of credible allegations of overzealousness and misconduct directed specifically at the individual Defendants, but has consistently encouraged misconduct by the rest of his staff by his indifference to such allegations.

232.     The foregoing violations of Plaintiff's federal constitutional rights and resultant injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant, CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the BDAO, namely:

> (a)     the institution and implementation of plainly inadequate of unlawful policies, procedures, regulations, practices and/or customs concerning:
>
> > i.       the duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings, including bail hearings, pretrial hearings, and trial;
> >
> > ii.      the continuing obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred, including moving or consenting to overturn convictions

discovered to have been obtained through such unconstitutional means;

iii.   the continuing duty to obtain, to preserve, and to make timely disclosure to the appropriate parties, including the court and the defense, during criminal investigations and prosecutions, of all material evidence or information favorable to a person suspected, accused or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching the credibility or undercutting the reliability of prosecution witnesses, and including verbal as well as recorded information; and

iv.   the duty to refrain form abusing court process or other wise coercing or manufacturing false or inherently unreliable statements and testimony from witnesses;

(b)   the failure to adequately instruct, train, supervise, and discipline their employees with respect to such matters.

233.   The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant, CITY OF NEW YORK, including, but not limited to, the District Attorney of Kings County and his delegates who knew:

(a)   to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)   that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c)   that the wrong choice municipal employees make concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

234. The aforementioned policymaking officials had the knowledge alleged in the preceding paragraph, based upon, among other circumstances:

(a) as noted above, numerous credible allegations, many substantiated by judicial decisions, that police officers and ADA's, had wrongfully withheld, lost, or destroyed evidence favorable to the defense that the prosecution had been required to timely disclose to the defense under *Brady*, had presented or failed to correct false or misleading testimony and argument, and/or had abused judicial process to coerce false or inherently unreliable statements or testimony from witnesses;

(b) civil lawsuits, some of which resulted insubstantial civil settlements, alleging that police and/or ADA's have falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crime;

(c) numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with the rules;

(d) Judicial decisions putting the Kings County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADA's regarding their *Brady* and related due process obligations, including their obligations not to abuse judicial process or coerce false or unreliable statements and testimony, *see, e.g., Walker v. City of New York,*974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York,* 285 a.d.2D 284, 729 N.Y.S.2d 678, 692-96 (1ST Dept. 2001), *Leka v. City of New York* , 04 CV 8784 (DAB) and *Zahrey v. City of New York, et. al.,* 98 Civ. 4546 (DCP);

(e) the inherent obviousness of the need to train, supervise and discipline ADA's in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

235. Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant, CITY OF NEW YORK perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train and/or supervise their personnel with regard to the proper

constitutional and statutory requirements in the exercise of their authority, had no employee

handbook or other published practices, policies or procedures for investigating and disciplining

prosecutors who had engaged in *Brady* violations and related constitutional violations, and did

not discipline or otherwise properly supervise the individual personnel who engaged in such

practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices

and/or customs, described above, with deliberate indifference to the effect of said policies,

procedures, regulations, practices and/or customs upon the constitutional rights of resident

and citizen of the City and the State of New York.

236.    The aforesaid policies, procedures, regulations, practices and/or customs of

Defendant, CITY OF NEW YORK were collectively and individually a substantial factor in bring

about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of the United

States in causing his damages.

237.    Under the principles of municipal liability for federal civil rights violations, the

District Attorney of Kings County (or his authorized delegates) has final managerial

responsibility for training, instructing, supervising and disciplining attorneys and other

employees in his office regarding their conduct in the prosecution of criminal matters,

including, but not limited to, their obligations not to coerce witnesses or manufacture false or

unreliable "evidence", not to abuse judicial process, to make timely disclosure of exculpatory

evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and

to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and

post-trial proceedings.

238.     The Kings County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

239.     The District Attorney of Kings County at all relevant times was and is an elected officer of Kings County, one of the constituent counties of Defendant CITY OF NEW YORK, and the Office was and is funded out of the CITY OF NEW YORK's budget.

240.     Furthermore, the District Attorney was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York provided by statute (N.Y. County Law §§ 53, 941) that the CITY OF NEW YORK's constituent counties (including Kings County), and hence Defendant, CITY OF NEW YORK itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

241.     The District Attorney of Kings County, Charles J. Hynes, personally and/or through his authorized delegates, at al relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

242.     During all times material to this Complaint, the CITY OF NEW YORK, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

243.    By virtue of the foregoing, Defendant CITY OF NEW YORK is liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## TENTH CAUSE OF ACTION

### (Negligent Hiring, Training and Supervision Under State Law; Defendant City of New York)

244.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 214   of this Complaint.

245.    By virtue of the foregoing, Defendant, CITY OF NEW YORK is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the BDAO and/or the NYPD with regard to their aforementioned duties.

## DAMAGES DEMAND

**WHERFORE,** Plaintiff demands judgment against the Defendants as follows:

a.    For compensatory  damages of not less than $24 million;

b.    For punitive damages of not less than $100 million.

c.    For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1099 and to the inherent powers of this Court;

d.    For such other and further relief as this Court may deem just and proper.

Dated:      Glen Head, New York
            July 24, 2014

                                LAW OFFICES OF DENNIS J. KELLY, P.C.

                                Dennis Kelly, Esq.

*Attorneys for Plaintiff*
137 Glen Head Road
Glen Head, New York 11545
Telephone: (516) 686-6768
Facsimile:  (516) 686-6771

To:     Corporation Counsel of the City of New York
        All Defendants

Index No.: 1;14-CV-03743-BMC
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

ALICE LOPEZ, as Administrator of the Estate of
WILLAM LOPEZ,

                                    Plaintiff(s),

        -against-

THE CITY OF NEW YORK, ASSISTANT DISTRICT ATTORNEY
TESS ALLEN, ASSISTANT DISTRICT ATTORNEY LENI
KLAIMITZ, Individually and as Employees of the KINGS
COUNTY DISTRICT ATTORNEY'S OFFICE, DETECTIVE
PATRICK BOYLE, DETECTIVE PHILIP GRIMALDI, DETECTIVE
PHILIP KURDIS, and DETECTIVE W.P. BUCKLY, Individually
and as Employees of the NEW YORK CITY POLICE
DEPARTMENT,

                                    Defendant(s).

-------------------------------------------------------------------------X

## SECOND AMENDED COMPLAINT

### LAW OFFICES OF DENNIS J. KELLY, P.C.
137 Glen Head Road
Glen Head, New York 11545
Telephone: (516) 686-6768
Facsimile: (516) 686-6771

---

*Pursuant to 22 NYCRR 130.1.1, the undersigned, and attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed documents are not frivolous.*

*Dated: November 26, 2014*                  Signature: _____
                                            Print Name: Dennis Kelly, Esq.

---

Service of a copy of the within SECOND AMENDED COMPLAINT is hereby admitted

Dated: November 26, 2014                    _____

                                            Attorney(s) for Plaintiff