EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

WILLIAM LOPEZ,                                          **MEMORANDUM & ORDER**

                     Petitioner,                      **02-CV-3988 (NGG) (LB)**

     -against-

DAVID L. MILLER, Superintendent, Eastern
Correctional Facility,

               Respondent.

------------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

     The case of William Lopez began twenty-three years ago. It was rotten from day one.

     In 1989, a man entered a crackhouse in Brooklyn and shot and killed a drug dealer named Elvirn Surria. Lopez was charged with murder for this shooting. After a jury trial before Justice Carolyn Demarest in New York Supreme Court, Lopez was convicted and sentenced to twenty-five years to life in prison. His direct appeal and state collateral proceeding—again before Justice Demarest, twenty years later—were unsuccessful. Lopez now asks this court to grant his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"), which argues, among other things, that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments. The court resolves this Petition today.

     Any discussion of Lopez's case must begin with the weakness of the evidence the prosecution presented at trial. Lacking a murder weapon or any forensic evidence connecting Lopez to the shooting, the prosecution relied upon the testimony of two witnesses who were present at the crime scene, only one of whom identified Lopez.

1

The first, Daisy Guadalupe Flores Lopez ("Flores," and no relation to the Petitioner), came face-to-face and spoke with the shooter but did not recognize Lopez when she saw him in the courtroom. She described the shooter as a "tall, dark, black" man above 6'3" in height. Lopez is around 5'7" and the State later conceded that his "complexion could not be described as black." Justice Demarest agreed that it was "not possible [that] this defendant could have committed the crime based upon [Flores's] description."

The second witness was Janet Chapman. On the morning of the shooting, Chapman was in a room in the basement of the crackhouse in the midst of a two-day crack binge, and admittedly had smoked ten to twelve vials of crack in the two hours prior to the shooting. She told a prosecutor after the crime that she did not witness the shooting but saw Lopez with a gun, went back into her room, and then heard a shot and a body fall. At the trial itself, she switched gears and testified that she did in fact see Lopez shoot Surria through the partially ajar door to her room. After trial, Chapman changed her story yet again, this time even more dramatically—she claimed that Lopez was not present at all at the scene of the crime and that her testimony had been a "pure fabrication" made under duress from the prosecution.

Just as important are those who did not testify. Lopez claims he told his trial attorney that his mother-in-law and sister-in-law (the "alibi witnesses") were ready to testify that Lopez had been with them around the time of the crime. Counsel later stated that he had interviewed one witness and decided not to call her. But both witnesses have since submitted affidavits swearing that counsel never spoke to either of them regarding an alibi defense and describing in detail their interactions with Lopez around the time of the murder.

Another key non-witness was Earline Cafield, who knew Janet Chapman when both of them were inmates at Rikers Island jail. After trial but prior to sentencing, Cafield sent a letter to

2

a prosecutor stating that Chapman had told her that someone other than Lopez had committed the

crime.  The prosecution forwarded this letter to Lopez's counsel, but counsel never mentioned its

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

WILLIAM LOPEZ,                                            **MEMORANDUM & ORDER**

                              Petitioner,                **02-CV-3988 (NGG) (LB)**

        -against-

DAVID L. MILLER, Superintendent, Eastern
Correctional Facility,

                              Respondent.

------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

        The case of William Lopez began twenty-three years ago.  It was rotten from day one.

        In 1989, a man entered a crackhouse in Brooklyn and shot and killed a drug dealer named

Elvirn Surria.  Lopez was charged with murder for this shooting.  After a jury trial before Justice

Carolyn Demarest in New York Supreme Court, Lopez was convicted and sentenced to

twenty-five years to life in prison.  His direct appeal and state collateral proceeding—again

before Justice Demarest, twenty years later—were unsuccessful.  Lopez now asks this court to

grant his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (the "Petition"), which

argues, among other things, that he received ineffective assistance of counsel in violation of the

Sixth and Fourteenth Amendments.  The court resolves this Petition today.

        Any discussion of Lopez's case must begin with the weakness of the evidence the

prosecution presented at trial.  Lacking a murder weapon or any forensic evidence connecting

Lopez to the shooting, the prosecution relied upon the testimony of two witnesses who were

present at the crime scene, only one of whom identified Lopez.

1

The first, Daisy Guadalupe Flores Lopez ("Flores," and no relation to the Petitioner), came face-to-face and spoke with the shooter but did not recognize Lopez when she saw him in the courtroom. She described the shooter as a "tall, dark, black" man above 6'3" in height. Lopez is around 5'7" and the State later conceded that his "complexion could not be described as black." Justice Demarest agreed that it was "not possible [that] this defendant could have committed the crime based upon [Flores's] description."

The second witness was Janet Chapman. On the morning of the shooting, Chapman was in a room in the basement of the crackhouse in the midst of a two-day crack binge, and admittedly had smoked ten to twelve vials of crack in the two hours prior to the shooting. She told a prosecutor after the crime that she did not witness the shooting but saw Lopez with a gun, went back into her room, and then heard a shot and a body fall. At the trial itself, she switched gears and testified that she did in fact see Lopez shoot Surria through the partially ajar door to her room. After trial, Chapman changed her story yet again, this time even more dramatically—she claimed that Lopez was not present at all at the scene of the crime and that her testimony had been a "pure fabrication" made under duress from the prosecution.

Just as important are those who did not testify. Lopez claims he told his trial attorney that his mother-in-law and sister-in-law (the "alibi witnesses") were ready to testify that Lopez had been with them around the time of the crime. Counsel later stated that he had interviewed one witness and decided not to call her. But both witnesses have since submitted affidavits swearing that counsel never spoke to either of them regarding an alibi defense and describing in detail their interactions with Lopez around the time of the murder.

Another key non-witness was Earline Cafield, who knew Janet Chapman when both of them were inmates at Rikers Island jail. After trial but prior to sentencing, Cafield sent a letter to

2

a prosecutor stating that Chapman had told her that someone other than Lopez had committed the crime. The prosecution forwarded this letter to Lopez's counsel, but counsel never mentioned its contents to Justice Demarest.

Finally, just a few months ago, Lopez's habeas counsel was able to track down a man named Cesar Diaz in the Dominican Republic. At an evidentiary hearing before this court, Diaz testified via videoconference that he was in the crackhouse when Surria was killed and saw the shooting. Diaz described the shooter as a "black, dark-skinned" man approximately 5'3" in height. When shown a mug shot of Lopez taken soon after the murder, Diaz said he was "certain" that the person in the picture was not the shooter.

In short, the prosecution's evidence was flimsy to begin with and has since been reduced to rubble by facts arising after trial. Habeas relief, however, is an extraordinary remedy, particularly for those prisoners who are in custody pursuant to a judgment of a state court. Lopez has a number of challenging hurdles to surpass if he is to receive it.

The first is a procedural hurdle. Lopez's Petition is indisputably untimely under the one-year statutory limitation period prescribed for habeas petitions from state prisoners. See 28 U.S.C. § 2244(d)(1). He argues, however, that he should be excused from this limitation period because he has made a credible and compelling showing that he is actually innocent of the crime. See Rivas v. Fischer, 687 F.3d 514, 518 (2d Cir. 2012). To establish a "gateway" claim of actual innocence and thus overcome his procedural default, Lopez must demonstrate using "'new reliable evidence'" that it is "'more likely than not . . . [that] no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" Id. at 541 (quoting House v. Bell, 547 U.S. 518, 538 (2006), and Schlup v. Delo, 513 U.S. 298, 324 (1995)). Based on the weakness of the

prosecution's case and the new evidence Lopez has presented since trial, the court concludes that any reasonable juror would have reasonable doubt as to his guilt; he is thus excused from the limitation period. (See Part II.)

The second hurdle is one of state-court deference. Lopez's ineffective assistance of counsel claim was rejected on the merits by Justice Demarest during Lopez's collateral state court proceeding. This means that under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), the court may not grant habeas relief unless Justice Demarest's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). The court concludes that Justice Demarest's analysis of the new evidence Lopez submitted in support of his ineffective assistance claim was an unreasonable determination of the facts under § 2254(d)(2). Indeed, her refusal to hold an evidentiary hearing to develop the central factual disputes underlying Lopez's claim—without so much as an explanation—is baffling, not to mention unfortunate because the two alibi witnesses are now no longer available to testify. (See Part III.A.)

Finally, there is a constitutional hurdle. Putting aside the reasonableness of Justice Demarest's adjudication of his claim, Lopez must show that he is being held in custody in violation of the United States Constitution. See 28 U.S.C. § 2254(a). For his ineffective assistance of counsel claim, he must show: (1) that his counsel's representation "fell below an objective standard of reasonableness"; and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Lopez has satisfied this standard

4

because of his trial counsel's failure to call his available alibi witnesses, a decision that had no basis in reasonable trial strategy and undermines the court's "confidence in the outcome" of Lopez's trial. Id. at 694. (See Part III.B.)

For these reasons and those set forth below, Lopez's Petition for Writ of Habeas Corpus is GRANTED.

I.    BACKGROUND

A.    Trial Evidence and Proceedings

The evidence at trial shows that on August 31, 1989, sometime after 2:00 a.m., two men entered the basement of a crackhouse at 3053 Brighton Fifth Street in Brooklyn and demanded money and drugs from a drug dealer named Elvirn Surria. (Trial Tr. (Dkt. 59-2) at 247-50.) One of the men shot Surria twice with a double-barreled shotgun. (Id. at 250-54.) The weapon was not recovered (id. at 427), but Surria was later determined to have died from a single shotgun wound to the abdomen (Trial Tr. (Dkt. (59-1) at 161-62). William Lopez was charged for this shooting in New York Supreme Court, Kings County. (Goodman Aff. (Dkt. 59) ¶ 5.) Following a jury trial before Justice Carolyn Demarest, he was convicted of second-degree murder, second-degree criminal possession of a weapon, and third-degree criminal possession of a weapon. (Trial Tr. (Dkt. 59-3) at 722-23.) He was sentenced to concurrent terms of imprisonment totaling twenty-five years to life. (Sentencing Tr. (Dkt. 59-3) at 21.)

Two eyewitnesses testified at trial. The court will discuss each of their testimony in turn.

1.    Testimony of Daisy Guadalupe Flores Lopez

Daisy Guadalupe Flores Lopez was an immigrant from El Salvador. (See Trial Tr. (Dkt. 59-2) at 229.) On August 31, 1989, she was working at the crackhouse for Surria, whom she knew as "Moreno"; her job was to open the door to the crackhouse and hand people drugs. (Id.

at 229-30, 232, 247-54.) She "[n]ever" used drugs herself but accepted the job from Surria because she had been unable to secure other employment. (Id. at 254-55.)

Drug deals at the crackhouse took place at a side door entrance into the building. (Id. at 235.) The side door was the only point of entrance and exit into the basement, which was down the stairs past the side door after entry. (Id. at 232-37, 334.) There were five rooms in the basement. (Id. at 331-32.)

At around 2:00 a.m. on the morning of the shooting, Flores went down with Surria to one of the rooms in the basement of the crackhouse, and the two talked for awhile and listened to music. (Id. at 247-48.) At one point Flores went upstairs to the side door entrance and sold drugs to a girl. (Id.) She then went back downstairs to the basement. (Id.)

"Seconds later," someone knocked on the side door. (Id.) Surria went upstairs to the side door and Flores stayed downstairs. (Id. at 248-49.) Two armed men, one carrying a double-barreled shotgun, pushed Surria downstairs into the basement room occupied by Flores. (Id. at 249-50.) The two men demanded money and drugs from Surria and began searching the room. (Id. at 249.) Surria got angry and tried to grab their weapons. (Id. at 255-56.)

The man with the shotgun then shot Surria twice and Surria fell to the floor. (Id. at 249, 251.) He pointed the gun at Flores, but, after Flores pleaded for her life, he did not shoot her. (Id. at 250.) The two men searched the basement and Surria's pockets and took money and some pills. (Id. at 251-54.) After the men left, Flores stayed in the basement for a few minutes and then called an ambulance. (Id. at 251.)

Flores offered a description of the shooter at trial. To fully understand this description, it is important to note the events at a hearing Justice Demarest conducted in the absence of the jury prior to Flores's testimony.

During that hearing, both Lopez's counsel—William Lupo—and Assistant District Attorney Tess Allen ("A.D.A. Allen") asked Flores to look around the courtroom to see if she recognized someone. (Id. at 216-17, 223.) Although Lopez was in the room, Flores stated multiple times—and in response to both attorneys' questions—that she did not recognize anyone and that she did not see the shooter. (Id. at 217, 223.) After A.D.A. Allen persisted in seeking permission from Justice Demarest to attempt to elicit an identification from Flores during trial (see id. at 223-26), Justice Demarest ordered A.D.A. Allen to instruct Flores that she was not to offer any identification of a person in the courtroom (id. at 226). Justice Demarest stated: "This ruling is the identification by this witness, she has clearly testified unequivocally, and I see her looking around and saw her look at the defendant, I don't think there's any question that she cannot recognize him. The identification is suppressed in any way, shape or form." (Id. at 225.)

After Flores's testimony resumed, A.D.A. Allen asked Flores to describe the shooter, and Flores answered that he was "tall, dark, black," "Hispanic," and appeared "drugged." (Id. at 258-59.) Lupo then cross-examined Flores. In response to Lupo's questioning, Flores testified that the shooter was a "little tall[er]" than Lupo and approximately Lupo's size. (Id. at 260.)

During a hearing before the court at the end of trial, Lupo stated: "I would ask the Court, for the purpose of this record, to indicate that I am approximately six-feet-three and 245 to 50 pounds, and that the defendant in this case is approximately 150 pounds, about five-feet-seven and is white, or light-skinned." (Id. at 528.) A.D.A. Allen refused to stipulate to the defense counsel's description of Lopez's height and weight, but stated that "[t]he Court certainly can judicially note at this time that Mr. Lopez's complexion could not be described as black." (Id.) Lopez has since submitted documentation showing that he is 5'7" and light-skinned. (Frost Aff. (Ex. P to Resp. Opening Opp'n (Dkt. 59-5)) ¶ 6 (affidavit from Lopez's investigator averring that

7

he met Lopez and that Lopez was approximately 5'7" and "light-skinned"); Department of Correctional Services Inmate Photographs (Dkt. 109-1) (showing Lopez's height and weight on September 26, 2012, as 5'7" and 165 pounds, respectively, and describing his race as "White"); Institutional Admission Form (Dkt. 109-1) (indicating on May 13, 1991, that Lopez was 5'7" and white).) In its brief in opposition to Lopez's motion to vacate judgment, the State acknowledged that Lopez was no taller than 5'9". (People Aff. in Opp'n to Mot. to Vacate J. (Ex. R. to Resp. Opening Opp'n (Dkt. 59-6)) at 9.)[1]

After the jury convicted Lopez, Lupo moved to set aside the verdict on the grounds that it was against the weight of the evidence, arguing again that Flores's description of the shooter did not fit Lopez's characteristics. (Trial Tr. (Dkt. 59-3) at 729-31.) Justice Demarest agreed with Lupo that "it appeared not possible [that] this defendant could have committed the crime based upon [Flores's] description." (Id. at 732.) Nevertheless, she found that she was required to "assume the jury accepted [Janet Chapman's] testimony," and thus denied Lopez's motion. (Id.)

### 2.   Testimony of Janet Chapman

Janet Chapman (also known as "Janet Chamber," "Janet Chaplan," and "Ashley Foster") was living in a room in the basement of the crackhouse at the time of the shooting. (Trial Tr. (Dkt. 59-2) at 331-32, 350, 381.) She was twenty-two years old, unemployed, and had a $200-per-day crack habit, which she supported through prostitution. (Id. at 382.) Chapman had been previously convicted twice of misdemeanor drug possession, twice of prostitution, and once for a drug sale. (Id. at 382.)

---

[1]      There are a few documents in the record prepared by members of the New York Police Department ("NYPD") that indicate Lopez's height as 6'2". (NYPD Worksheet (Ex. X to Resp. Opening Opp'n (Dkt. 59-6)); Exs. A & B to Frost Aff.)  The court considers these documents to be outliers and does not credit them in light of the multiple other documents showing Lopez's height as 5'7". In any event, the State has conceded that Lopez is no taller than 5'9" (People Aff. in Opp'n to Mot. to Vacate J. at 9)—still significantly shorter than 6'3".

Chapman testified that at approximately 2:00 a.m. on the morning of the shooting, she was in her room smoking crack with her friend Howie Sachs. (Id. at 350, 353, 355-56, 389-90.) Sachs had been "shooting up" cocaine (i.e., injecting rather than smoking or snorting it) for several days; he was "very high" and was not "aware of anything that was going [on] around him." (Id. at 356, 358, 389.) Chapman had not slept for two days and had smoked ten to twelve vials of crack in the two hours before the shooting. (Id. at 368, 389-91, 485-86, 512-16.)

At some point that morning, Chapman heard "a girl's voice" and Surria's voice speaking in Spanish, a language that Chapman did not understand. (Id. at 354.) Someone then knocked on the side door to the crackhouse. (Id.) Chapman testified that, looking out from the partially ajar door to her room, she saw Surria walk down the stairs with Lopez (a.k.a. "Billy"), whom she had known from the neighborhood for over a year. (Id. at 354-55, 359.) The two seemed to be arguing in Spanish; Chapman did not understand what they were saying. (Id. at 354.)

Through the crack in the door, Chapman saw Lopez point a shotgun at Surria and fire, after which she saw some smoke and heard (but did not see) Surria fall to the ground. (Id. at 355, 358, 364-66.) She then saw Lopez put his gun down and check Surria's pockets but did not see him take anything. (Id. at 366.) Chapman then went back into her room. (Id. at 369.) After Lopez left the crackhouse, Chapman waited for about five minutes and left herself. (Id.)

Chapman did not call the police after the shooting. (Id. at 369-70.) She testified that she did not come forward immediately because she was "scared," "didn't believe there w[ere] any innocent people involved," and "was doing drugs at the time." (Id. at 491.)

On September 29, 1989, Chapman was arrested for prostitution. (Id at 370-71.) She was taken to a police station, was interviewed by a detective, and then gave a sworn audiotaped

9

statement to an assistant district attorney concerning the Surria homicide. (Id. at 393, 395-96, 468-85.) She subsequently viewed a lineup and identified Lopez as the shooter. (Id. at 374-75.)

On cross-examination, Lupo attempted to impeach Chapman with a portion of the audiotaped statement she made at the police station. Contrary to her direct testimony, at the police station Chapman stated to the assistant district attorney that she had not been looking at Lopez when the gun was fired but rather saw Lopez with a gun, went back to her room, and then heard a shot and a body fall to the ground in the hallway. (Id. at 471-72, 477, 479.) When Lupo questioned her about this statement, Chapman said: "Yes. I had seen part of it. Okay, I didn't see the—maybe somethings, but I saw most of it." (Id. at 483.)

At the time of her testimony, Chapman had been in custody at Rikers Island jail for about five months pursuant to an arrest for a drug sale and a related charge for a violation of probation ("VOP"). (Id. at 328.) There is conflicting evidence in the record regarding whether, at the time of her testimony, there was an outstanding deal between the prosecution and Chapman whereby Chapman would receive a sentence of time served on the VOP charge if she testified against Lopez consistently with her audiotaped statement at the police department.

Specifically, during jury selection for Lopez's trial on October 15, 1990, A.D.A. Allen volunteered that she did not "have any understanding of any promises or agreements or deals" with Chapman. (Trial Tr. (Dkt. 59-1) at 91.) Defense counsel referenced contrary information that he had gleaned from conversations with A.D.A. Allen. (See id. at 91-92.) A.D.A. Allen then told Justice Demarest that at an October 10, 1990, hearing on Chapman's VOP before Justice Michael Curci, Justice Curci had the "bright idea [that] what we should do is a contract" with Chapman in exchange for her testimony, requiring that "she would testify consistent with [her] prior statement" at the police department. (Id. at 94-95.) A.D.A. Allen also told Justice

Demarest, however, that the arrangement was never actually discussed with Chapman and that Chapman was not aware of it. (Id. at 94-96.)

As it turns out, A.D.A. Allen's representation was false. The transcript of the October 10 hearing before Judge Curci shows that the "contract" was discussed in open court in Chapman's presence. (See Oct. 10, 1990, Hr'g Tr. (Hr'g Exs.[2] (Dkt. 95-1) at 227-32) at 4-5.)[3] Lupo brought this fact to Justice Demarest's attention after he began to cross-examine Chapman. (See Trial Tr. (Dkt. (59-2) at 401-02.) A.D.A. Allen then shifted her position and represented to Justice Demarest that although there had been an offer, the offer had been "rescinded" and "there st[ood] at th[at] time no such agreement." (Id. at 403.)

Lupo continued his cross-examination of Chapman. Chapman acknowledged that she had heard Justice Curci's statements about the "contract" at the October 10 hearing and that a contract had in fact been offered to her, but maintained that it had been withdrawn and that she did not expect any benefit in exchange for her testimony. (Id. at 489-90, 492, 494-95.)

---

[2]   "Hr'g Exs." refers to the exhibits that the parties submitted to the court at the September 13, 2012, evidentiary hearing. Lopez filed the exhibits from both sides on October 25, 2012. (Dkt. 95-1.)

[3]   In relevant part, the following colloquy occurred between Justice Curci and A.D.A. Allen:

THE COURT:  You're going to bring in the testimony, the backround [sic] of which you would like her to be consistant [sic] with in order to gain the promise of one year excuted [sic], right?
MS. ALLEN: Yes, your Honor.
THE COURT: *That is the contract.* I need those transcripts in order to back that up, right?
MS. ALLEN: Correct.
. . .
THE COURT: . . . The plea is predicated by she giving testimony in a homicide case, is that right Miss Allen?
MS. ALLEN: That is right.
THE COURT:  That testimony has to be consistant [sic] with the interviews with the DA which are manifested by an audio taped transcript that I will get in my hands in a couple of days, is that right?
MS. ALLEN: That is right.

(Oct. 10, 1990, Hr'g Tr. at 4-5 (emphasis added).)

The withdrawal of the deal is not reflected in the transcript of the second appearance in Chapman's VOP case on October, 12, 1990. (Dkt. 94-7.) That hearing took place "outside the presence of [Chapman]" and reflects only an off-the-record discussion between A.D.A. Allen, Chapman's attorney, and the court, and then an adjournment of the case until October 24. (Id.) The transcript of the final hearing on the VOP case on October 24, 1990—after Chapman's testimony and Lopez's conviction—suggests that the offer was in fact eventually withdrawn. (See Oct. 24, 1990, Hr'g Tr. (Dkt. 123-1) at 4.) However, as Justice Demarest pointed out in her decision denying Lopez's motion to unseal the October 24 transcript, there was "no indication" in the transcript of whether the offer was withdrawn "prior to or subsequent to [Chapman's] testimony at [Lopez]'s trial." (June 11, 1999, N.Y. Sup. Ct. Decision & Order (Dkt. 64-1) at 3.)

**B.    Alibi Witnesses**

At the time of the shooting and his trial, Lopez was common-law married to a woman named Juliana Guido ("Juliana"). (See Sept. 13, 2012, Evidentiary Hr'g Tr. (Dkt. 113) ("First Ev. Hr'g Tr.") at 8.) Lopez considered Helen Guido ("Guido"), Juliana's mother, to be his mother-in-law, and Lydia Rivera, Juliana's sister, to be his sister-in-law. (Id. at 10, 16.)

According to Lopez, both prior to and during the trial he informed his counsel Lupo that both Guido and Rivera were willing to testify that Lopez had been with them at the time of the shooting. (See Lopez Aff. (Dkt. 55-3) at 1; First Ev. Hr'g Tr. at 15, 19.) Lopez claims Lupo later told him that he had spoken to both of these women and had advised against calling them as witnesses because they were "closely related" to Lopez and therefore would not be believable to the jury. (Lopez Aff. at 1; First Ev. Hr'g Tr. at 17.)

After the State rested, Lupo told Justice Demarest at a hearing that Lopez had "produced for [Lupo] an alibi witness in this case." (Trial Tr. (Dkt. 59-3) at 536.) Lupo stated that he had

12

"interviewed that alibi witness" at "considerable length," that he had advised Lopez and his family not to call this witness, and that Lopez and his family had agreed with that advice. (Id. at 536-37.) The court asked Lopez whether counsel had spoken truthfully and whether Lopez was "satisfied in not presenting whoever this witness was"; Lopez responded in the affirmative.[4] (Id. at 537.) According to Lopez, he agreed with Lupo's decision based upon Lupo's representation that Lupo had spoken to Guido and Rivera. (See First Ev. Hr'g Tr. at 17-18.)

After Lopez was convicted and incarcerated, his relationship with Juliana ended, and he remarried. (First Ev. Hr'g Tr. at 9.) He began to lose contact with the people he had previously considered his family because they "weren't too happy" about his remarriage. (Id. at 20.) He testified that sometime in 2003, he had a conversation with Rivera over the phone, and she told him that Lupo had never spoken to her about appearing as a witness. (Id. at 20-21.) She later told him that Lupo had not spoken to Guido either. (Id.) Lopez asked Rivera if she could make a statement, and she agreed to do so. (See id.)

In 2005, Rivera and Guido provided signed and notarized affidavits to Lopez. (Rivera Aff. (Hr'g Exs. at 1); Guido Aff. (Hr'g Exs. at 2).)

---

[4]     The transcript of the full colloquy is as follows:

> MR. LUPO: . . . I want to put one other thing on the record.  The defendant produced for me an alibi witness in this case.  I interviewed that alibi witness.  After speaking to this alibi witness at some length, considerable length, I then spoke to my client and members of my client's family and it was my advice not to put this witness on the witness stand.  It is my understanding or it is my understanding based on my conversations with my client and his family that they're taking my advice in allowing me not to call this witness.  Perhaps we can have the defendant's assent or dissent.
> THE DEFENDANT: Yes, I agree with him.
> THE COURT: You acknowledge that what your lawyer said is true?
> THE DEFENDANT: Yes.
> THE COURT: And, the decisions that have been made are with your agreement; is that correct?
> THE DEFENDANT: That's correct.
> . . .
> THE COURT: And, you're satisfied in not presenting whoever this witness was; is that correct?
> THE DEFENDANT: That's also correct.

(Trial Tr. (Dkt. 59-3) at 536-37.)

Guido's affidavit, dated April 4, 2005, states that on August 31, 1989, Lopez was living with Juliana and their daughter in the rear apartment of Guido's home at 84 Brighton 1st Place in Brooklyn. (Guido Aff.) She "vividly" recalled that, at "approximately two to three in the morning" on the day of the shooting, Lopez came by and talked to her for "about an hour or so" about a disagreement he had with Juliana earlier. (Id.) Guido was awake at that time because she worked a midnight shift at Coney Island Hospital and normally could not fall asleep until early the next morning. (Id.) Guido offered him some advice and then Lopez told her that he was going to his brother's home on Brighton 3rd Street—where Rivera lived in the basement—to spend the night. (Id.; see also First Ev. Hr'g Tr. at 113.) Besides Lopez's concern about the disagreement with Juliana, Lopez "appeared to be in good spirits." (Guido Aff.) Guido stated that she could "attest with absolute certainty[] that [Lopez] could not have committed the crime . . . because later after communicating with [her] daughter Lydia Rivera, [she] was informed that [Rivera] was in fact with him during the time frame in which this crime was to have occurred," at "[a]pproximately 3 to 3:30 am." (Id.) Guido also stated that she was present during trial and expected to testify, but that Lupo never spoke to her about testifying. (Id.)

Rivera's affidavit, dated October 21, 2005, states that on August 31, 1989, she resided at 3053 Brighton 3rd Street in Brooklyn with her husband and two children. (Rivera Aff.) She alleges that in the early hours of that "warm summer day," she, Lopez, Juliana, and Rivera's son "were all in the front of the house drinking refreshments and simply talking about different things," including "trying to patch up [the] disagreement" between Lopez and Juliana. (Id.) After the start of Lopez's trial, she asked Lopez "how in the world they c[ould] accuse him of doing something as heinous as murdering someone that morning when [they] were all outside in front of the house during that time," and advised him to make clear to his attorney that she was

willing to testify on his behalf.  (Id.)  However, she stated, "Lupo never called to speak to [her]
nor attempted to inquire about her testimony."  (Id.)

### C.   Earline Cafield's Letter

On November 2, 1990, after Lopez's conviction but prior to his sentencing, A.D.A. Allen

sent Lopez's counsel a letter attaching another letter from a Rikers Island inmate named Earline

Cafield.[5]  (Allen Ltr. (Hr'g Exs. at 240); Cafield Ltr. (Hr'g Exs. at 233-35).)  Cafield's letter,

dated October 12, 1990—the day Lopez's jury was selected and sworn—recited conversations

that Cafield had with Chapman while the two were housed together at Rikers Island, prior to

Chapman's testimony in Lopez's case.  (See Cafield Ltr.)

The letter states, in relevant part:

> [T]here's someone here who claims to have been a witness to a murder and "is
> cooperating" with the Brooklyn D.A.'s office.  Her name is Janice Chaplin
> A.K.A. Janet Chapman.  She says she's here ostensibly on a probation violation
> but that in actual fact the D.A. had her picked up to make sure she'd be available
> to testify against this guy she says she saw kill another guy.  She's a crack addict
> and a prostitute.  First she told me the guy who got killed [Surria] was a dealer
> from South America.  Then she said at another time that the guy was at the place
> where he was killed to buy crack.  At another time she's told me she was dealing
> crack for the guy who got murdered.  Then, about three weeks ago another girl
> ["Joyce"] comes into the jail who was also at the crime scene immediately before
> and after the murder and she may have been there when it happened.  There was
> also a "Howie" there who went through the victim's pockets after he was killed.
> . . . She [Chapman] told me [on October 11, 1989,] that the guy [Surria] had
> bought some crack for a [ ] girl in exchange for sex (oral sex) and the girl[']s
> boyfriend came after they'd finished and had an argument with the guy and shot
> him with a shotgun over the girl going out with him, but last night from a
> conversation between the three of us [Cafield, Chapman, and Joyce], it came out
> that the guy [Surria] was lured there to be robbed, she's [Chapman is] the one
> who lured him there and this Howie did the killing.  Howie has a Jewish last name
> and is a Vietnam veteran.

(Id.)

---

[5]     Cafield sent the letter to the Richmond County District Attorney's Office, which then forwarded the letter
to the Kings County District Attorney's Office.  (Allen Ltr. at 1.)  After receiving the letter, A.D.A. Allen, with the
assistance of others in her office, undertook an investigation of the statements made in the letter and then turned the
letter over to Lupo, copying the court.  (See id.)

In other words, Cafield was told on different occasions that the murder was committed by (1) a man whose girlfriend had exchanged sexual favors for crack with Surria or (2) a man named "Howie" with "a Jewish last name"—presumably Howie Sachs—who had conspired with Chapman to lure Surria to the crackhouse to be robbed. (Id. at 2-3.)

In her cover letter, A.D.A. Allen stated that her office had conducted an investigation of the letter and had learned that Cafield: (1) "underwent a CPL 730 [mental competency] exam at one time and was found unfit"; and (2) "ha[d] a history of violence that was known to [Chapman]." (Allen Ltr. at 1.) She noted further that cooperating witnesses often sought to "remove the taint of the image of cooperating by putting another gloss on themselves to the other inmates for the purposes of self-protection," that multiple women connected to the Lopez case were in the same facility as Chapman and Cafield, and that Chapman had been confronted in the jail "by an incarcerated girlfriend of [Lopez]." (Id.) A.D.A. Allen concluded:

> In light of the various people in jail from the neighborhood where Janet [Chapman] lives, and in light of the obvious dangers to people considered as 'rats' and so forth, the District Attorney's office is convinced that Janet [Chapman]'s in court testimony should not be upset by a letter from a source as unreliable as Earline Cafield.

(Id.)

The defense never made meaningful use of the Cafield letter. Lopez's trial counsel, Lupo, was incapacitated after the verdict, having undergone heart bypass surgery, and is now deceased. Lopez was represented at sentencing by Irving Anolik. (Sentencing Tr. (Dkt. 59-3).) At the time of Lopez's sentencing hearing before Justice Demarest, Anolik confessed that he had not seen the trial transcript (id. at 5), that he was "totally unfamiliar" with Lopez's case (id. at 8), and that he was "totally unprepared to handle the sentence" (id. at 13), but Justice Demarest insisted on proceeding with sentencing (id. at 16-17).

16

The following colloquy then occurred:

THE COURT:  You don't wish to speak to any issues?
MR. AN[OLIK]:  Well, I can just speak to what I was told very briefly.  One, I understand that a letter was received during the trial or perhaps shortly after the trial from some individual.
THE COURT:  Mr. An[olik], my interest is what you think is fair for your client and whether you wish to draw my attention to anything specifically.

(Id. at 18.)

Anolik then proceeded to discuss Lopez's "steady history of employment," "stable family," non-violent past, and belief that he had not received a fair trial. (Id. at 18-19.) Anolik never mentioned the Cafield letter again.  Justice Demarest then sentenced Lopez to concurrent terms of imprisonment totaling twenty-five years to life. (Id. at 20-21.)

**D.      Janet Chapman's Recantation**

Lopez's brother, Eugene Lopez ("Eugene"[6]), testified at the September 13, 2012, evidentiary hearing in this court regarding three typewritten statements Chapman gave him in the months after Lopez was sentenced, each of which was admitted into evidence at the hearing. Eugene knew Chapman casually from the neighborhood as a drug addict and a prostitute; Chapman would occasionally purchase drugs and paraphernalia from Eugene, and would sometimes spend time with Lopez's then common-law wife Juliana, who lived with Lopez in the basement of Eugene's apartment and was also a drug user. (First Ev. Hr'g Tr. at 93-94, 113.)

According to Eugene, a couple of months after the trial, Chapman approached Eugene and Juliana as the two of them were sitting on the stoop in front of Eugene's home. (Id. at 95, 110.) Chapman "apologize[d] for having to testify the way she did against [Lopez]" and told Eugene that Officer Boyle of the NYPD had "pressured" and "threatened" her into testifying, and had held her in custody for three weeks until she testified. (Id. at 95.) Eugene asked her "if

---

[6]        The court will continue to refer to Petitioner as "Lopez" and will refer to his brother as "Eugene."

she could help [him] fix what she had done," and "she agreed to write a statement." (Id. at 95-96.) Eugene testified that he did not threaten Chapman or offer her anything in return for the statement, but rather that Chapman agreed to give the statement "voluntarily." (Id. at 99.)

A few days later, Chapman came to Eugene's home and gave Eugene a typed statement that was signed but not sworn, dated, or notarized. (Id. at 96.) Eugene testified that neither he nor Juliana typed this statement—or any of the three statements—for Chapman, but he did not know if anyone else had assisted Chapman in writing it. (Id. at 101-02.) This letter states:

> I Jannet [sic] Chapman of sound mind and judgement [sic] do hereby confess that my testimony relevant to the trial of the People vs. William Lopez was not true. William Lopez was not present at the scene of the crime. The D.A. forced me to testify on behalf of the state under due ress [sic] and the constant threat of going to jail if I did not cooperate with the D.A. office. Let me say again William Lopez is completely innocent he was never at the scene of the crime.

(First Chapman Statement (Hr'g Exs. at 237).)

Eugene sent Chapman's statement to Lopez. (First Ev. Hr'g Tr. at 96-97.) Lopez told Eugene that the statement was unacceptable because it was not notarized. (Id. at 97, 114-15.) Eugene then "waited around" for a few days until Chapman "resurfaced again" and told her that the letter was unacceptable. (Id.) Chapman "volunteered" to write another letter. (Id. at 115.)

A few days later, while Eugene was sitting outside his home with Juliana, Chapman brought Eugene another typed (and again unsworn) statement. (Id. at 98.) This one states, in relevant part:

> I Janet Chapman of sound[] mind, and judgement [sic] do hereby confirm that my testimony given on 10/16/90 for the murder trial of the PEOPLE V. WILLIAM LOPEZ . . . was not true and William Lopez is completely innocent. . . . William Lopez was not at the murder scene and never had anything to do with the murder.

(Second Chapman Statement (Hr'g Exs. at 238).)

18

Eugene, Juliana, and Chapman then took a cab ride over to a nearby pharmacy. (First Ev. Hr'g Tr. at 114.) The statement was signed and notarized at the pharmacy in Eugene's presence. (Id. at 114, 117.) The three of them then left the pharmacy, got back into the cab, and were driven back to Brighton Beach. (Id.) Eugene thanked Chapman and she left. (Id. at 114.)

Eugene brought the statement to his brother. (Id. at 99.) Lopez told Eugene that his appellate attorney, Anolik, "had said something about it being shabby or incorrectly written" and that he would "need a better statement." (Id.)

Eugene testified that Chapman then "disappeared for a while." (Id.) When she "showed up back in the neighborhood," Eugene "told her about what had happened" and asked if she could provide a "better" statement; she agreed to do so. (Id. at 99, 117-18.)

Sometime after that, on a Sunday, Chapman came back to Eugene's house. (Id. at 100.) She presented Eugene with an unsigned affidavit dated "August, 1991." (Id.; Third Chapman Statement (Hr'g Exs. at 226).) The affidavit states:

> JANET CHAPMAN aka JANET CHAMBERS, being duly sworn under penalty of perjury, deposes and says: The district attorney's representative promised to arrange my early release in exchange for a statement that I saw William Lopez carrying a shotgun-type weapon near the scene of a shooting murder. Although I never saw anything such as the assistant district attorney suggested, I readily agreed to make the statement because I wanted to get out of jail. I attended William Lopez's trial and testified against him when I knew my every word was pure fabrication. I immediately felt guilty for telling a lie that placed a man in prison, but I was also frightened of being sent back to jail on other charges or for perjury; therefore, I kept quiet for a time and only confided in a few close friends. Each person who heard the story of my lie was horrified. I reached the point where I could no longer live with the lie constantly weighing down on my conscience. I must also reveal that the district attorney told me never to tell anyone that we cut a deal about my testimony in exchange for my freedom. Even when I took the stand at trial, I lied about the deal and testified that no promises had been made to me.

(Third Chapman Statement.)

19

Eugene remembered that because it was a Sunday, he could not get the statement notarized. (First Ev. Hr'g Tr. at 100, 119.) Chapman therefore left the statement with Eugene and promised to come back the following day. (Id. at 100.) But she did not come back, and Eugene never saw her again. (Id. at 100-01.)

E.   **Direct Appeal**

After trial, still represented by Anolik, Lopez appealed his convictions to the New York Supreme Court Appellate Division, Second Department, on six grounds:  (1) insufficiency of the evidence; (2) the prosecution's failure to disclose the existence of a cooperation agreement between the prosecution and Chapman; (3) prosecutorial misconduct during summation; (4) various errors in the jury charge; (5) variance between the indictment and the prosecution's theory of the case at trial; and (6) ineffective assistance of counsel at sentencing. (Goodman Aff. ¶ 9.) On October 12, 1993, the Appellate Division affirmed the judgment below and rejected all of Lopez's claims on the merits. See People v. Lopez, 602 N.Y.S.2d 872 (N.Y. App. Div. 2d Dep't 1993). Lopez moved for reconsideration, and that motion was denied on January 19, 1994. (See Goodman Aff. ¶¶ 11-12.)

Anolik did not petition on Lopez's behalf for leave to appeal to the New York Court of Appeals. On November 29, 1999, Lopez made a pro se motion to the Court of Appeals seeking permission to file a late application for leave to appeal, pursuant to New York Criminal Procedure Law ("C.P.L.") § 460.30. (Id. ¶ 13.) The Court of Appeals dismissed the motion as untimely on May 4, 2000. (Id. ¶ 14.)

Lopez then filed a petition for writ of coram nobis with the Appellate Division, claiming that his appellate counsel was ineffective for failing to seek leave to appeal to the Court of

Appeals. (Id. ¶ 16.)  The Appellate Division denied this petition on December 24, 2001. People v. Lopez, 735 N.Y.S.2d 782 (N.Y. App. Div. 2d Dep't 2001).

**F.      Habeas Petition**

On July 5, 2002, Lopez filed a pro se Petition for Writ of Habeas Corpus with this court pursuant to 28 U.S.C. § 2254, raising the same six issues he raised on direct appeal.  (Pet. (Dkt. 1).)  On April 24, 2004, the court dismissed Lopez's Petition as time-barred, on the grounds that it had been filed more than a year after his conviction became final and that there were no extraordinary circumstances meriting equitable tolling of the limitation period.[7]  (Apr. 24, 2004, Mem. & Order (Dkt. 12).)  Lopez moved for reconsideration of the court's decision on the grounds that he was entitled to an exception from the one-year limitation period because he was actually innocent of the crimes of conviction.  (Dkts. 14-15.)

On September 13, 2005, this court granted Lopez's motion for reconsideration.  (Sept. 13, 2005, Mem. & Order (Dkt. 17).)  The court first noted that, at the time, it was not settled in the Second Circuit whether the Constitution requires an actual innocence exception to AEDPA's limitation period, and that the Second Circuit had instructed district courts to address this question only if confronted with a colorable actual innocence claim.  (Id. at 1-2 (citing Whitley v. Senkowski, 317 F.3d 223 (2d Cir. 2003)).)  The court then found that Chapman's written recantation of her trial testimony "appear[ed], assuming its veracity, to provide substantial support for Lopez's actual innocence claim."  (Id. at 2.)  Accordingly, the court vacated its April 24, 2004, opinion, reopened Lopez's case, appointed Lopez counsel, and instructed counsel to engage an investigator to locate Chapman.  (Id. at 3.)

---

[7]      Section 2244(d)(1) of Title 28 provides a one-year limitation period for petitions for writ of habeas corpus made by persons in custody pursuant to a state court judgment.

### G. Investigation

At counsel's request, this court assigned Lawrence Frost to locate Chapman. (Nov. 1, 2005, Order.) Frost learned, however, that Chapman had died, as had Howard Sachs. (Frost Aff. (Ex. P to Resp. Opening Opp'n (Dkt. 59-5)) ¶¶ 3, 18.) Frost was unable to locate Earline Cafield (id. ¶ 19), and Lopez later learned that she too had died (July 17, 2012, Pet'r Ltr. (Dkt. 72) at 1). Frost himself died on April 17, 2012. (May 8, 2012, Pet'r Ltr. (Dkt. 67) at 1.)

### H. State Collateral Proceedings

On October 9, 2009, following Frost's investigation, Lopez asked the court for an order staying and holding his Petition in abeyance so that he could exhaust his state court claims. (Dkt. 40.) See 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). The court granted this motion. (Dkt. 42.)

Lopez then moved in New York Supreme Court, Kings County, to vacate his judgment of conviction pursuant to C.P.L. § 440.10(1)(d), (g), and (h). (Def. Mot. to Vacate J. (Dkt. 59-5).) He raised four claims: (1) that he was denied effective assistance of counsel because of counsel's failure to investigate and call the alibi witnesses and to investigate the Cafield letter; (2) that he was actually innocent of the crime of conviction; (3) that Chapman's recantation, the Cafield letter, and the existence of the alibi witnesses constituted newly discovered evidence that would have resulted in his acquittal; and (4) that the use of Chapman's perjured testimony at trial violated his due process rights. (Def. Mem. in Supp. of Mot. to Vacate J. (Dkt. 59-5) ("Def. 440 Mem.") at 21-43.) He also requested an evidentiary hearing. (Id. at 27, 36.)

22

On December 8, 2010, Justice Demarest—the same judge who had presided over Lopez's trial—issued an order denying Lopez's motion to vacate judgment. (Dec. 8, 2010, N.Y. Sup. Ct. Decision & Order (Dkt. 59-6) ("440 Opinion").) She did not mention Lopez's request for an evidentiary hearing, thus denying that request by implication. (See id.) The pertinent details of her decision will be discussed in Part III.A.

Lopez submitted an application for leave to appeal Judge Demarest's decision to the Appellate Division, which was denied on April 7, 2011. (N.Y. App. Div. Decision & Order on Appl. (Dkt. 59-6).) Lopez then filed an application with the New York Court of Appeals for a certificate to appeal the decision pursuant to C.P.L. § 460.20; this application was dismissed on June 30, 2011. (N.Y. Ct. of Appeals Certificate Dismissing Appl. (Dkt. 59-6).)

### I.     Amended Habeas Petition

Having exhausted his claims, Lopez returned to this court, and filed an Amended Petition for Writ of Habeas Corpus on November 25, 2011. (Am. Pet. (Dkt. 54).) He raised three claims in addition to those he raised in his original Petition: (1) that he was actually innocent of the crimes of conviction, excusing him from AEDPA's limitation period (Pet'r Opening Mem. (Dkt. 56) at 22-29)); (2) that he received ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, because of counsel's failure to investigate and call the potential alibi witnesses and investigate Cafield's letter (id. at 30-35); and (3) that the use of Chapman's perjured testimony violated the Fourteenth Amendment (id. at 36-38).

### J.     First Evidentiary Hearing

Lopez requested an evidentiary hearing on his actual innocence claim (id. at 28-29) and his ineffective assistance claim (id. at 35). The court granted this request. (April 17, 2012, Order (Dkt. 66).) The parties then submitted letters discussing the proper scope of the hearing.

(See May 8, 2012, Pet'r Ltr. (Dkt. 67); May 21, 2012, Resp. Ltr. (Dkt. 68); May 31, 2012, Pet'r

Ltr. (Dkt. 69).) In particular, the parties disagreed on whether the Supreme Court's decision in

Cullen v. Pinholster, 131 S. Ct. 1388 (2011), permitted the court to hold an evidentiary hearing

on Lopez's ineffective assistance claim.

On July 10, 2012, this court issued an opinion addressing the effect of Pinholster on

Lopez's request for an evidentiary hearing. Lopez v. Miller, No. 02-CV-3988 (NGG) (LB),

2012 WL 6027751 (E.D.N.Y. July 10, 2012) ("Lopez I"). The court concluded as follows:

> Lopez is entitled to an evidentiary hearing on both his gateway claim of actual
> innocence and his claim of ineffective assistance of counsel. With respect to the
> latter claim, however, Pinholster precludes the court from relying upon evidence
> produced at the hearing to determine whether, under 28 U.S.C. § 2254(d), the
> state court's adjudication of Lopez's ineffective assistance claim involved an
> unreasonable application of federal law or was based on an unreasonable
> determination of the facts. But if the court later concludes—based solely on the
> state court record—that the state court's decision was unreasonable under
> § 2254(d), it will consider the evidence generated at the hearing to determine
> whether Lopez is being held in custody in violation of the United States
> Constitution, thus entitling him to habeas relief under 28 U.S.C. § 2254(a). The
> court will hold the hearing on Lopez's claims before it rules on the substance of
> those claims.

Id. at *1.

Prior to the hearing, Lopez informed the court that Rivera and Guido were unable to

testify (see Sept. 11, 2012, Pet'r Ltr. (Dkt. 86) at 4 & n.3), and has since provided the court with

evidence that Rivera died less than a month before the hearing (see Rivera Death Certificate

(Dkt. 105-1)), and that Guido could not testify because of mental and physical disability (see

McHale Aff. (Dkt. 105-2) (affidavit from Lopez's investigator stating that the social worker at

Guido's nursing home had told him in person that Guido "would never be able to travel to New

York" because of "anxiety depression, altered mental status[,] . . . a blockage in her heart,

diabetes, heart failure and a-fib," and that the administrator of the facility later told him over the

24

phone that "Guido's condition [wa]s unchanged and unlikely to improve"); Zduniak Aff. (Dkt. 120-1) (signed letter from Guido's social worker stating that "[d]ue to [Guido's] health conditions [Guido] was unable to attend the hearing she was requested to attend in September")).[8] Lopez argued that the court should consider Guido's and Rivera's affidavits in lieu of live testimony, as well as Chapman's recantation statements and Cafield's letter. (See Sept. 11, 2012, Pet'r Ltr.)  Respondent argued that the court should not consider any of these documents. (See Sept. 12, 2012, Resp. Ltr. (Dkt. 77).)

The court held an evidentiary hearing on September 13, 2012.  Lopez, Eugene, and A.D.A. Allen testified.  (First Ev. Hr'g Tr.)  The parties filed additional briefing after the hearing. (Pet'r Post-Hr'g Mem. (Dkt. 94); Resp. Post-Hr'g Opp'n (Dkt. 97); Pet'r Post-Hr'g Reply (Dkt. 104).)

### K.   Second Evidentiary Hearing

On December 13, 2012, Lopez moved to reopen the evidentiary hearing so that the court could hear testimony via videoconference from a man named Cesar Diaz who was living in Santo Domingo, the capital of the Dominican Republic. (Dec. 13, 2012, Pet'r Ltr. (Dkt. 114).) Lopez provided the court with a signed affidavit from Diaz explaining the substance of Diaz's intended testimony. (Diaz Aff (Dkt. 114-1).) Lopez also explained his unsuccessful efforts to locate Diaz before the first evidentiary hearing. (See Dec. 13, 2012, Pet'r Ltr. at 3-4.)  The court granted Lopez's motion and set a date for the hearing. (Dec. 14, 2012, Order.)

---

[8]      Respondent has since conceded that Rivera was unavailable to testify at the evidentiary hearing but refuses to concede that Guido was unavailable, and has indicated that he will not do so without an affidavit from Guido's physician. (See Nov. 16, 2012, Resp. Ltr. (Dkt. 107).) Nevertheless, Respondent concedes that he "has no information contradicting the averments in Andrew McHale's affidavit" (id.), and the court finds this affidavit and Zduniak's affidavit sufficient to establish Guido's unavailability.

On January 10, 2013, the court held another evidentiary hearing. (Jan. 10, 2013, Evidentiary Hr'g Tr. ("Second Ev. Hr'g Tr.").) Diaz testified from Santo Domingo via a videoconference and a Spanish-language translator.[9] (See id.)

Diaz testified that in August 1989, he was living in Brighton Beach, Brooklyn. (Id. at 7.) He was involved in selling drugs, including in the basement of the 3053 Brighton Fifth Street crackhouse. (Id. at 8-9.) His partner in the drug business was Surria, a friend of his whom he knew as "Moreno." (Id. at 9.)

At approximately 9:00 p.m. on August 30, 1989, Diaz went to the basement of the crackhouse. (Id.) Also present were Surria and two women who lived in the crackhouse. (Id. at 9-10.) Diaz consumed between ten and fifteen beers. (Id. at 10, 19.)

At one point after 1:00 a.m., someone knocked on the door to the crackhouse. (Id.) Diaz went upstairs and opened the door. (Id. at 10.) Two men were at the doorway. (Id.) One of them—a "little black guy" approximately 5'3" to 5'4", 140 pounds, and with a Panamanian accent—put a gun (a "long weapon") to Diaz's throat. (Id. at 10, 22-23.) The second man was about 5'0" and "chubby," and had a Puerto Rican accent. (Id. at 10, 23.) The two men demanded money and drugs from Diaz. (Id. at 11.) Diaz claimed that he did not have any drugs or money, and one of the men put his hand in Diaz's pocket and took out $200. (Id.)

---

[9]     Federal Rule of Civil Procedure 43(a) permits testimony "by contemporaneous transmission from a different location" "[f]or good cause in compelling circumstances and with appropriate safeguards." Diaz was deported in 2003 to Santo Domingo (see Second Ev. Hr'g Tr. at 13) and may not legally reenter the United States, see 8 U.S.C. § 1326(a), thus easily satisfying Rule 43(a)'s requirement, see Fed. R. Civ. P. 43(a) advisory committee's note (the "most persuasive showings of good cause and compelling circumstances are likely to arise when a witness is unable to attend" in person); see also El-Hadad v. United Arab Emirates, 496 F.3d 658, 668-69 (D.C. Cir. 2007) (finding videoconference testimony from Egypt appropriate where the witness could not obtain a visa to enter the United States). The court also took appropriate safeguards; everyone in the courtroom was able to see and hear Diaz and the people with him, and Respondent had an opportunity for cross-examination. Respondent does not contest the propriety of the videoconference. Cf. Fed. R. Civ. P. 43(a) advisory committee's note ("Good cause and compelling circumstances may be established with relative ease if all parties agree that testimony should be presented by transmission.").

When the men arrived, Surria was in a room with the two women, but when he heard the conversation between Diaz and the two men, he came out immediately. (Id.) The man with the gun fired a shot at Surria's stomach. (Id.) Surria said, "oh, what's happening here? Why did you do this to me?" and fell to the floor. (Id.) The two intruders fled the crackhouse immediately. (Id. at 11, 25.) Diaz checked Surria's pulse and found that he was not breathing. (Id. at 12.) Diaz then ran outside to his girlfriend's house and asked her to call the police. (Id.)

Shortly after this event, Diaz moved to Manhattan. (Id. at 12.) He collected about $3,000 so that he could send Surria's corpse to Surria's family in Santo Domingo. (Id. at 12-13.) At one point, he learned that the police wanted to speak with him about the shooting, but he never spoke with them. (Id. at 13.) Diaz was subsequently convicted of drug-related crimes and was deported to Santo Domingo in 2003, where he has since lived. (Id. at 13-14.)

After several unsuccessful efforts, Lopez's lawyers were able to locate Diaz in 2012. (See Dec. 13, 2012, Pet'r Ltr. at 3-4.) One of Lopez's lawyers spoke with him on the phone and then sent him a mug shot of Lopez that was taken when he was arrested in August 1989. (Second Ev. Hr'g Tr. at 14; Ex. A to Second Ev. Hr'g Tr. (Dkt. 121-1).)

At the evidentiary hearing, Diaz testified that the person in the mug shot did not resemble either of the two men who broke into the crackhouse the night Surria was killed. (Second Ev. Hr'g Tr. at 14.) Unlike the man in the picture, Diaz said, one of the intruders was "black [and] dark-skinned, and the other one was short and chubby." (Id. at 15.) Diaz stated that he was "certain" that the person in the mug shot was not one of the two intruders. (Id.) Diaz was then cross-examined, and the hearing concluded. (Id. at 17-30.)

27

## II.    ACTUAL INNOCENCE

The court has already determined that Lopez's Petition was not filed within the one-year limitation period prescribed for habeas petitions submitted by state prisoners, see 28 U.S.C. § 2244(d),[10] and that Lopez had not shown any "extraordinary circumstances" meriting equitable tolling of the limitations period. (Apr. 24, 2004, Mem. & Order at 3-4.)  Lopez does not dispute these conclusions.  Instead, he argues that he has established a credible and compelling "gateway" claim of actual innocence, thereby excusing him from the limitation period and enabling this court to reach the merits of his constitutional claims in spite of his procedural default. (See Pet'r Opening Mem. at 24-28; Pet'r Post-Hr'g Mem. at 17-20.)  The court agrees.

"[H]abeas corpus is, at its core, an equitable remedy."  Schlup v. Delo, 513 U.S. 298, 319 (1995).  The Supreme Court has thus long recognized that, in "appropriate cases," the principles of comity and finality underlying procedural bars on habeas review "must yield to the imperative of correcting a fundamentally unjust incarceration."  Engle v. Isaac, 456 U.S. 107, 135 (1982).  Such exceptions are, however, limited to "extraordinary case[s] where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Murray v. Carrier, 477 U.S. 478, 496 (1986).

---

[10]    AEDPA's limitation period runs from the latest of a number of triggering events, including "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review," 28 U.S.C. § 2244(d)(1)(A), and "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," Id. § 2244(d)(1)(D).  Petitioners like Lopez whose convictions became final before the effective date of AEDPA—April 24, 1996—are entitled to a one-year "grace period," meaning that their petitions must be filed by April 24, 1997, regardless of the date that their judgments became final.  Ross v. Artuz, 150 F.3d 97, 103 (2d Cir. 1998).  Lopez filed his Petition on July 5, 2002, and the court has previously concluded that a duly diligent person in Lopez's circumstances could have "petition[ed] the court for a writ of habeas corpus by April 24, 1997." (Apr. 24, 2004, Order at 3.)

"Though the [Supreme] Court has never expressly held that a petitioner may obtain habeas relief based solely on a showing of actual innocence,[11] it has recognized that, in rare cases, an assertion of innocence may allow a petitioner to have his *accompanying* constitutional claims heard despite a procedural bar." Rivas v. Fisher, 687 F.3d 514, 540 (2d Cir. 2012) (citations omitted). An actual innocence claim is therefore procedural (not substantive) in nature; it is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." Schlup, 513 U.S. at 315. In other words, in order to obtain habeas relief in the face of a procedural obstacle such as this, a petitioner must advance *both* a legitimate "gateway" claim of actual innocence and a meritorious constitutional claim. Rivas, 687 F.3d at 540-41.

The Supreme Court has applied the actual innocence exception to a number of procedural barriers to habeas relief, including the bar on second and successive habeas petitions, see Schlup, 513 U.S. at 324, and procedural default in state court, see House v. Bell, 547 U.S. 518, 521-22 (2006). The Court has not yet ruled, however, on whether a gateway claim of actual innocence could excuse a petitioner from AEDPA's limitation period.[12]

Until recently, the Second Circuit had declined to decide the issue as well. The court explained that it would not do so (and instructed district courts not to do so) until presented with a case where resolution of the issue could make a difference—that is, where the petitioner made a credible and compelling showing of actual innocence. See Doe v. Menefee, 391 F.3d 147, 174 (2d Cir. 2004); Whitley, 317 F.3d at 225. That was the state of the law when this court first

---

[11]     The Court has assumed arguendo—but has never decided—that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief." Herrera v. Collins, 506 U.S. 390, 417 (1993).

[12]     The Supreme Court recently granted certiorari to decide this issue. See Perkins v. McQuiggin, 670 F.3d 665 (6th Cir. 2012), cert. granted, McQuiggin v. Perkins, 81 U.S.L.W. 3074, 2012 WL 3061886 (U.S. Oct. 29, 2012) (No. 12-126).

recognized the potential that Lopez could pass through the actual innocence gateway.  (See Sept. 13, 2005, Mem. & Order.)

In Rivas v. Fischer, 687 F.3d 514 (2d Cir. 2012), the Second Circuit was at last presented with the proper case for deciding whether the Constitution requires an actual innocence exception to AEDPA's limitation period.  The court answered this question in the affirmative, holding "that a credible and compelling showing of actual innocence under the standard described by the Supreme Court in Schlup and House warrants an equitable exception to AEDPA's limitation period, allowing the petitioner to have his otherwise time-barred claims heard by a federal court."  Rivas, 687 F.3d at 518.

Before discussing whether the petitioner himself had made such a showing, Rivas elucidated the Supreme Court's standard for actual innocence claims.  To excuse a petitioner from a procedural default, "a claim of actual innocence must be both 'credible' and 'compelling.'"  Id. at 541 (quoting House, 547 U.S. at 521).  "For the claim to be 'credible,' it must be supported 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'"  Id. (quoting Schlup, 513 U.S. at 324).  As long as the petitioner has presented "*some* new reliable evidence," the court may proceed to the "compelling" prong of the claim, at which point the court's analysis "is not limited to [new reliable] evidence" but must be based on "*all* the evidence, old and new."  House, 547 U.S. at 537 (emphases added) (internal quotation marks omitted); see also Rivas, 687 F.3d at 542.  "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'"  Rivas, 687 F.3d at 518 (quoting

House, 547 U.S. at 538).  This "standard is 'demanding and permits review only in the extraordinary case.'"[13]  Id. at 542 (quoting House, 547 U.S. at 538).

The court will address the two requirements for a gateway actual innocence claim— "credible" and "compelling"—in turn.

## A.   Credible

To repeat, a "credible" actual innocence claim "must be supported 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'"[14]  Id. (quoting Schlup, 513 U.S. at 324).  Lopez has presented four pieces of purported new reliable evidence in support of his actual innocence claim:  the alibi witness affidavits, Earline Cafield's letter, Janet Chapman's recantation statements, and Cesar Diaz's testimony.[15]  All of this evidence is "new" for actual innocence purposes because it was not presented at trial.  See Rivas, 687 F.3d at 543 ("new

---

[13]      The Second Circuit made clear that, to be entitled to the actual innocence exception, it is not necessary for the petitioner to show that he acted with reasonable diligence to file his claim during the limitation period.  See Rivas, 687 F.3d at 547 n.42.  The Supreme Court will apparently address this issue when it decides McQuiggin.  See Questions Presented in McQuiggin v. Perkins, available at http://www.supremecourt.gov/qp/12-00126qp.pdf (last visited Jan. 14, 2013).

[14]      Evidence supporting an actual innocence claim need not fit within one of the categories explicitly listed in Schlup so long as the court determines it to be "new reliable evidence."  See Munchinski v. Wilson, 694 F.3d 308, 338 (3d Cir. 2012) (noting that "Schlup's three categories are not an exhaustive list of the types of evidence that can be 'reliable,'" and that in House, "the Supreme Court spent a large portion of its analysis on evidence that implicated another suspect" (citing House, 547 U.S. at 548-53)); Wolfe v. Johnson, 565 F.3d 140, 164 n.32 (4th Cir. 2009) (Schlup's "list is nonexhaustive"); Souter v. Jones, 395 F.3d 577, 593 n.8 (6th Cir. 2005) ("A correct reading of Schlup reveals that the examples following the words 'new reliable evidence' were not meant to be an exhaustive list of everything upon which an actual innocence claim may be based.").

[15]      Lopez does not argue that his own testimony at the evidentiary hearing qualifies as "new reliable evidence," and the court assumes that it does not.  But the court may nonetheless consider it for the purposes of the "compelling" prong if it concludes that at least one of Lopez's other pieces of new evidence is reliable.  See House, 547 U.S. at 537 (for the "compelling" prong, the court's analysis "is not limited to [new reliable] evidence" but is based on "all the evidence, old and new").

evidence" is "evidence not heard by the jury").[16]  The question for the court is thus whether these pieces of evidence are "reliable."

As an initial matter, it is important to note that in considering the reliability of evidence for actual innocence purposes, the court "is not bound by the rules of admissibility that would govern at trial." Schlup, 513 U.S. at 328.  Instead, the court must determine the reliability of *all* the new evidence Lopez has submitted, both admissible and inadmissible, by considering it "both on its own merits and, where appropriate, in light of the pre-existing evidence in the record." Doe, 361 F.3d at 161.  As to new witness testimony in particular, the court "consider[s] the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or presumptions that crediting particular testimony would require." Id. at 164-65.

---

[16]      The circuit courts are split on whether "new" includes only "newly discovered" evidence—evidence that was not *available* at the time of trial—or more broadly encompasses "newly presented" evidence—all evidence that was not *presented to the jury* during trial. Compare Osborne v. Purkett, 411 F.3d 911, 920 (8th Cir. 2005) ("Evidence is only new if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." (internal quotation marks omitted)), and Hubbard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004) (requiring new evidence that was not available at the time of trial), with Gomez v. Jaimet, 350 F.3d 673, 679 (7th Cir. 2003) ("All Schlup requires is that the new evidence is reliable and that it was not presented at trial."), and Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003) (requiring "newly presented," not newly available, evidence); see also Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012) (noting the circuit split). The Rivas court did not discuss the issue in detail, but appears to have taken the "newly presented" side of the circuit split, which clearly covers the evidence Lopez now presents. See 687 F.3d at 543 ("new evidence" is "evidence not heard by the jury"). In any event, even under the "newly discovered" reading, the evidence Lopez has submitted in support of his actual innocence claim was not reasonably available to him at trial: Chapman did not recant her testimony until after trial; the prosecution did not forward Cafield's letter to Lopez's counsel until around the time of sentencing; Lopez was unable to locate Diaz until just recently; and although the alibi witnesses were ready to testify at the trial, Lopez claims that they were not given an opportunity to do so only because of his trial counsel's ineffectiveness, which makes the alibi witness affidavits analogous to the alibi information considered in Schlup. See 513 U.S. at 312-13, 331 (considering alibi information disclosed to petitioner after trial to be new evidence potentially supporting petitioner's actual innocence claim even though the alibi witness was available to provide exculpatory information at trial and claimed that he would have done so if asked by the petitioner's attorney, but where counsel failed to make that request or interview the potential alibi witness); see also Cleveland, 693 F.3d at 636-37 & n.4 (considering alibi affidavit submitted after trial to be "new evidence" where petitioner alleged ineffective assistance of counsel and where it was unclear why counsel did not obtain the alibi witness's statement earlier); Gomez, 350 F.3d at 680 ("If procedurally defaulted ineffective assistance of counsel claims may be heard upon a showing of actual innocence, then it would defy reason to block review of actual innocence based on what could later amount to counsel's constitutionally defective representation."). Thus, under either the "newly discovered" or "newly presented" theory, Lopez's evidence is "new" for actual innocence purposes.

1.   Affidavits of Guido and Rivera

Although the affidavits of Guido and Rivera are hearsay, the court has no difficulty

concluding that they are reliable and may be considered for Lopez's actual innocence claim.

First, the court finds no reason to doubt that the affidavits actually constitute the

testimony of Guido and Rivera.  Each of the affidavits is signed, notarized, and sworn, and

Respondent does not dispute their authenticity.

Second, although approximately sixteen years had passed between the shooting and the

signing of the affidavits, their contents indicate little risk that the affiants misremembered the

events of the morning of the shooting.  Both Guido and Rivera stated that they had clear

memories of that morning due to the context in which they interacted with Lopez.  (See Rivera

Aff. (recalling the morning "distinctly"); Guido Aff. (recalling the morning "vividly").)  Guido

recalled that she was usually awake around the time she saw Lopez because she worked the

midnight shift at Coney Island Hospital and normally could not fall asleep until early next

morning.  She also remembered that although Lopez "appeared to be in good spirits," he was

concerned about a disagreement he had with Juliana earlier that night.  Rivera recalled that the

shooting occurred on a "warm summer day"; that she, Lopez, Juliana, and Rivera's son were in

front of the house in the early hours of that day drinking refreshments and talking; and that they

were attempting to "patch up [the] disagreement" between Lopez and Juliana.  The affidavits are

thus detailed and consistent with each other.  Cf. United States v. Leppert, 408 F.3d 1039, 1042

(8th Cir. 2005) ("cross-corroboration" of statements supported their reliability).  Moreover, the

affiants expected that they would need to remember their interactions with Lopez soon after they

occurred—once Lopez was arrested and put on trial—and were thus unlikely to misremember

the key elements of these interactions with the passage of time.  (See Guido Aff. (stating that

33

"during [Lopez]'s trial, [she] remember[ed Lopez] telling [her] to expect to be called to testify");
Rivera Aff. (prior to Lopez's trial, she "specifically advised him that when he spoke to his
lawyer," he should "make clear to [counsel] that [she] was willing to testify on [Lopez's]
behalf").)

Third, because Lopez's post-conviction proceedings were still pending at the time Guido
and Rivera provided their affidavits, they presumably expected to be subject to
cross-examination on their contents, suggesting to the court that the affidavits were truthful.  See
Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 113 (3d Cir. 2001) (upholding
the district court's decision to admit an affidavit based in part on the fact that "the declarant was
aware of the pending litigation at the time he made the declaration and thus knew that his
assertions were subject to cross examination" (internal quotation marks omitted)).  Indeed, both
Guido and Rivera had every intention of testifying at the first evidentiary hearing before this
court until shortly before the hearing was to take place.  (See July 19, 2012, Rivera Aff. in Supp.
of Rule 43 Mot. (Dkt. 73-1) (stating that Rivera would like to testify at Lopez's hearing but
could not travel to New York to do so); July 23, 2012, Order (granting Lopez's request to permit
Rivera to testify by teleconference from Michigan); Sept. 11, 2012, Pet'r Ltr. at 4 n.3
("Undersigned counsel last spoke with Helen Guido by telephone a few months ago, at which
time she indicated her willingness to testify.").)  They did not testify only because Rivera died
(see Rivera Death Certificate) and Guido became unable to testify due to mental and physical
disability (see McHale Aff.; Zduniak Aff.).  The affiants' willingness to testify at the very least
suggests that they would have repeated the contents of their affidavits and were prepared to
submit to cross-examination on their statements.

Respondent contests the reliability of the alibi witness affidavits in four ways, none of which has merit.

First, Respondent argues that because "Guido and Rivera [we]re related to [Lopez] by marriage," they were "biased in his favor" (Resp. Opening Opp'n (Dkt. 59) at 12) and had "a motive to falsify an alibi for [him]" (Sept. 12, 2012, Resp. Ltr.). Respondent has presented no evidence that Guido and Rivera were biased other than the fact that they were once related to Lopez, and that relationship alone would not change the court's determination as to their reliability. See Brownridge v. Miller, No. 06-CV-6777 (RJD) (SMG), 2010 WL 2834829, at *6 (E.D.N.Y. July 15, 2010) ("[A]n alibi is not disingenuous merely because it involves family members."); see also Wright v. U.S. Postal Serv., 183 F.3d 1328, 1333 (Fed. Cir. 1999) ("A familial interest, while relevant, is not sufficient to disregard a witness' testimony."); Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996) ("The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony."). In any event, at the time they submitted their affidavits, Guido and Rivera no longer had any familial relationship to Lopez; after Lopez's conviction, his relationship with Juliana ended, he remarried in 1993, and he lost essentially all contact with Guido and Rivera because they "weren't too happy" about his remarriage. (First Ev. Hr'g Tr. at 9.) The court has difficulty believing that Guido and Rivera were significantly biased in favor of a former common-law in-law they had largely lost contact with, let alone to the degree that they would submit perjurious affidavits to exonerate him.

Second, Respondent argues that "[t]he time frames alleged in the[] affidavits were so vague and their residences were so close to the crime scene that [Lopez] could have committed the murder and still been with Guido and Rivera at their residences as they alleged." (Resp. Post-Hr'g Opp'n at 22.) This argument does not undermine the reliability of the affidavits; if

anything, it calls into question whether the affidavits establish Lopez's innocence, which the court discusses in Part II.B.3.

Third, Respondent points out that "neither Guido nor Rivera explains why it took them respectively until April and October of 2005 (16 years after the crime) to come forward with information supporting an alibi defense," suggesting that the affidavits are unreliable because they were made in anticipation of litigation. (Id. at 12-13.)  But the passage of time alone does not convince the court to reject the alibi witnesses' testimony.  See Cleveland v. Bradshaw, 693 F.3d 626, 641 (6th Cir. 2012) ("[T]he passage of time is [not] sufficient in and of itself to render [an alibi] affidavit unreliable.").  To the contrary, as discussed above, the fact that Guido and Rivera submitted their affidavits during a *pending* litigation supports the reliability of their affidavits because it shows a willingness to be cross-examined on what they said.  In any event, at the evidentiary hearing Lopez provided a reasonable explanation for the passage of time between the trial and the submission of the affidavits.  After his remarriage, he lost contact with Guido and Rivera, and the two were not involved again in Lopez's case until he contacted Rivera in 2003. (First Ev. Hr'g Tr. at 9, 20-21.)  Before then, Lopez believed that his trial counsel had interviewed Guido and Rivera and made a reasonable decision not to call them as witnesses (see id. at 16-17, 20-21), and thus had no particular reason to request affidavits from them.

Fourth, Respondent argues that "the existence of two alibi witnesses appears to be a recent fabrication, as [Lopez] acknowledged at trial that there was only one alibi witness." (Resp. Opening Opp'n at 13.)  This argument is again irrelevant to the reliability of the affidavits themselves and pertains (if anything) to Lopez's communications with Lupo as to the alibi witnesses' availability to testify, which will be discussed in Part III.

36

For these reasons, the affidavits of Guido and Rivera constitute "new reliable evidence" supporting Lopez's actual innocence claim. See Schlup, 513 U.S. at 331 (noting that the sworn statements of two people "that cast[ed] doubt on whether [petitioner] could have participated in the murder" in light of his whereabouts around the time of the crime would support the petitioner's actual innocence claim if found to be reliable); Cleveland, 693 F.3d at 636 (affidavit declaring that the affiant met with the petitioner around the time of the crime was new reliable evidence supporting the petitioner's actual innocence claim). Although this finding is sufficient for the court to proceed to Schlup's "compelling" prong, see House, 547 U.S. at 537, the court will consider whether the Cafield letter, Chapman's recantation statements, and Diaz's testimony qualify as "new reliable evidence" as well.

    2.    Earline Cafield's Letter and Janet Chapman's Recantations

Closer questions are presented by these documents. Considered individually, their reliability is suspect: the statements are hearsay, lack important indicia of formality, were made by questionable sources, and are at times ambiguous or inconsistent both internally and with Chapman's trial testimony; they do not convincingly establish what Chapman actually saw on the night of the shooting. When considered together and along with other evidence, however, the court finds that these documents reliably support a limited proposition: that Chapman expressly contradicted the testimony she gave at trial on multiple occasions, and eventually disavowed it. In other words, these documents are reliable not for the truth of their contents—i.e., to establish what exactly Chapman knew about the murder—but for the purposes of impeaching Chapman's already questionable testimony.

a.   *Cafield's Letter*

The reliability concerns inherent in Cafield's letter are obvious. The letter is unsworn and not notarized. (See Cafield Ltr.) Cafield had a history of mental instability. (See Allen Ltr. at 1.) And apart from Cafield's own unreliability, Chapman appears to have given her two inconsistent versions of the shooting: that the murder was committed by (1) a man whose girlfriend had exchanged sexual favors for crack with Surria, and (2) a man named "Howie" who had conspired with Chapman to lure Surria to the crackhouse to be robbed. (Cafield Ltr. at 2-3.) The second of the two accounts is not attributed solely to Chapman but more ambiguously to a "conversation between" Cafield, Chapman, and another inmate named Joyce "who was also at the crime scene immediately before and after the murder and [ ] may have been there when it happened." (Id.; see also Part I.C.) Finally, as Respondent points out (see Resp. Post-Hr'g Opp'n at 17), there is no evidence specifically corroborating the stories Chapman told Cafield; for example, there is no other evidence that Howie Sachs killed Surria.

But regardless of how one assesses Cafield's general credibility, what is clear is that her letter contains factual allegations that she *herself* could not have fabricated. Cafield was not present at the shooting and had no independent knowledge about it. Thus, she could only have obtained the information in her letter about the trial and the underlying crime from Chapman, such as the fact that Chapman had been arrested for a probation violation and had been cooperating with the Brooklyn District Attorney's Office (Cafield Ltr. at 2); that there was a man named "Howie" at the crime scene with a "Jewish last name" (id. at 2-3); and that Surria was killed with a shotgun (id. at 3). The court thus finds it likely that Chapman actually said the things Cafield claimed she said, and Respondent essentially concedes as much. (See Resp. Post-Hr'g Opp'n at 17 (arguing that the fact that Cafield "relate[d] details that only Chapman

would know . . . *may tend to prove that Chapman talked to Cafield*, but it does not prove that

what Chapman told Cafield was true" (emphasis added)).)

The court also highly doubts the suggestion made by A.D.A. Allen and Respondent that

Chapman fabricated her stories to Cafield to avoid being labeled a "rat" or a "snitch" at Rikers

Island and in her neighborhood.  (Allen Ltr.; Sept. 12, 2012, Resp. Ltr. at 3.)  Although it may

generally be true that cooperating witnesses often attempt to alleviate their reputations as

snitches, here, according to Cafield's letter, Chapman *admitted* that she was "cooperating with

the Brooklyn D.A.'s office." (Cafield Ltr. at 1 (internal quotation marks omitted).)  Having

made that admission, Chapman could not have reasonably believed that confessing to Cafield

that she was about to testify against the *wrong* person would make her more sympathetic in the

eyes of Cafield, the rest of the prison population, or the people in her neighborhood.

Similarly, Justice Demarest found that "Chapman had reason to avoid letting Cafield

know she was a cooperating witness because she would likely face harm from other prisoners."

(440 Opinion at 7.)  Although the court normally defers to a state court's factual findings, see 28

U.S.C. § 2254(e)(1), and assumes without deciding that such deference applies to an actual

innocence analysis, the court gives this particular finding no deference because it is unreasonable

on its face, see Jones v. Walker, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (where the state court

"unreasonably determine[s] the facts relevant to [the petitioner's] claim," the court "do[es] not

owe the state court's findings deference under AEDPA," because the court "is not bound to defer

to unreasonably-found facts"); Taylor v. Maddox, 366 F.3d 992, 1008 (9th Cir. 2004) ("When

we determine that state-court fact-finding is unreasonable, . . . we have an obligation to set those

findings aside . . . .").  As discussed above, Chapman *did* tell Cafield that she was a cooperating

witness (see Cafield Ltr. at 1), and so the notion that Chapman fabricated her story to Cafield in order to "avoid" discovery of this fact makes little sense.

For these reasons, the court finds that although Cafield's letter does not clearly establish what actually occurred on the night of the shooting, it reliably supports the limited proposition that Chapman gave a different account of the shooting to Cafield (indeed, multiple different accounts) than the one she gave at trial, thus undermining the credibility of her trial testimony. This proposition is further supported by Chapman's recantation statements.

### b.   *Chapman's Recantation Statements*

"It is axiomatic that witness recantations must be looked upon with the utmost suspicion." Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007) (internal quotation marks omitted).  But such evidence must not simply be dismissed out-of-hand.  See Schlup, 513 U.S. at 328 (court must evaluate an actual innocence claim "in light of *all* the evidence . . . (but with due regard to any unreliability of it)" (emphasis added)); Fairman v. Anderson, 188 F.3d 635, 646 (5th Cir. 1999) (although a person's "status as a recanting witness detracts from the credibility of [the witness's] new testimony, it is not a bar to the acceptance of such testimony" (citation omitted)); see also Cleveland, 693 F.3d at 638-40 (finding recantation reliable).  As with any witness testimony, "the court evaluates recanted testimony 'in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require.'"  Castillo v. Ercole, No. 07-CV-11256 (LAP) (GWG), 2009 WL 1492182, at *6 (S.D.N.Y. May 27, 2009) (quoting Doe, 391 F.3d at 173).

Here, each of Chapman's recantation statements lacks important indicia of formality:  her first statement is signed but not sworn, notarized, or dated, and her first name is misspelled (as

"Jannet"); the second is signed, dated, and notarized, but is not sworn; and the third purports to
be "sworn under penalty of perjury" but is not dated, signed, or notarized. The statements are
also of course inconsistent with Chapman's sworn trial testimony and with her audiotaped
statement at the police station.

Despite these flaws, however, the court finds no compelling reason to conclude that
Chapman did not actually *provide* the statements to Eugene in the manner in which he testified,
or that the statements were fabricated without her permission, or that she was somehow
pressured into providing false statements by members of Lopez's family. Thus, once again, the
court finds them reliable to the extent they establish the limited proposition that Chapman
provided multiple inconsistent accounts of the shooting before, during, and after trial—a fact that
further undermines her credibility.

The court draws this conclusion based in large part on the evidentiary hearing testimony
of Eugene, whom the court found to be a believable witness. His account of the events
surrounding Chapman's provision of the statements was detailed, internally consistent, and
consistent with the statements themselves. (See generally Part I.D.) Eugene made clear that
Chapman provided him with the statements voluntarily (see id. at 99, 115); indeed, he testified
that each discussion between him and Chapman regarding the statements occurred when
Chapman approached Eugene and Juliana as the two were sitting outside of their shared home
(see id. at 95, 97, 117-18). Eugene also provided cogent explanations for why certain statements
bear particular indicia of formality and others do not. For example, he explained that the first
statement (unlike the second) was not notarized because neither he nor Chapman realized that it
needed to be notarized until he spoke with Lopez about it later (see id. at 97, 114-15), a
possibility the court finds likely given the lack of sophistication of the people involved. And

Eugene explained that the third statement was not signed or notarized because Chapman provided it to Eugene on a Sunday (when the pharmacy with the notary was closed), after which Chapman never returned to Eugene's home. (See id. at 100-01, 119.)

Respondent makes several arguments contesting Eugene's testimony that Chapman voluntarily provided the recantation statements to him in the manner that he described. None of these arguments is persuasive.

First, Respondent argues that, "as [Lopez's] brother, [Eugene] is biased in favor of [Lopez]." (Resp. Post-Hr'g Opp'n at 13.) As with Guido and Rivera, Eugene's familial relationship alone does not convince the court to reject his testimony. See Brownridge, 2010 WL 2834829, at *6; see also Wright, 183 F.3d at 1333; Smolen, 80 F.3d at 1289. For the reasons discussed above, the court finds his testimony credible despite his relationship to Lopez.

Second, Respondent argues that Eugene has a "propensity for dishonesty" shown by his conviction for felony gun possession, his use of crack and heroin, and his sale of crack. (Resp. Post-Hr'g Opp'n at 13 (citing First Ev. Hr'g Tr. at 94, 102-06).) There is some irony in Respondent's argument given the criminal history of Chapman, the prosecution's sole identifying witness. But regardless, the court finds this evidence to be of little if any probative value for determining Eugene's character for truthfulness, particularly because these criminal activities took place over twenty years ago. (See First Ev. Hr'g Tr. at 94, 102.) See also Smith v. Great W. Cas. Co., No. 05-CV-4654, 2007 WL 4114342, at *2 (E.D. La. Nov. 15, 2007) ("[F]or the purposes of impeachment, the types of crimes typically considered relevant are those crimes involving dishonesty and false statement."); United States v. McIntosh, No. 03-CR-0298, 2006 WL 293224, at *13 (M.D. Pa. Feb. 7, 2006) ("[C]rimes which touch on the honesty of the witness involve, or at least relate to, communicative, often verbal dishonesty. Such crimes

42

would include perjury, criminal fraud, embezzlement, false pretense or any other offense the commission of which involves some element of untruthfulness, or falsification bearing on the [witness's] propensity to testify truthfully." (alteration in original) (citation and internal quotation marks omitted)); Eagan v. LaPlace Towing, Inc., No. 91-CV-4623, 1993 WL 121237, at *4 (E.D. La. Apr. 14, 1993) (finding that the "possession of an illegal substance [wa]s hardly probative of truthfulness or untruthfulness" (internal quotation marks omitted)).

Third, Respondent finds it unlikely that Chapman produced the typed statements herself because:  (1) the statements "differ markedly in the degree of literacy of the writer and in the degree of skill of the typist" (Resp. Post-Hr'g Opp'n at 14); (2) "Eugene testified that Chapman was a homeless addict"[17] and "d[id] not explain how a homeless drug addict had access to a typewriter" (id. (citing First Ev. Hr'g Tr. at 97, 109)); and (3) "Chapman's first name was misspelled in the first recantation as 'Jannet'" (id. (quoting First Chapman Statement)).  Each of these points at most calls into question whether Chapman physically *wrote* the three statements, not whether she caused them to be written or (with respect to the first or second statements) signed them.  To the extent that Chapman did receive assistance in the drafting of the statements, this fact would not be inconsistent with Eugene's testimony because Eugene acknowledged that he did not know if Chapman had received any such assistance.  (See First Ev. Hr'g Tr. at 101-02.)  Nor would any assistance undermine the statements' reliability; affiants, of course, very often do not prepare the sworn affidavits they sign.  See United States v. Shakur, No. 82-CR-312 (CSH), 1987 WL 15519, at *4 (S.D.N.Y. Aug. 3, 1987) (finding nothing "improper" about the preparation of an affidavit by a person other than the affiant because "[a]nyone familiar with the preparation of affidavits knows that they are often prepared by lawyers").

---

[17]     Respondent's characterization of Eugene's testimony is not quite right.  Eugene testified that he had no personal knowledge of Chapman's address but that he "*would think* that she was homeless" because he "constantly saw her on the street."  (First Ev. Hr'g Tr. at 97 (emphasis added).)

Fourth, Respondent suggests that the statements are unreliable because they are inconsistent with each other. (See Resp. Opening Opp'n at 9-10.) As Respondent points out, Chapman's second and third statements do not repeat the allegation in the first that the prosecutor "forced" her to testify against Lopez under a "threat of going to jail" if she did not. But there is no inconsistency here. The second statement simply does not mention any coercion; it does not provide contradictory information. And the third alleges that "[t]he district attorney's representative promised to arrange [Chapman's] early release in exchange for" her testimony, an allegation that appears to be simply a more sophisticated and specific way of saying what Chapman said more crudely in the first. Overall, the crux of Chapman's recantation is consistent between the three statements: each states that Chapman's testimony at Lopez's trial was not true; each states that Lopez was not at the scene of the crime; and the first and third state that Chapman testified against Lopez because of pressure from the prosecution, whether that pressure was a "threat" of additional jail time if she did not testify (the first statement) or a "promise[]" of less jail time if she did (the third).

It is also worth noting that there is evidence in the record corroborating Chapman's statement that she made a bargain with the prosecution in exchange for her early release from prison. Cafield's letter suggests that Chapman was "picked up to make sure she'd be available to testify" against Lopez. (Cafield Ltr. at 1.) And as discussed in Part I.A.2, it is undisputed that at some point, the prosecution offered Chapman a bargain whereby she would receive a sentence of time served on her VOP charge if she testified against Lopez consistently with the audiotaped statements she had made at the police station. (See Trial Tr. (Dkt. 59-1) at 94-95; Oct. 10, 1990, Hr'g Tr. at 4-5; Trial Tr. (Dkt. 59-2) at 489, 495.) It is unclear from the record whether the deal was revoked prior to Chapman's testimony; although A.D.A. Allen represented that it was (see

Trial Tr. (Dkt. 59-2) at 403), the court questions the veracity of this representation in light of

A.D.A. Allen's original false statement that Chapman had *never* been made aware of any offer to

begin with (compare Trial Tr. (Dkt. 59-1) at 94-96 (A.D.A. Allen's statements to Justice

Demarest that Chapman had never been made aware of any offer), with Oct. 10, 1990, Hr'g Tr.

at 4-5 (contract discussed in open court in Chapman's presence), and Trial Tr. (Dkt. 59-2) at

489-90, 492, 494 (Chapman's testimony acknowledging that a contract had been offered to her at

some point before being withdrawn)). But even assuming that the contract with Chapman was

(inexplicably) withdrawn prior to her testimony, the fact that such a deal was at some point

offered to Chapman corroborates her statement that she testified against Lopez out of hope that it

would result in an early release from prison. Cf. Cleveland, 693 F.3d at 640 (finding a

recantation statement more credible than the witness's trial testimony because the recantation

statement, unlike the trial testimony, was not given in exchange for a benefit from the police).

 Fifth, Respondent argues that "it is unlikely that [Chapman] gave these statements to

members of [Lopez's] family freely and voluntarily" because Chapman "was very afraid of

[Lopez] after the murder, up until the time of trial," and "testified at trial that she did not go to

the police immediately after witnessing the murder because she was afraid of the people

involved." (Resp. Opening Opp'n at 11-12 (citing Trial Tr. (Dkt. 59-2) at 491); see also Resp.

Post-Hr'g Opp'n at 14.) Respondent mischaracterizes Chapman's testimony. When asked why

she did not come forward to the police immediately after the shooting, Chapman stated:

"Because at the time, the people that I was involved with there was no—I didn't believe there

was any innocent people involved, okay and I was scared. I was scared, I was very scared,

okay." (Trial Tr. (Dkt. 59-2) at 491.) Chapman did not testify that she was afraid of *Lopez* or

other people involved in the case. To the contrary, when Lopez's counsel continued to press

Chapman on why she did not come forward, she stated: "Because I was scared at the time *I was doing drugs at the time*." (Id. (emphasis added).) This statement suggests that she was afraid not of Lopez or his family but of the possibility of getting arrested for her own drug usage by coming forward to the police. Chapman's testimony therefore does not call into question Eugene's assertion that Chapman provided her recantation statements voluntarily.[18]

Sixth, Respondent argues that Chapman may have been motivated to falsely recant to avoid being labeled a "snitch" in her neighborhood. (See, e.g., Resp. Post-Hr'g Opp'n at 12; Sept. 12, 2012, Resp. Ltr. at 2.) But as indicated above, given Chapman's admissions both to Cafield and to Lopez's family that she cooperated with the prosecution in exchange for her early release (see Cafield Ltr. at 1; Third Chapman Statement), the court doubts that she believed her recantation statements would help her avoid a "snitch" reputation. Moreover, Respondent's argument would apply to just about *any* recantation, and yet the case law is clear that recantation statements cannot simply be dismissed as unreliable without further analysis. See Schlup, 513 U.S. at 328; Fairman, 188 F.3d at 646; see also Cleveland, 693 F.3d at 638-40. Indeed, where courts have found recantation statements unreliable, they have based these findings on reliability flaws far more serious than those in Chapman's statements. See, e.g., Doe, 391 F.3d at 169, 173 (victim's recantation testimony was unreliable where it was inconsistent with the petitioner's own testimony at his plea allocution); Young v. Kirkpatrick, No. 07-CV-0371 (VEB), 2010 WL 4721592, at *13 (W.D.N.Y. Nov. 22, 2010) (recantation affidavit was unreliable because the witness "previously had been threatened with violence by [petitioner] when she refused to resume a romantic relationship with him"); Castillo, 2009 WL 1492182, at *6-7 (recantation

---

[18]     To the extent Justice Demarest found Chapman's recantation unreliable based on the notion that "Chapman recanted because she was admittedly afraid of testifying against [Lopez]" (440 Opinion at 10), that finding was unreasonable because it mischaracterizes Chapman's testimony, as discussed above. The court therefore accords this finding no deference. See Jones, 540 F.3d at 1288 n.5; Taylor, 366 F.3d at 1008.

testimony was unreliable where the witness had claimed that she gave her original testimony solely to collect reward money and yet had never collected any reward, and where other evidence corroborated her original testimony); Brown v. Woods, No. 07-CV-0058 (DLI), 2009 WL 789443, at *8 (E.D.N.Y. Mar. 20, 2009) (recantation testimony was unreliable for a "plethora" of reasons, including that the witness admitted to lying in his supporting affidavit and that his testimony was inconsistent with physical evidence); Dominguez v. Portuondo, No. 02-CV-5885 (PKC), 2004 WL 2002930, at *5 (S.D.N.Y. Sept. 8, 2004) (recantation was unreliable where the witness had received—and subsequently destroyed—five to seven letters from the petitioner while the petitioner was in prison and "admitted to liv[ing] in fear" during that time, and where she admitted to only briefly scanning "part" of her recantation affidavit).

For these reasons, the court believes Eugene's testimony and finds that Chapman provided the statements to him voluntarily in the manner he described.[19]

3.    Cesar Diaz's Testimony

Finally, the court finds Cesar Diaz's testimony to be reliable. Diaz testified under oath via a live video feed—permitting the court to see and hear him as he testified—and was subject to cross-examination by Respondent. Cf. United States v. Yates, 438 F.3d 1307, 1327 (11th Cir. 2006) (finding two-way videoconference testimony reliable because it "allow[ed] the witness to see the jury and the defendant," and vice versa); United States v. Owens, 789 F.2d 750, 756 (9th Cir. 1986) ("Live testimony is considered reliable because it is given under oath, the jurors can observe the witness' demeanor, and the witness is subject to cross-examination."), reversed on other grounds by 484 U.S. 554 (1988). Although more than twenty-three years had passed

---

[19]    Because of the limited impeachment purpose for which the court relies upon Chapman's recantation statements, it need not resolve whether, as Respondent argues, the statements are *less* reliable than her sworn testimony and audiotaped statements at the police station. (See, e.g., Resp. Post-Hr'g Opp'n at 12; Sept. 12, 2012, Resp. Ltr. at 2.) Even taking that as a given, the recantation statements demonstrate Chapman's inconsistency.

between the shooting and Diaz's testimony, and although he had been drinking on the night of the shooting (Second Ev. Hr'g Tr. at 10, 19), Diaz was able to describe the relevant details of the shooting with specificity. Among other things, he described: the approximate layout of the crackhouse (see id, at 9-10); the fact that there were two women in the crackhouse at the time (id. at 9-10); the complexions, heights, weights, and accents of the two intruders (id. at 10, 23); his own actions before and after the shooting (id. at 9-12); and the murder weapon (id. at 22 ("a long weapon")). Diaz also had no previous relationship with Lopez and thus no reason to be biased in his favor; indeed, Diaz was a good friend of *Surria's*, which if anything would give him good reason to want to bring Surria's murderer to justice. (Id. at 10, 12-13.) In short, nothing causes the court to seriously question the reliability of Diaz's account.[20]

### 4.   Summary of Conclusions on the "Credible" Prong

In sum, the court finds that the alibi witness affidavits and Diaz's testimony are reliable and properly considered on their substance for the purposes of resolving Lopez's actual innocence claim. Although that is sufficient for the court to move on to Schlup's "compelling" prong, see House, 547 U.S. at 537, the court has also discussed the purposes for which the Cafield letter and Chapman's recantation statements are reliably considered. These documents are of questionable reliability for determining the truth of the matters asserted therein—that is, for determining what Chapman actually saw on the night of the shooting. On the other hand, the court has found that Cafield's account of what Chapman *told her* is likely accurate, and believes Eugene's testimony that Chapman voluntarily provided him with the recantation statements in

---

[20]   On cross-examination, Respondent attempted to impeach Diaz's testimony based on his previous convictions for drug distribution and weapons possession. (See Second Ev. Hr'g Tr. at 26-28.) For similar reasons to those discussed with respect to Eugene (see Part II.A.2.b), the court finds this approximately 10-year-old criminal activity to be of little if any probative value for determining Diaz's character for truthfulness. See Smith, 2007 WL 4114342, at *2; McIntosh, 2006 WL 293224, at *13; Eagan, 1993 WL 121237, at *4.

the manner that he described. For these reasons, the court finds that the Cafield letter and Chapman's recantation statements reliably support the limited proposition that Chapman expressly contradicted her trial testimony on multiple occasions and eventually disavowed it, thus undermining her already suspect credibility.

### B.   Compelling

Having concluded that Lopez's actual innocence claim is "credible," the court must determine whether it is "compelling." Rivas, 687 F.3d at 541. The court holds that it is.

To make a "compelling" claim of actual innocence, a petitioner "must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" Id. (quoting House, 547 U.S. at 538). "It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather, the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." Schlup, 513 U.S. at 329. "This probabilistic analysis must determine 'not merely whether a reasonable doubt exists in the light of the new evidence,' but rather whether it is more likely than not 'that no reasonable juror would have found the defendant guilty.'" Doe, 391 F.3d at 163 (alterations omitted) (quoting Schlup, 513 U.S. at 329); see also Schlup, 513 U.S. at 333 (O'Connor, J., concurring) ("[A] petitioner does not pass through the [actual innocence] gateway . . . if the district court believes it is more likely than not that there is any juror who, acting reasonably, would have found the petitioner guilty beyond a reasonable doubt." (emphasis added) (citation omitted)). In making this inquiry, the court "consider[s] all the evidence, old and new, incriminating and exculpatory." House, 547 U.S. at 538 (internal quotation marks omitted).

49

Although the actual innocence standard is somewhat cryptic, the Supreme Court has attempted to clarify it by contrasting it with the standard for claims of insufficiency of evidence under Jackson v. Virginia, 443 U.S. 307 (1979).[21] The Jackson standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis omitted). The Court has made clear that the Jackson and Schlup standards are "by no means equivalent" and contain two key differences. Schlup, 513 U.S. at 330.

First, while "'[u]nder Jackson, the use of the word 'could' focuses on the *power* of the trier of fact to reach its conclusion,' the use of the word 'would' in the Schlup standard 'focuses the inquiry on the *likely* behavior of the trier of fact.'" Rivas, 686 F.3d at 542 (quoting Schlup, 513 U.S. at 330). "[U]nder Jackson the mere existence of sufficient evidence to convict would be determinative of [a] claim," Schlup, 513 U.S. at 330, because a reasonable juror *could* convict under these circumstances regardless of whether that juror would likely do so in light of other evidence in the record. Under Schlup, however, the court must ask whether the evidence as a whole tends to "show that the petitioner is *factually* innocent," Doe, 391 F.3d at 163, in order to determine the *likelihood* that any reasonable juror would convict in light of all the evidence—and regardless of whether that juror would possess the power to convict because of the existence of evidence in the record supporting the defendant's guilt.

Second, the Schlup standard permits the reviewing court to consider a different mix of evidence than the Jackson standard. Under Jackson the court "is limited to considering the evidence actually presented at trial, and must view that evidence in the light most favorable to

---

[21]   The Supreme Court has also noted that the gateway standard is "stronger [ ] than that needed to establish prejudice" but "lower . . . than the 'clear and convincing' standard" required for claims of actual innocence related to the penalty phase of capital cases. Schlup, 513 U.S. at 327 (quoting Sawyer v. Whitley, 505 U.S. at 333, 336 (1992) (requiring a petitioner to show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty")).

the prosecution." <u>Rivas</u>, 687 F.3d at 542. In contrast, "[b]ecause a <u>Schlup</u> claim involves evidence the trial jury did not have before it, the inquiry requires a federal court to assess how reasonable jurors would react to the overall, newly supplemented record," which may, unlike under <u>Jackson</u>, "include consideration of the credibility of the witnesses presented at trial." <u>House</u>, 547 U.S. at 538-39 (internal quotation marks omitted); <u>see also Schlup</u>, 513 U.S. at 330 (explaining that unlike under <u>Jackson</u>, where "the assessment of the credibility of witnesses is generally beyond the scope of review," under the gateway standard "the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial").

The court concludes that any reasonable juror would have reasonable doubt as to Lopez's guilt. It draws this conclusion based on: (1) the weakness of the prosecution's case at trial; (2) the new evidence undermining Chapman's testimony; (3) the alibi witnesses' affidavits; (4) Diaz's testimony; and (5) Lopez's testimony.

  1. <u>Weakness of the Prosecution's Evidence</u>

Even *without* the benefit of Lopez's new evidence, a reasonable juror would likely have serious questions about Lopez's guilt.

The first prosecution witnesses—Flores—was sober, face-to-face with the shooter, and spoke to him as he pointed a gun to her head. (Trial Tr. (Dkt. 59-2) at 250.) Yet she did not recognize Lopez when she saw him in the courtroom before her testimony, and stated in his presence that she did not see the shooter in the courtroom at all. (<u>Id.</u> at 217, 223; <u>see also id.</u> at 225 (Justice Demarest: "I see her looking around and saw her look at the defendant, I don't think there's any question that she cannot recognize him.").) Flores then testified that the shooter was "tall, dark, black," and "a little tall[er]" than Lupo, who was 6'3." (<u>Id.</u> at 258, 260, 528.) Lopez is 5'7" (<u>see</u> Part I.A.1) and the State later conceded that his "complexion could not

51

be described as black" (Trial Tr. (Dkt. 59-2) at 528).[22] Indeed, Justice Demarest found that "it appeared *not possible* [that] this defendant could have committed the crime based upon [Flores's] description."[23] (Trial Tr. (Dkt. 59-3) at 732 (emphasis added).)

The only eyewitness who *did* claim to recognize Lopez—Chapman—was in the midst of a two-day crack binge on the night of the shooting and had smoked ten to twelve vials of crack in the preceding two hours. (Trial Tr. (Dkt. 59-2) at 368, 389-91, 485-86, 512-16.) She claimed that, peering through the crack of the door to her room, she saw Lopez shoot Surria. (Id. at 355, 358, 364-66.) This testimony was inconsistent with her sworn audiotaped statement to the police that she did not see Lopez fire the gun but rather saw Lopez with a weapon, went back to her room, and then heard a shot and a body fall.[24] (Id. at 471-72, 477, 479.)



---

22    The court has reviewed a mug shot of Lopez taken in 1989 (see Dkt. 106-1) and agrees with the State's concession.

23    Respondent argues that "[t]he jury may have reasonably concluded that Flores confused the roles of the two perpetrators, and that her description of the shooter as tall, black, and Hispanic may have been the description of [Lopez's] accomplice." (Resp. Opening Opp'n at 17.) Anything is conceivable of course, but this speculative possibility—for which there is no support in the record—shows at most that Flores's description does not *rule out* Lopez's guilt; it does nothing to eliminate the *reasonable doubt* that Flores's description creates about Lopez's guilt.

24    Respondent suggests that none of this matters because "[t]he jury had an adequate opportunity to assess [Chapman's] credibility," and "heard and rejected all the reasons that [Lopez] has identified . . . as rendering [Chapman's] testimony unreliable." (Resp. Opening Opp'n at 15.) Respondent confuses the <u>Schlup</u> and <u>Jackson</u> standards. It may be true that the jury had an opportunity to assess Chapman's credibility, heard many of the factors undermining her testimony, and *could* reasonably have delivered a guilty verdict based on that testimony, but the existence of sufficient evidence to convict Lopez is not dispositive to the *likelihood* that any reasonable juror *would* deliver that verdict, considering both the weakness of the evidence produced at trial and the new evidence Lopez has presented. See <u>Schlup</u>, 513 U.S. at 330.



### 2.   Evidence Undermining Chapman's Testimony

Chapman's already suspect credibility is undermined further by the statements she made outside of the courtroom. As discussed above (see Part II.A.2), the court will consider Earline Cafield's letter and Chapman's recantation affidavits for the limited purpose of establishing Chapman's inconsistency. These documents show that Chapman expressly contradicted the testimony she gave at trial on multiple occasions and eventually disavowed it.

At trial, Chapman's testimony was quite sparse:  while she was in her room smoking crack with Howie Sachs, she heard a girl and Surria speaking in Spanish (Trial Tr. (Dkt. 59-2) at 354); heard a knock on the door (id.); saw Surria walk down the stairs with Lopez as the two were arguing in Spanish (id. at 354-55); saw Lopez point a shotgun at Surria and fire (id. at 355, 358, 364-66); heard Surria fall to the ground after she went back into her room (id. at 366); and then saw Lopez put down the gun, check Surria's pockets, and leave (id. at 369).  Chapman also testified that she did not understand what Surria and the shooter were saying because they were speaking in Spanish.  (Id. at 355.)

The stories Chapman told Cafield bear little resemblance to this testimony.  (See Part I.C.)  At one point Chapman told Cafield that Surria had bought crack for a girl in exchange for oral sex, that the girl's boyfriend came over and argued with Surria, that the boyfriend shot Surria "over the girl going out with him," and that someone named "Howie" with a "Jewish last name" then "went through the victim's pockets."  (Cafield Ltr. at 2-3.)  This story does not

---

[25]     Justice Demarest's opinion on Lopez's motion to vacate judgment states in a conclusory fashion that there was "strong evidence of guilt at [Lopez's] trial."  (440 Opinion at 8.)  This finding contains no explanation and is, frankly, outlandish given the circumstances described above.  The court gives it no deference.  See Jones, 540 F.3d at 1288 n.5; Taylor, 366 F.3d at 1008.

directly contradict Chapman's trial testimony—the jealous "boyfriend" may have been Lopez, his girlfriend may have been responsible for the "girl's voice" that Chapman claimed to have heard at trial (Trial Tr. (Dkt. 59-2) at 354), and the argument between Surria and the boyfriend may have been the argument in Spanish that she said she heard at trial.  But these facts are in serious tension with Chapman's testimony (1) that she could not understand the content of any of the conversations in Spanish between Surria, the shooter, and the "girl" at the scene (id.); and (2) that Howie Sachs was so high that he was not "aware of anything that was going [on] around him" (id. at 356, 358, 389), let alone alert enough to rob Surria after the shooting.  This story is also inconsistent with the testimony of Flores, who swore that Surria was killed after two men entered the crackhouse and demanded money and drugs, not that a single man entered the crackhouse and instigated a fight about his two-timing girlfriend.

In any event, even if the first story Cafield heard could be reconciled with Chapman's trial testimony, surely the second cannot be.  Cafield's letter states that in a conversation between Cafield, Chapman, and another inmate named Joyce, "it came out that the guy [Surria] was lured there [to the crackhouse] to be robbed, she's [Chapman is] the one who lured him there and [ ] Howie did the killing." (Cafield Ltr. at 2-3.)  Thus, in the second story Cafield heard, a different person killed Surria (Howie Sachs rather than Lopez), and Chapman herself had a role in luring Surria to the crackhouse to be robbed.[26]

Finally, after trial, Chapman explicitly recanted her testimony.  (See Part I.D.)  All three of the recantation statements Chapman provided to Eugene express clearly that Lopez was not present at the crime scene and had nothing to do with Surria's murder.  See Cleveland, 693 F.3d

---

[26]     The court notes that it is not entirely clear from Cafield's letter that the second story came from Chapman herself.  Cafield stated only that the story "came out" during a conversation between Cafield, Chapman, and Joyce (Cafield Ltr. at 3), and it is possible that Joyce rather than Chapman told the story.  Nevertheless, Cafield's letter suggests that Chapman was present during the conversation and either implicitly or explicitly agreed with the story even if it was Joyce who told it.  At the very least, there is no indication that Chapman disagreed with the story.

at 636, 641 (finding that "the recantation of the only eyewitness to [petitioner's] murder" presented, along with other evidence, "a compelling case for [petitioner's] innocence," particularly where "the jury heard plenty of evidence that called [the eyewitness's] credibility into question"). And two of the statements assert that Chapman fabricated her testimony because of pressure from the prosecution, a proposition that is corroborated by: (1) the evidence that the prosecution offered Chapman a deal (perhaps revoked prior to her testimony, perhaps not) whereby she would receive a sentence of time served on her VOP charge if she testified consistently with the audiotaped statement she made at the police department (see Part I.B); and (2) the Cafield letter, which asserts that Chapman told her she had been "picked up to make sure she'd be available to testify" against Lopez (Cafield Ltr. at 1).

In sum, we have now heard five different accounts of Chapman's perspective on the shooting: (1) she saw Lopez with a gun but did not see him fire it (audiotaped statement at the police station); (2) she saw Lopez shoot Surria (trial testimony); (3) Surria was shot by an unnamed man whose girlfriend had exchanged sexual favors for crack with Surria (first Cafield story); (4) Surria was shot by a man named "Howie" with a "Jewish last name" after he conspired with Chapman to lure Surria to the crackhouse to be robbed (second Cafield story); and (5) Lopez was not at the scene of the crime at all (recantation statements). Looking at Chapman's various statements alone, it is practically impossible to know how Surria was killed. But one thing seems relatively obvious: Chapman was not to be believed.

3.     Alibi Witness Affidavits

In addition to the failure of one eyewitness to recognize Lopez and the unreliability of the other, two people—Guido and Rivera—have sworn that Lopez was with them around the time of the crime. (See Part I.B.) The shooting occurred sometime after 2:00 a.m. on August 31, 1989.

(Trial Tr. (Dkt. 59-2) at 247.) According to Guido, "at approximately two to three" that morning, Lopez came to their shared home and talked to her for "about an hour or so" about a disagreement with his then common-law wife Juliana. (Guido Aff.) Lopez then told her that he was going to his brother's and Rivera's shared apartment to spend the night. (Id.) Rivera swore that in the early hours of that day, she, Lopez, Juliana, and Rivera's son were in front of her house drinking refreshments and attempting to patch up the disagreement between Lopez and Juliana. (Rivera Aff.) After the beginning of Lopez's trial, she asked Lopez "how in the world they c[ould] accuse him of doing something as heinous as murdering someone that morning when [they] were all outside in front of the house during that time." (Id.) Similarly, Guido stated that she could "attest with absolute certainty[] that [Lopez] could not have committed the crime" because Rivera told her that she "was in fact with [Lopez] during the time frame in which th[e] crime was to have occurred," at "[a]pproximately 3 to 3:30 am."[27] (Guido Aff.)

To be sure, these affidavits—even if fully credited—do not definitively eliminate the possibility that Lopez committed the crime. Neither affiant recalled the precise time of her meeting with Lopez, nor was the exact time of death established. For example, Flores testified that the murder occurred shortly after 2:00 a.m. (Trial Tr. (Dkt. 59-2) at 247), and Guido's affidavit places Lopez at their shared home "at approximately two to three" that morning, meaning that Lopez could conceivably have committed the crime before meeting with Guido.[28]

---

[27]     Based on this statement, Respondent argues that Guido "had no first-hand knowledge of [Lopez's] whereabouts when the crime occurred" but rather "her knowledge of [Lopez's] whereabouts . . . was based on representations made to her by Lydia Rivera." (Resp. Post-Hr'g Opp'n at 31.) The court disagrees. The precise time of the shooting is unclear from the record, so Lopez may have been with either Guido or Rivera (or neither) at the time it occurred. Although Guido did make reference to facts she heard from Rivera, what is important about each of the affidavits is the manner in which they track Lopez's activities during the approximate time of the crime; both women had personal knowledge in that regard.

[28]     Such a finding would be in some tension with Guido's statement that Lopez "appeared to be in good spirits," in contrast with Flores's testimony that the shooter was "drugged" and "acting . . . really crazy." (Trial Tr. (Dkt. 59-2) at 259.)

Moreover, as Justice Demarest pointed out, because "[t]he affiants both lived near the building where the shooting took place," Lopez could have been in all three places—his shared home with Guido, Rivera's home, and the crackhouse—at around the time of the murder. (440 Opinion at 6.) For instance, given that Rivera did not specify the exact time that Lopez was at her home (cf. Rivera Aff. (attesting that she was with Lopez on "the morning of August 31, 1989")), Lopez might have stopped by the crackhouse between the time he saw Guido and the time he saw Rivera; or he may have left Rivera's home, committed the crime, and returned. As a matter of common sense, the court finds it unlikely that Lopez could have walked away from a family gathering, killed a man, and then returned to the gathering without his family noticing a change in his demeanor or otherwise becoming suspicious; but these possibilities cannot be ruled out.

As a legal matter, however, the imperfections of the affidavits mean little. The actual innocence test "does not require absolute certainty about the petitioner's guilt or innocence." House, 547 U.S. at 538. The "appropriate question" is not whether the affidavits "conclusively and definitively establish [Lopez's] innocence, but whether . . . a reasonable juror considering the entire mix of evidence in the case would more likely vote to acquit or to convict." Rivas, 687 F.3d at 545; see also id. at 542-43 (noting that "it may be enough for the petitioner to introduce credible new evidence that thoroughly undermines the evidence supporting the jury's verdict" (citing House, 547 U.S. at 553-54)). In Schlup, for example, the petitioner "presented statements from [two alibi witnesses] that cast[ed] doubt on whether [petitioner] could have participated in the murder" in light of his location elsewhere around the same time. 513 U.S. at 331 (emphasis added). The Court noted that if these statements were "true . . . it surely [could not] be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." Id. Here, although the alibi witness affidavits do not establish

with certainty that Lopez did not commit the crime, they certainly "cast doubt" on the already flimsy evidence supporting the jury's verdict.  Id.

### 4.  Diaz's Testimony

The most straightforward—and perhaps the most compelling—piece of new evidence Lopez has presented is Cesar Diaz's testimony.  Simply put, after viewing a picture of Lopez taken shortly after the shooting, Diaz testified that he was "certain" that the man in the picture did not kill Surria.  (Second Ev. Hr'g Tr. at 15.)  Like Flores, Diaz described a shooter with characteristics very unlike those of Lopez:  a "black," "dark-skinned" man approximately 5'3" to 5'4" in height.[29]  (Id. at 10, 15; see also Part I.A.1.)

Of course, although Diaz's account of the shooter's complexion aligns with that of Flores, their accounts of the shooter's height—5'3" versus 6'3"—are starkly inconsistent.  The court cannot find any good way to reconcile these descriptions, but does not need one, as each clearly casts doubt on Lopez's involvement in the murder.  There are a number of inconsistencies between the accounts of the three eyewitnesses present at the shooting, but the bottom line is that, in the end, none of them apparently believed Lopez was there.

### 5.  Lopez's Testimony

Finally, the court considers the testimony of Lopez himself.  Lopez stated that he was having trouble sleeping between August 30 and 31, 1989, because he and Juliana had been arguing.  (First Ev. Hr'g Tr. at 184.)  He took a nap at his brother's house at 3053 Brighton Third Street from approximately 10:30 p.m. to 12:00-12:30 a.m., woke up, and walked over to his own apartment to check on Juliana.  (Id.)  Juliana's lights were off when he arrived so he walked over to Helen Guido's side of the apartment where she was awake reviewing some bills.  (Id. at 185.)

---

[29]     Diaz's description of the second intruder into the crackhouse—5'0" and "chubby" (Second Ev. Hr'g Tr. at 10, 23)—also bears no relation to Lopez, who, as mentioned above, is 5'7" (see Part I.A.1).

After talking to Guido for awhile, he returned at 2:45 a.m. to his brother's (and Lydia Rivera's) home, and was outside talking to Rivera until about 3:30 a.m. (Id.) He found out about the shooting of Surria from a person who walked by Rivera's house and "mumble[d] something about . . . a murder in the neighborhood." (Id. at 11-12.) He then went inside his brother's house to sleep. (Id. at 93, 185.)

Needless to say, a habeas petitioner's own testimony must be treated with suspicion. But the court has observed Lopez's demeanor and found him to be a believable witness.[30] His account was cogent, detailed, and substantially consistent with the affidavits of Guido and Rivera, and was not undermined in any significant way on cross-examination. His testimony thus lends additional (albeit limited) support to his actual innocence claim.

6.   Summary of Conclusions on the "Compelling" Prong

Based on "all of the evidence, both old and new," the court concludes that Lopez has established a "compelling" claim of actual innocence. House, 547 U.S. at 537. To summarize:

The only prosecution eyewitness who was sober and saw the perpetrator face-to-face—Flores—did not recognize Lopez when she saw him in the courtroom and described a shooter with such different characteristics that Justice Demarest found it "not possible [that] this defendant could have committed the crime based upon [Flores's] description." (Trial Tr. (Dkt. 59-3) at 732.) That alone would likely create at least some significant doubt in any reasonable juror.

---

[30]   Respondent argues that Lopez's "criminal history—which includes auto theft, criminal possession of stolen property, drug use, and drug dealing—is indicative of a propensity for dishonesty and for putting his own interests above those of society." (Resp. Post-Hr'g Opp'n at 18 (citation omitted) (citing First Ev. Hr'g Tr. at 7-8, 65-68).) For similar reasons to those discussed with respect to Eugene (see Part II.A.2.b) and Diaz (see Part II.A.3), the court does not believe that this criminal history has significant probative value for determining Lopez's character for truthfulness. See Smith, 2007 WL 4114342, at *2; McIntosh, 2006 WL 293224, at *13; Eagan, 1993 WL 121237, at *4.

The only prosecution eyewitness who *was* able to identify Lopez had been awake for two days straight, had smoked ten to twelve vials of crack in the two hours prior to the shooting, claimed (at most) to have seen everything while looking from a separate room through a partially ajar door, provided several inconsistent accounts of what she saw, and eventually stated unambiguously that Lopez was not at the scene of the crime and was innocent. Even without giving full credit to Chapman's recantation statements, it is hard to imagine how any juror, thinking reasonably, could fail to suspect the veracity of such a dubious witness.

Since trial, two people have sworn that Lopez was with them around the time of the crime. Although viewed in isolation, the affidavits of Guido and Rivera do not entirely eliminate the possibility that Lopez committed the crime, they certainly "cast doubt" on whether [Lopez] could have participated in the murder," Schlup, 513 U.S. at 331, particularly in light of the other evidence both during and after trial.

Most recently, a man who, like Flores, apparently came face-to-face with the shooter, witnessed the shooting, and had no particular reason to lie, has testified that the person displayed in Lopez's mug shot was not the shooter and was not present at the crime scene. Also like Flores, he described a shooter with characteristics that do not resemble those of Lopez.

Finally, there is Lopez himself. Prior to his conviction, Lopez had never been convicted of any violent crime or any crime involving a weapon, and has never during his twenty-three years in prison received a disciplinary infraction for any violent activity. (See First Ev. Hr'g Tr. at 7, 88.) Since his conviction, Lopez has unrelentingly maintained his innocence, including compiling a 223-page dossier devoted to telling his story. (See Hr'g Exs. at 3-225.) At the evidentiary hearing, he told that story openly and persuasively.

In light of all of these factors—Flores's description, Chapman's lack of credibility and eventual recantation, Lopez's plausible alibi, and Diaz's exonerating testimony—the court finds it "more likely than not any reasonable juror would have reasonable doubt" as to Lopez's guilt. House, 547 U.S. at 538. Because Lopez has presented a "credible" and "compelling" claim of actual innocence, his is one of those "extraordinary cases" warranting an equitable exception to AEDPA's limitation period. Rivas, 687 F.3d at 518. The court will therefore reach the merits of his ineffective assistance of counsel claim despite his failure to timely file the Petition. See id.

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Lopez argues that he received ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, because of his trial counsel's failure to investigate and call Helen Guido and Lydia Rivera as witnesses.[31] (See Pet'r Opening Mem. at 32-33; Pet'r Post-Hr'g Mem. at 24-26.) Justice Demarest adjudicated this claim on the merits in denying Lopez's motion to vacate judgment. (See 440 Opinion at 5-6.) Thus, as explained below, Lopez must establish both (1) that Justice Demarest's decision was unreasonable under 28 U.S.C. § 2254(d) and (2) that his constitutional rights were violated under 28 U.S.C. § 2254(a). He has done so.

Section 2254(a) of Title 28 empowers a district court to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Section 2254(d), a provision of AEDPA, sets forth a highly deferential standard

---

[31]      Because of the result the court reaches on this claim, it need not address the six constitutional claims Lopez raised in his original Petition (see Pet. (asserting the same six claims Lopez asserted on direct appeal)) or the due process claim Lopez raised in his Amended Petition (see Am. Pet; Pet'r Opening Mem. at 36-38). Nor does the court reach the other components of Lopez's ineffective assistance of claim: that Lopez's various counsel were ineffective for failing to adequately follow up on Cafield's letter (see Pet'r Opening Mem. at 33-35) and that Irving Anolik provided him with ineffective assistance at sentencing (see Pet'r Post-Hr'g Mem. at 27-29). The court notes without deciding, however, that Anolik's admitted lack of preparation at Lopez's sentencing and failure to make any meaningful attempt to bring the Cafield letter to Justice Demarest's attention (see generally Part I.C) may very well provide additional support for Lopez's ineffective assistance claim. Cf. Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (considering errors made by counsel "in the aggregate").

of review that federal courts must apply when reviewing a claim in a habeas corpus petition that was adjudicated on the merits in state court proceedings:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Thus, when faced with a claim for habeas relief that was adjudicated on the merits in state court, the court must first ask whether the state court's adjudication of the claim was unreasonable under either of the two prongs of § 2254(d). For these purposes, the court's review is "limited to the record that was before the state court that adjudicated the claim on the merits," Pinholster, 131 S. Ct. at 1398, and so the court may not consider evidence produced at a federal evidentiary hearing, see Lopez I, 2012 WL 6027751, at *1.

If the petitioner surpasses the § 2254(d) hurdle, the court may nonetheless grant habeas relief only if the petitioner has shown a violation of federal law under § 2254(a). See Paige v. McDonough, No. 06-CV-389 (MCR) (EMT), 2008 WL 1844358, at *8 (N.D. Fla. Apr. 22, 2008). In that second analysis, the court reviews the claim de novo—i.e., with no deference to the state court's legal conclusions. See Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."); Detrich v. Ryan, 677 F.3d 958, 982 (9th Cir. 2012) (although Panetti's analysis was addressed to § 2254(d)(1), the court

could "see no reason why [its] approach should be different where a state court's adjudication of a claim is dependent on an antecedent unreasonable determination of fact" under § 2254(d)(2). Thus, at that point, the court may consider evidence that was not before the state court, including evidence produced at a federal evidentiary hearing. See Lopez I, 2012 WL 6027751, at *1.

For the reasons that follow, the court concludes (1) that Justice Demarest's adjudication of Lopez's ineffective assistance claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2) (see Part III.A); and (2) that Lopez "is in custody in violation of the Constitution or laws or treaties of the United States" because his counsel rendered ineffective assistance by failing to call Guido and Rivera as alibi witnesses, 28 U.S.C. § 2254(a) (see Part III.B). The court addresses § 2254(d) and § 2254(a) in turn.

### A.  Section 2254(d):  Reasonableness of the State Court's Adjudication

During his state collateral proceeding, Lopez's ineffective assistance claim was largely based on his own sworn affidavit and the affidavits of Guido and Rivera, each of which he provided to Justice Demarest. His own affidavit alleges, in relevant part:

> Prior to and during trial my trial attorney William Lupo, was apprised of my intent to pursue my alibi defense. Subsequently, I gave him the names of the two witnesses and he said he would speak to them; however, during trial . . . he counseled that it was bad idea to present them since they were closely related and because of it, the jury would not believe them. Being naive of the law, and most importantly trusting in my attorney I assented to his decision. Years later, after I came upstate I discovered from my witnesses that Mr. Lupo[] never interviewed them. In fact, he never called them nor spoke to them.

(Lopez Aff. at 1-2.) As discussed above, the affidavits of Guido and Rivera also assert that Lupo never contacted them about testifying at trial.  (See Part I.B.)  Lopez argued that Lupo's failure to "interview[] the potential alibi witness or witnesses" and his failure to "call one or both of them . . . deprived [him] of effective assistance of counsel."  (Def. 440 Mem. at 21.)

In her opinion denying Lopez's motion to vacate judgment—which, by implication, denied his request for an evidentiary hearing—Justice Demarest provided a two-paragraph analysis of Lopez's ineffective assistance claim based on counsel's failure to call the alibi witnesses:

> Defendant first claims that trial counsel was ineffective for failing to investigate two prospective alibi witnesses, Lydia Rivera (defendant's sister-in-law) and Helen Guido (defendant's mother-in-law). Both Rivera and Guido provided affidavits stating that they were talking to defendant in the early morning hours of August 31, 1989, when the shooting took place, and that they were never contacted by Lupo. Defendant's claim, however, is undermined because it is directly contradicted by his own and counsel's statements on the record. After the close of the evidence, defense counsel Lupo placed on the record that defendant had informed him of a single alibi witness. Counsel told the court that he had interviewed the witness at length and that he had advised defendant and his family that it would not be prudent to put that witness on the stand. Counsel asked whether defendant agreed and defendant stated, "Yes, I agree with him." The court asked defendant to acknowledge whether what his lawyer said was true; defendant replied in the affirmative and confirmed that he was satisfied in not presenting the alibi witness. Now claiming that counsel neglected to investigate two alibi witnesses, defendant nevertheless fails to explain why he would have misled the court into believing that only one alibi witness existed, that defense counsel properly investigated that witness, and that defendant had discussed the matter with counsel. Accordingly, defendant's new allegations are simply not credible.
>
> Additionally, even if counsel was aware of defendant's purported alibi witnesses, the Rivera and Guido affidavits do not necessarily exculpate defendant and counsel may not be deemed ineffective for choosing not to call these two affiants to testify. The fact that Rivera and Guido may have seen defendant in the early hours of August 31, 1989, while sharing drinks, does not render defendant's participation in the shooting impossible. The affiants both lived near the building where the shooting took place and defendant could have easily been in both places during that stretch of time. After investigating defendant's alleged alibi defense, counsel could have come to the reasonable and strategic conclusion that presenting Rivera and Guido as witnesses would not benefit the defense.

(440 Opinion at 5-6 (citations omitted).)

In short, Justice Demarest rejected Lopez's claim for two reasons, both of which were directed to the adequacy of Lupo's performance: she determined (1) that Lopez's "new

allegations" related to Lupo's investigation were "not credible" because of the statements Lopez and Lupo made on the record at the time of trial; and (2) that "counsel could have come to the reasonable and strategic conclusion that presenting Rivera and Guido as witnesses would not benefit the defense" because, due to the proximity of their residences to the location of the shooting, their affidavits "d[id] not render [Lopez's] participation in the shooting impossible." (Id.) Both of these justifications were unreasonable.

With respect to the first justification, the court will put aside whether it was reasonable for Justice Demarest to find—based entirely on Lopez's brief and generalized answers to her questions in court—that Lopez told Lupo about only one potential alibi witness rather than two. Lopez's ineffective assistance claim rested not on whether Lupo failed to interview *one* of the two witnesses Lopez told him about, but on his claim that Lupo interviewed *neither* of them. (See Def. 440 Mem. at 21, 23-24.) If this factual issue had been resolved in Lopez's favor, Lupo's investigation of the alibi defense would almost certainly have been inadequate. See Pavel v. Hollins, 261 F.3d 210, 220 (2d Cir. 2001) (counsel's failure to call petitioner's mother as alibi witness "was based on an inadequate investigation" because, "at the very least, [counsel] should have directly contacted [the witness]—to learn more about the testimony that she would have offered, and to determine whether she might serve as a suitable witness based, *inter alia*, on his assessment of her credibility"); Pena-Martinez v. Duncan, 112 F. App'x 113, 114 (2d Cir. 2004) ("[C]ounsel's failure to investigate alibi witnesses is particularly egregious."); Poindexter v. Booker, 301 F. App'x 522, 528 (6th Cir. 2008) ("[W] have [ ] granted habeas relief when counsel failed to investigate, particularly when counsel declined to interview key defense witnesses." (emphasis omitted)); Grooms v. Solem, 923 F.2d 88, 90 (8th Cir. 1991) ("Once a defendant identifies potential eyewitnesses, it is unreasonable not to make some effort to contact

[alibi witnesses] to ascertain whether their testimony would aid the defense."); <u>Crisp v.
Duckworth</u>, 743 F.2d 580, 584 (7th Cir. 1984) ("[A]n attorney who fails even to interview a
readily available witness whose noncumulative testimony may potentially aid the defense should
not be allowed automatically to defend his omission simply by raising the shield of 'trial strategy
and tactics'"); <u>McCollough v. Bennett</u>, No. 02-CV-5230, 2010 WL 114253, at *11 (E.D.N.Y.
Jan. 12, 2010) ("A failure to investigate alibi witnesses is particularly egregious.").

Justice Demarest rejected Lopez's claim without evaluating this central factual issue of
whether Lupo failed to interview *both* of the alibi witnesses.  On this issue, what mattered was
not *Lopez's* credibility—on which Justice Demarest focused—but Lupo's, Guido's and Rivera's;
only they had personal knowledge regarding whether Lupo spoke to Guido and Rivera.  Both
Guido and Rivera swore that Lupo did not speak with them (<u>see</u> Guido Aff.; Rivera Aff.), while
Lupo had represented to Justice Demarest that he "interviewed [one] alibi witness" at
"considerable length" (Trial Tr. (Dkt. 59-3) at 536-37).  These conflicting accounts gave rise to a
credibility contest that Justice Demarest simply could not have effectively resolved without
holding an evidentiary hearing to gauge the credibility of Guido and Rivera (two women whom
Justice Demarest had never before met).  <u>See</u> <u>Winston v. Kelly</u>, 592 F.3d 535, 557 (4th Cir.
2010) (finding that the state court's denial of discovery and an evidentiary hearing produced an
adjudication of "a claim that was materially incomplete," and thus instructing the district court to
extend no deference under AEDPA to the state court); <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1169-70
(9th Cir. 2005) (state court's resolution of a "credibility contest" between a petitioner and law
enforcement officers was an unreasonable determination of fact where the court did not conduct
an evidentiary hearing); <u>Fanaro v. Pineda</u>, No. 10-CV-1002, 2012 WL 1854313, at *3 (S.D. Ohio

May 21, 2012) (state court acted unreasonably in "fail[ing] to hold a hearing at which [ ] a credibility determination could be made").

Not only did Justice Demarest fail to hold a hearing, she made *no* attempt to resolve this essential factual dispute, instead fixating solely on the brief colloquy exchanged between her and Lopez during trial. That colloquy, however, provided little guidance on whether Lupo interviewed Guido and Rivera. Lopez specifically stated in his affidavit to Justice Demarest that his statements in court were based upon Lupo's representation to him that Lupo would speak to the two witnesses, which Lopez only learned years later to be false. (See Lopez Aff. at 2 (swearing that Lupo "said he would speak to" Guido and Rivera, that Lupo later "counseled that it was a bad idea to present them since they were closely related," and that, "[b]eing naive of the law, and most importantly trusting in [Lupo, Lopez] assented to his decision").) Thus, Lopez's answer of "Yes" when Justice Demarest asked him if what Lupo said in court was true (Trial Tr. (Dkt. 59-3) at 537) was not informative in light of the evidence before Justice Demarest; at most, it showed that Lupo indeed *told* Lopez that he had spoken with *either* Guido or Rivera. Once Lopez explained to Justice Demarest (in his affidavit) why he gave affirmative answers during their brief colloquy and showed her two affidavits explicitly contradicting Lupo's statements, Justice Demarest could not have reasonably evaluated Lupo's investigation without hearing live testimony from the only living people with personal knowledge relating to that investigation.

Justice Demarest's second justification was unreasonable for similar reasons. It is true, as discussed above, that the alibi witness affidavits did not conclusively exonerate Lopez—even fully crediting their contents, Lopez could potentially have been with Guido and Rivera on the morning of the shooting and still committed the crime. (See Part II.B.3.) But this possibility alone surely does not make Lupo's decision objectively reasonable or even strategic in nature.

The question of whether Lupo reasonably decided not to call Guido and Rivera depends on the credibility of the witnesses and the *likelihood* that Lopez could have committed the crime in light of his location around the time of the shooting, which in turn would determine the likelihood that the alibi witnesses' testimony would have benefited Lopez's defense. If Lupo failed to interview either Guido and Rivera at all—a possibility that, as discussed above, Justice Demarest did not reasonably address—then Lupo would have had *no* information about the likelihood that Lopez could have committed the crime in light of their testimony, and could not have reasonably decided against calling them on this basis. See Pavel, 261 F.3d at 220; Pena-Martinez, 112 F. App'x at 114; Poindexter, 301 F. App'x at 528; Grooms, 923 F.2d at 90; Crisp, 743 F.2d at 584; McCullough, 2010 WL 114253, at *11. An evidentiary hearing was thus necessary both (1) to determine whether Lupo in fact interviewed Guido and/or Rivera and obtained details on the timing and nature of their experiences with Lopez on the day of the shooting, which would inform whether Lupo conducted an adequate *investigation* of these witnesses; and (2) to provide Justice Demarest herself with those details so that she could determine the likelihood that Lopez could have committed the crime in light of his interactions with Guido and Rivera, which would inform her as to the reasonableness of Lupo's ultimate *decision* not to call them. Instead, Justice Demarest focused solely on the fact that the affidavits did not establish Lopez's innocence with absolute certainty. That was unreasonable.

In sum, Justice Demarest's decision was unreasonable because it was based on a "materially incomplete" analysis. Winston, 592 F.3d at 557. First, she found that Lopez's claims lacked credibility without developing—and, indeed, disregarding entirely—the central and contested factual issue of whether Lupo failed to speak with *either* Guido or Rivera before deciding not to call them, see id.; Earp, 431 F.3d at 1169-70; Fanaro, 2012 WL 18543133, at *3,

a fact that if decided in Lopez's favor would almost certainly render Lupo's assistance ineffective under well-established case law, see, e.g., Pavel, 261 F.3d at 220; Pena-Martinez, 112 F. App'x at 114; Poindexter, 301 F. App'x at 528; Grooms, 923 F.2d at 90; Crisp, 743 F.2d at 584; McCollough, 2010 WL 114253, at *11.  Second, she failed to ascertain the likelihood that Lopez could have committed the crime in light of the timing and nature of his interactions with Guido and Rivera on the morning of the shooting, another contested factual issue that was critical to whether Lupo's decision had a basis in reasonable trial strategy and one that Justice Demarest could not have reliably settled without holding an evidentiary hearing.  Thus, Justice Demarest's adjudication of Lopez's ineffective assistance claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

**B.    Section 2254(a): Constitutional Violation**

Because Lopez has surpassed AEDPA's § 2254(d) hurdle, the court must next decide whether he is "in custody in violation of the Constitution."  28 U.S.C. § 2254(a); see also Paige, 2008 WL 1844358, at *8.  Here, the court's review is de novo, see Panetti, 551 U.S. at 953; Detrich, 677 F.3d at 982, and it may consider the evidence that was produced at the evidentiary hearings, see Lopez I, 2012 WL 6027751, at *1.  But before the court conducts its de novo analysis of Lopez's ineffective assistance claim, it must resolve an evidentiary issue.

**1.    Admissibility of the Alibi Witness Affidavits**

The parties dispute whether the affidavits of Guido and Rivera are admissible under the Federal Rules of Evidence.[32]  (See Sept. 11, 2012, Pet'r Ltr. at 4-5; Sept. 12, 2012, Resp. Ltr. at 3.)  The court holds that they are.

_____

[32]     The court did not need to conduct an analysis under the Federal Rules of Evidence in ruling on Lopez's actual innocence claim because, as discussed above, such claims are "not bound by the rules of admissibility that

The Federal Rules of Evidence apply in federal habeas proceedings.[33] Loliscio v. Goord, 263 F.3d 178, 186 (2d Cir. 2001) (citing Fed. R. Evid. 1101(e)). Under Rules 801 and 802, "[a]ny statement that is made by a declarant not testifying at trial, offered in evidence to prove the truth of the matter asserted, is excluded as hearsay absent applicability of one of the hearsay exceptions provided in the Federal Rules of Evidence or a relevant statute." United States v. Carneglia, 256 F.R.D. 384, 391 (E.D.N.Y. 2009). The "traditional" exceptions to the hearsay rule are set forth in Rules 803 and 804, but where (as here) a statement falls within none of these traditional exceptions, it may nonetheless be admissible under the "catch-all" or "residual" exception in Rule 807. Id. at 391-92. The parties both acknowledge that the alibi witness affidavits are hearsay, but dispute whether they are admissible under Rule 807. (See Sept. 11, 2012, Pet'r Ltr. at 4-5; Sept. 12, 2012, Resp. Ltr. at 3.)

Rule 807 must be invoked "very rarely, and only in exceptional circumstances." Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir. 1991). It contains five requirements: (1) "the statement has equivalent circumstantial guarantees of trustworthiness"; (2) "it is offered as evidence of a material fact"; (3) "it is more probative on the point for which it is offered than any

---

would govern at trial." Schlup, 513 U.S. at 328. Moreover, as Respondent does not dispute, the court did not need to discuss the Federal Rules for the purposes of its § 2254(d) analysis. Justice Demarest, after all, did consider the alibi witness affidavits in ruling on Lopez's motion to vacate judgment (see 440 Opinion at 5-6), and so the documents must be considered in order to determine the reasonableness of her decision. See 28 U.S.C. § 2254(d)(2) (court may not grant habeas relief under § 2254(d)(2) unless the state court's decision "was based on an unreasonable determination of the facts *in light of the evidence presented in the State court proceeding*" (emphasis added)).

[33]   Although the court concludes that the alibi witness affidavits are admissible under a straightforward application of the Federal Rules, it notes that "[t]he discretion generally afforded judges in making evidentiary rulings in habeas corpus cases" because of both (1) "the nonjury nature of the proceeding" and (2) "Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts, which allows introduction into the record of materials that would be excludable on hearsay and other evidentiary grounds in most federal trial contexts." 1 Randy Hertz and James S. Liebman, Federal Habeas Corpus Practice and Procedure § 21.2 (6th ed. 2011) (citing Amadeo v. Zant, 486 U.S. 214, 227 n.5 (1988)); see also 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 102.06 & n.1 (2d ed. 2012) (the Federal Rules "offer[] ample justification and support for less restrictive application of the rules of evidence in different kinds of cases," and "strict application of the rules of evidence is not warranted in non-jury . . . hearings").

other evidence that the proponent can obtain through reasonable efforts"; (4) "admitting it will best serve the purposes of these rules and the interests of justice"; and (5) "the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars." Fed. R. Evid. 807; see also Silverstein v. Chase, 260 F.3d 142, 149 (2d Cir. 2001). "[T]he evidence must, in other words, fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice." Schering Corp. v. Pfizer Inc., 189 F.3d 218, 231 (2d Cir. 1999) (internal quotation marks and alteration omitted).

The second, third, and fifth requirements are easily satisfied here. The affidavits are material because they support Lopez's alibi. They are more probative than other available evidence because both Rivera and Guido are unavailable to testify. (See Rivera Death Certificate; McHale Aff.; Zduniak Aff.; supra n.8.) And Lopez provided Respondent with reasonable notice of his intent to offer the affidavits—he provided them to Justice Demarest in 2010 in connection with his collateral proceeding, and he noted in September his intent to offer the affidavits in lieu of live testimony. (See Sept. 11, 2012, Pet'r Ltr. at 4-5.)

The fourth Rule 807 requirement (interests of justice) generally collapses with the first (trustworthiness).[34]  See In re Drake, 786 F. Supp. 229, 234 (E.D.N.Y. 1992). Thus, the admissibility of the alibi witness affidavits comes down to whether they have "equivalent circumstantial guarantees of trustworthiness." Fed. R. Evid. 807(a)(1).

The word "equivalent" refers to the traditional hearsay exceptions in Rules 803 and 804. Fed. R. Evid. 807(a); see also Schering, 189 F.3d at 233 ("The traditional exceptions to the hearsay rule . . . provide the benchmark against which the trustworthiness of evidence must be

---

[34]     Respondent challenges only Lopez's satisfaction of the first requirement, and does not contend that admission of the affidavits would not be in the interests of justice for some reason independent of their lack of trustworthiness. (See Sept. 12, 2012, Resp. Ltr. at 3.)

compared in a residual hearsay analysis."). Evidence may thus be admitted under Rule 807 only if it "possesses all the particularized guaranties of trustworthiness found in the other hearsay exceptions." In re Cornfield, 365 F. Supp. 2d 271, 278 (E.D.N.Y. 2004). Under these traditional exceptions, the proponent of the hearsay has the burden of showing its trustworthiness. See United States v. Paulino, 445 F.3d 211, 220 (2d Cir. 2006). "To carry this burden, he must point to evidence that corroborates both the declarant's trustworthiness and the truth of the statement." Id. (internal quotation marks omitted). "[T]he inference of trustworthiness from the proffered 'corroborating circumstances' must be strong, not merely allowable." United States v. Salvador, 820 F.2d 558, 561 (2d Cir. 1987); see also United States v. Bahadar, 954 F.2d 821, 829 (2d Cir. 1992) (if a statement fails Rule 804's "corroborating circumstances" test, it "obviously lacks equivalent guarantees of trustworthiness").

The court's inquiry with respect to trustworthiness is guided by the "four classes of risk peculiar to [hearsay] evidence: those of (1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." Schering, 189 F.3d at 232. "The hearsay rule ordinarily prohibits the admission of out-of-court statements by declarants on the theory that cross-examination can help test for these four classes of error." Id. The guarantees of trustworthiness in the exceptions to the hearsay rule are "a function of their ability to minimize some of the[se] four classic hearsay dangers." Id. at 233. Thus, although "a hearsay statement need not be free from all four categories of risk to be admitted under Rule 807," the court must consider "the relative degree to which the evidence offered is prone to [the four] risks." Id.

The second, third, and fourth categories are not particularly problematic here. Guido and Rivera knew Lopez very well and almost certainly could not have "misperceived" that they were with him on the morning of the shooting absent some lapse in memory. And the risk of faulty

memory is minimal as well, for the reasons discussed in Part II.A.1. Although sixteen years had passed between the shooting and the signing of the affidavits, both Guido and Rivera described the morning of the shooting in detail: both remembered discussing the disagreement between Lopez and Juliana; Guido remembered that she was normally awake at around the time she saw Lopez because of her midnight shift at the hospital; and Rivera remembered the weather and the people present at her house that morning. See Goode v. United States, 730 F. Supp. 2d 469, 475 (D. Md. 2010) ("[W]hether a statement i[s] rich in detail . . . [is] relevant to the trustworthiness determination."); see also United States v. Sablan, No. 00-CR-00531 (WYD), 2008 WL 700172, at *25 (D. Colo. Mar. 13, 2008) ("The detailed nature of the letter makes it more trustworthy."). The risk of faulty memory is particularly low because, soon after the events in question—once Lopez was arrested and indicted—the affiants expected that they would need to remember their interactions with Lopez. (See Guido Aff. (stating that "during [Lopez]'s trial, [she] remember[ed Lopez] telling [her] to expect to be called to testify"); Rivera Aff. (prior to Lopez's trial, she "specifically advised him that when he spoke to his lawyer," he should "make clear to him that [she] was willing to testify on his behalf").) There is also no apparent risk of faulty narration, such as where testimony "reflect[s] confusion" or where the witness "simply missp[eaks]." Rus, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d 302, 308 n.3 (S.D.N.Y. 2003). Both witnesses stated without ambiguity (and in writing) that they were with Lopez on the morning of the shooting and gave relatively clear accounts of the basics of their interactions with Lopez. Although the witnesses could not describe the *timing* of these interactions with precision, this is not a problem of "faulty narration" but simply a fact that might make their testimony less compelling. (See Part II.B.3.) The court must assume that the witnesses would have been similarly imprecise if

they had been called to testify in person, but need not disregard their affidavits on this basis. In other words, the problem of imprecision goes to the affidavits' weight, not their admissibility.

The only potentially significant hearsay risk present with the alibi witness affidavits is the risk of insincerity—that is, the risk that Guido and Rivera were lying in their affidavits about their interactions with Lopez on the night of the shooting. Had the witnesses been available to testify, this class of error could have been tested with cross-examination. Nevertheless, for the reasons discussed in Part II.A.1, the court does not consider the risk of insincerity to be a major concern. The affidavits are detailed, internally consistent, and substantially consistent with each other. Because they were submitted in connection with a *pending* litigation, Guido and Rivera presumably expected to be subject to cross-examination on their contents, and indeed intended to testify before this court until shortly before the evidentiary hearing, when they became unable to do so. See Bohler-Uddeholm, 247 F.3d at 113 (upholding decision to admit affidavit based in part on the fact that "the declarant was aware of the pending litigation at the time he made the declaration and thus knew that his assertions were subject to cross examination" (internal quotation marks omitted)). And once again, the court rejects Respondent's suggestion that Guido and Rivera fabricated false affidavits because of their familial relationships with Lopez; these relationships (1) would not by themselves persuade the court to reject their testimony, see Brownridge, 2010 WL 2834829, at *6; see also Wright, 183 F.3d at 1333; Smolen, 80 F.3d at 1289; and (2) had ended long before Guido and Rivera wrote their affidavits, which occurred twelve years after Lopez's remarriage and his loss of virtually all contact with those he had previously considered his family. (See First Ev. Hr'g Tr. at 20-21.)

In short, three of the four classic hearsay dangers are absent or negligible, and the court does not find a significant risk of insincerity. See generally Schering, 189 F.3d at 233 (hearsay

"need not be free from all four categories of risk to be admitted under Rule 807."). The affidavits—as well as the trustworthiness of the affiants—are corroborated (1) by each other; (2) by Lopez's testimony, which, as discussed above, was substantially consistent with the affidavits (see Part II.B.4); and (3) by Chapman's recantation statements, Cafield's letter, and Diaz's testimony, each of which suggests, like the affidavits, that someone other than Lopez committed the murder. Cf. Paulino, 445 F.3d at 220; Salvador, 820 F.2d at 561. Thus, Lopez has met his burden of showing that the affidavits possess "equivalent circumstantial guarantees of trustworthiness" to the traditional hearsay exceptions. Fed. R. Evid. 807. Indeed, the court finds no good reason to doubt the trustworthiness of Guido and Rivera or their affidavits. Cf. United States v. Camacho, 166 F. Supp. 2d 287, 299 (S.D.N.Y. 2001) ("With respect to exculpatory statements, the purpose of the corroboration requirement is to prevent criminal accomplices from fabricating evidence at trial." (citing United States v. Rodriguez, 706 F.2d 31, 40 (2d Cir. 1983))).

Because the affidavits satisfy all five of the Rule 807 requirements and the interests of justice would be served by considering them, this case presents "exceptional circumstances" calling for the residual exception to the hearsay rule. Parsons, 929 F.2d at 907. Accordingly, the court will consider the affidavits in ruling on Lopez's ineffective assistance of counsel claim.

2.    Merits of Lopez's Ineffective Assistance of Counsel Claim

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy . . . the Assistance of Counsel for his defence." U.S. Const. amend VI. This right to counsel, which applies to the states as a component of the right to "due process of law" secured by the Fourteenth Amendment, see Evitts v. Lucey, 469 U.S. 387, 394 (1985), encompasses "the right to the *effective* assistance of counsel," McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).

Claims of ineffective assistance of counsel are governed by the Supreme Court's holding in Strickland v. Washington, 466 U.S. 668 (1984). See Williams v. Taylor, 529 U.S. 362, 390 (2000). Strickland established two requirements for such claims: the petitioner must demonstrate (1) that "counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687.

a.  *Performance*

Under Strickland's "performance" prong, a petitioner must show that trial counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms." Id. at 688. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" Greiner v. Wells, 417 F.3d 305, 319 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 690). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. Thus, a court must "not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a significant potential downside," or if the lawyer otherwise had "a reasonable justification for the decision." Greiner, 417 F.3d at 319 (internal quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91.

"The decision not to call a particular witness is typically a question of trial strategy," United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998), and the Second Circuit "ha[s] been especially hesitant to disturb such strategic decisions," Pavel, 261 F.3d at 217. But as discussed in Part III.A, it is well-established that the refusal even to *interview* a witness with potentially exculpatory information cannot be considered "strategic" and thus generally constitutes deficient performance. See, e.g., id. at 220-21; Pena-Martinez, 112 F. App'x at 114; Poindexter, 301 F. App'x at 528; Griffin v. Warden, Md. Corr. Adjustment Ctr., 970 F.2d 1355, 1358-59 (4th Cir. 1992); Grooms, 923 F.2d at 90; Lawrence v. Armontrout, 900 F.2d 127, 129 (8th Cir. 1990); Harris v. Reed, 894 F.2d 871, 878-79 (7th Cir. 1990); Crisp, 743 F.2d at 584; McCollough, 2010 WL 114253, at *11.

In light of this case law, the performance prong of Lopez's ineffective assistance claim would be relatively easy to resolve if Lopez could establish that Lupo never interviewed Guido or Rivera. As noted above, Guido and Rivera both testified as much, but Lupo himself represented that he did interview at least one of them. (See Trial Tr. (Dkt. 59-3) at 536-37.) And although Lopez now claims that he told Lupo about two alibi witnesses (see First Ev. Hr'g Tr. at 15, 19), Lupo stated during trial that Lopez told him about only one (see Trial Tr. (Dkt. 59-3) at 536), and Lopez represented at that time that Lupo's statement was true (see id. at 537). Thus, whether Lupo adequately investigated the alibi witnesses depends largely on whether the court believes (1) Guido's and Rivera's statements that Lupo never interviewed either of them or (2) Lupo's statement that he interviewed the only alibi witness of whom he was aware.

Unfortunately, because Lupo, Guido, and Rivera are all unavailable to testify, it is difficult for the court to gauge their relative credibility. Thus, particularly because of the strong presumption to which Lupo's decisions are entitled, see Strickland, 466 U.S. at 690; Greiner, 417

F.3d at 319, the court will assume without deciding that Lupo conducted an adequate investigation into Guido and Rivera.  Nevertheless, the court notes its serious concerns (1) as to whether Lupo interviewed either of the alibi witnesses and (2) assuming he did interview one of them, as to why he did not find out about and interview the second.  Cf. Wiggins v. Smith, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation [ ] a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); Bigelow v. Haviland, 582 F.3d 670, 670 (6th Cir. 2009) (counsel provided ineffective assistance where "counsel could have uncovered [alibi] witnesses with minimal additional investigation").

Although the court assumes that Lupo properly *investigated* Lopez's alibi defense—despite the concerns discussed above—Lupo's failure to *call* either alibi witness was not based on reasonable trial strategy.

As an initial matter, an attorney's failure to call an available alibi witness must be based on *some* reasonable justification in order for his representation to satisfy the Sixth Amendment. See Pavel, 261 F.3d at 220 ("[A]n attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it."); Pena-Martinez, 112 F. App'x at 114 ("Although a decision not to call particular witnesses is typically a question of trial strategy, an unexplained failure to call credible alibi witnesses cannot be considered reasonable trial strategy."); Moore v. Kirkpatrick, No. 09-CV-0457 (T), 2011 WL 1233124, at *14 (W.D.N.Y. Mar. 30, 2011) (same).  At the same time, the attorney need not necessarily articulate that justification; the court must "affirmatively entertain the range of possible reasons [ ] counsel may have had for proceeding as [he] did." Pinholster, 131 S. Ct. at 1407 (internal quotation marks omitted); see also Greiner, 417 F.3d at 320 (court must "look for

legitimate justifications for [counsel's] conduct, including justifications transparent on the record and justifications offered by counsel").

Here, the record indicates one explanation that Lupo stated for his failure to call the alibi witnesses: that Guido and Rivera were "closely related" to Lopez and thus would not be believable to the jury. (Lopez Aff. at 1; First Ev. Hr'g Tr. at 17.) This relationship alone does not reasonably justify a decision not to call witnesses with potentially exculpatory evidence. See Pavel, 261 F.3d at 220 (counsel rendered ineffective assistance where he failed to call the defendant's mother at trial because "there [was] simply no suggestion in the record that there was any reason not to put [her] on the stand"); Poindexter, 301 F. App'x at 529 (counsel's failure to call alibi witnesses because of their "close relationships with [petitioner]" was unreasonable "because alibi witnesses often have close relationships with the defendant"); Bell v. Howes, 757 F. Supp. 2d 720, 737 (E.D. Mich. 2010) ("[A] decision not to call an alibi witness based upon the alibi witness's close relationship with the defendant is not sound trial strategy because [ ] it is the nature of alibi witnesses that they typically have some sort of a relationship with the defendant."); Brownridge, 2010 WL 2834829, at *6 ("[A]n alibi is not disingenuous merely because it involves family members."). "It is the facts of the particular case, and the particular alibi defense that matter." Raygoza v. Hullick, 474 F.3d 958, 963 (7th Cir. 2007); compare Luna v. Cambra, 306 F.3d 954, 958, 961 (9th Cir. 2002) (counsel provided ineffective assistance because of his failure to call defendant's sister and mother as alibi witnesses), amended by 306 F.3d 954 (9th Cir. 2002), and Madrigal v. Yates, 662 F. Supp. 2d 1162, 1190 (C.D. Cal. 2009) (holding that counsel rendered ineffective assistance because he failed to call the petitioner's brother as an alibi witness, and noting that "the mere fact that [the witness] was a family member does not render [counsel's] failure to present his corroboration of Petitioner's alibi harmless"),

with Dolan v. Donelli, No. 06-CV-5891 (JS), 2010 WL 5491101, at *20 (E.D.N.Y. Dec. 30, 2010) (counsel reasonably decided not to present the petitioner's mother and father as alibi witnesses where "the parents provided scant alibi support" because they were either not present or saw the petitioner very briefly), and Morales v. Greiner, 273 F. Supp. 2d 236, 256-57 (E.D.N.Y. 2003) (counsel's decision not to call the petitioner's mother as an alibi witness at the petitioner's second trial was reasonable because, at the first trial, she had provided an alibi for a different day than the date of the crime). Thus, to the extent that Lupo decided not to call Guido and Rivera based solely on their relationship with Lopez—and regardless of the degree to which their testimony could exculpate him—this decision was unreasonable. See Pavel, 261 F.3d at 220; Poindexter, 301 F. App'x at 529; Bell, 757 F. Supp. 2d at 737; Brownridge, 2010 WL 2834829, at *6.

The court has "affirmatively entertain[ed]" any other "possible reasons [Lupo] may have had for proceeding as [he] did," Pinholster, 131 S. Ct. at 1407, and finds none that would be reasonable. One possibility is the vagueness of Guido and Rivera as to the timing of their interactions with Lopez on the morning of the shooting, in combination with the proximity of their homes to the crime scene, both of which may have undermined the effectiveness of their testimony. (See Resp. Post-Hr'g Opp'n at 31.) But even assuming that their trial testimony would have been no more specific than their affidavits as to the timing of these interactions—which is not self-evident given the suggestion in their affidavits that Lopez could not possibly have committed the shooting—that does not provide a reasonable basis for deciding not to call them. See Madrigal, 662 F. Supp. 2d at 1190 ("[T]hat a witness 'might not . . . make the best appearance' at trial is not a reasonable basis for failing to call a witness." (quoting Avila v. Galaza, 297 F.3d 911, 920 (9th Cir. 2002))). Here, Lupo "did not forego an alibi defense in

favor of a *better* defense." Bell, 757 F. Supp. 2d at 737 (emphasis added).  Instead of pursuing

an alibi defense, Lupo pursued *no case at all*, an option that can hardly be considered "strategic."

See Wood v. Allen, 130 S. Ct. 841, 853 (2010) (Stevens, J., dissenting) ("A decision cannot be

fairly characterized as 'strategic' unless it is a conscious choice between two legitimate and

rational alternatives."); cf. United States v. Smith, 113 F. Supp. 2d 879, 909-10 (E.D. Va. 1999)

("When [an] *alternative* legal strategy is reasonable, . . . this Court will not . . . second guess

counsel's legal tactics." (emphasis added)).

   Although Guido and Rivera were not perfect witnesses, the court cannot imagine any

significant harm that was likely to result from calling them to testify—only benefit, and

potentially tremendous benefit.[35]  See Pavel, 261 F.3d at 220 (counsel rendered ineffective

assistance because "there [was] simply no suggestion in the record that there was any reason not

to put [the petitioner's mother] on the stand"); cf. Greiner, 417 F.3d at 319 (court must "not

normally fault counsel for foregoing a potentially fruitful course of conduct *if* that choice also

entails a significant potential downside" (emphasis added)).  As in Pavel, "[i]t should have been

obvious to [Lupo] from the outset that [Lopez's] trial . . . was going to be a so-called 'credibility

contest.'" 261 F.3d at 220.  And presenting Guido and Rivera as witnesses would have been

consistent with the misidentification strategy Lupo took in attempting to undermine the

credibility of the prosecution's witnesses—that is, a showing that Lopez was with Guido and

Rivera at the time of the crime would have been consistent with Lupo's argument that Chapman

had identified the wrong person as the shooter.

---

[35]    Of course, there is always the possibility that potentially beneficial testimony will be so thoroughly
undermined on cross-examination that the testimony ends up decreasing the defendant's credibility in the eyes of the
jury and thus harming the defendant more than helping him.  But this possibility is present with just about any alibi
defense—indeed, just about any *witness*—and cannot alone justify a failure to present potentially exculpatory
evidence.  See Pavel, 261 F.3d at 220 ("[A]n attorney's failure to present available exculpatory evidence is
*ordinarily deficient*, unless some cogent tactical or other consideration justified it." (emphasis added)).

In short, so far as the record shows, calling Guido and Rivera as witnesses was clearly a better option than presenting no case at all; their testimony would likely have undermined the prosecution's already flimsy case against Lopez, without any significant likely downside that is apparent to the court. Lupo's failure to call them thus constitutes deficient performance.

b.   *Prejudice*

Under <u>Strickland</u>'s "prejudice" prong, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," but "the [petitioner] need not show that counsel's deficient conduct more likely than not altered the outcome in the case." <u>Id.</u> at 693. Instead, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.

The court has no difficulty concluding that Lopez was prejudiced by Lupo's failure to call Guido and Rivera as witnesses. Courts have "recognized that when trial counsel fails to present an alibi witness, '[t]he difference between the case that was and the case that should have been is undeniable.'" <u>Caldwell v. Lewis</u>, 414 F. App'x 809, 818 (6th Cir. 2011) (alteration in original) (quoting <u>Stewart v. Wolfenbarger</u>, 468 F.3d 338, 361 (6th Cir. 2007)). Indeed, "[e]yewitness identification evidence . . . is precisely the sort of evidence that an alibi defense refutes best." <u>Griffin</u>, 970 F.2d at 1359. Had Guido and Rivera testified—which they both swore they were ready to do—they would have provided strong (albeit imperfect) evidence that Lopez was with them around the time of the shooting, thus undermining the already weak testimony the prosecution presented at trial. There is a reasonable probability that this evidence would have swayed the jury to a verdict of not guilty. <u>See Strickland</u>, 466 U.S. at 694.

Respondent attempts to challenge Lopez's showing of prejudice by arguing yet again that "[t]he prosecutor would have impeached any testimony by Guido and Rivera on the grounds of bias, vagueness, and proximity to the crime scene." (Resp. Post-Hr'g Opp'n at 33.)  The court has little to add to what it has said above.  "[T]he simple fact that [Guido and Rivera] were family members did not render counsel's [ineffective assistance] harmless."  Luna, 306 F.3d at 962; see also Madrigal, 662 F. Supp. 2d at 1191 ("Despite [the alibi witness] being Petitioner's brother, [the witness's] testimony . . . would have clearly undermined the prosecution's relatively weak case against Petitioner.").  And the fact that Guido and Rivera could not establish Lopez's alibi with *certainty* does not change the court's conclusion that there is "*reasonable probability*" that their testimony would have changed the jury's verdict in an already questionable case. Strickland, 466 U.S. at 694 (emphasis added); see also Bigelow, 576 F.3d at 291 (failure to produce an alibi witness at trial was prejudicial even where the state postconviction court had said that the alibi witnesses would have been "unconvincing"); Raygoza v. Hulick, 474 F.3d 958, 965 (7th Cir. 2007) ("Obviously, a trier of fact approaching the case with fresh eyes might choose to believe the eyewitnesses and reject the alibi evidence, but this trier of fact never had the chance to do so.  This undermines our confidence in the outcome of the proceedings . . . ."); Brown v. Myers, 137 F.3d 1154, 1157-58 (9th Cir. 1998) (petitioner suffered prejudice from counsel's failure to present testimony of alibi witnesses even though their testimony "was vague with regard to time"); cf. United States v. Agurs, 427 U.S. 97, 113 (1976) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.").

*  *  *  *  *

Because of Lupo's failure to call Guido and Rivera as witnesses, his "performance was deficient." Strickland, 466 U.S. at 687.  This "deficient performance prejudiced the defense." Id. Lopez thus received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments and is "in custody in violation of the Constitution." 28 U.S.C. § 2254(a).

IV.    **CONCLUSION**

Lopez's habeas case presents a number of close legal issues, both because of the stringent standards governing federal habeas review and because of the unavailability of many key players.  But what is far from close in the court's view is that Lopez has been wronged by the State of New York.  This wrongdoing has ranged from an overzealous and deceitful trial prosecutor; to a series of indolent and ill-prepared defense attorneys; to a bewildering jury verdict; and to the incomprehensible Justice Demarest, who so regrettably failed time and time again to give meaningful consideration to the host of powerful arguments Lopez presented to her.  The result is that a likely innocent man has been in prison for over twenty-three years.  He should be released with the State's apology.

Lopez's Petition for Writ of Habeas Corpus is GRANTED.  "The typical relief in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner." Herrera v. Collins, 506 U.S. 390, 403 (1993).  Respondent is therefore ORDERED to release Lopez within sixty days "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry [him]." Pavel, 261 F.3d at 229.  The Clerk

of Court is directed to enter judgment and to close this case.

      SO ORDERED.

Dated: Brooklyn, New York
      January 16, 2013

/s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge