UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ALICE LOPEZ, as Administrator for WILLIAM LOPEZ,

          Plaintiff,

- against -

THE CITY OF NEW YORK, et al.,

          Defendants.

---

**MEMORANDUM DECISION AND ORDER**

14 Civ. 3743 (BMC)

**COGAN**, District Judge.

This case is before me on defendants' motion to dismiss the Second Amended Complaint ("SAC") in its entirety for failure to state a claim. William Lopez was convicted of the murder of a Brighton Beach crack dealer by a New York State jury in 1990. After two decades of post-conviction proceedings in state and federal court, his 23.5-year incarceration came to an end in 2013 when Judge Garaufis of this Court granted his petition for a writ of *habeas corpus* and ordered his release. Judge Garaufis concluded that

> Lopez has been wronged by the State of New York. This wrongdoing has ranged from an overzealous and deceitful trial prosecutor; to a series of indolent and ill-prepared defense attorneys; to a bewildering jury verdict; and to the incomprehensible Justice Demarest, who [in presiding over his criminal trial] so regrettably failed time and time again to give meaningful consideration to the host of powerful arguments Lopez presented to her. The result is that a likely innocent man has been in prison for over twenty-three years.

Lopez v. Miller, 915 F. Supp. 2d 373, 431 (E.D.N.Y. 2013) (the "Habeas Decision").

The issue in this case is simply whether any of the defendant Police Officers, Assistant District Attorneys, or the City of New York are liable to him for damages as a result. Among other things, plaintiff claims that defendants' conduct amounts to malicious prosecution under

New York State law and in violation of 42 U.S.C. § 1983, and that he was denied a fair trial by the fabrication of evidence in violation of his due process rights via § 1983. For the reasons that follow, defendants' motion is granted in part and denied in part.[1]

## BACKGROUND

The facts below are deemed true for the purpose of deciding the pending motion. As an initial matter, of course, the SAC incorporates by reference the findings made by Judge Garaufis in his Habeas Decision.[2] Familiarity with those findings is assumed.

The SAC further alleges the following specifics. On August 31, 1989, two men entered the Brighton Beach apartment of a crack dealer named Elvin Zorrilla. One of the two men shot and killed him. Eyewitness Daisy Flores, who had a "clear look" at the shooter, described him to police on the scene as "dark, black" and approximately 6'3" tall. A sprint report was published 11 minutes after the initial radio run, "looking for 2 male blacks." The SAC alleges that Flores soon thereafter "viewe[d] photos with negative results," but does not specify whether plaintiff's photo was among them.

Plaintiff alleges that from the outset, the investigation into Zorrilla's death was conducted by defendants Boyle and Klaimitz.[3] Boyle had already been "relentlessly badgering and harassing" plaintiff because plaintiff had sublet his apartment to drug dealers, and thus "[t]he investigators" (*i.e.*, Boyle and Klaimitz) "targeted" plaintiff to "take the fall" for Zorrilla's murder.

---

[1] Shortly after filing this case, Lopez passed away. I granted his estate's motion to be substituted. For the sake of simplicity, William Lopez is referred to herein as "plaintiff."

[2] At this stage, I need not and do not consider whether such findings, or any evidence taken in that case, will have any effect as proof in this case. I need only consider whether those findings, incorporated here by reference as allegations and taken together with the SAC, state a claim for the relief sought here.

[3] Defendants describe ADA Klaimitz's role as that of a "Riding ADA," who accompanies police during the early stages of a criminal investigation.

Some time after the shooting (presumably the same morning) at the NYPD's 60th Precinct, defendants Boyle and Klaimitz questioned Annie Burnell and Edgardo Rodriguez about plaintiff. Neither Burnell nor Rodriguez were eyewitnesses, and both were at the Precinct for unrelated reasons. Burnell stated that she knew plaintiff as a drug dealer from the area, and Rodriguez described him as a 6'2" drug dealer. Rodriguez described plaintiff as "usually armed with a shotgun."

The SAC alleges that defendant Boyle did not interview alibi witnesses proffered by plaintiff, did not follow up on a tip offered by a third party named Cesar Diaz, and did not interview Howie Sachs, the man in whose apartment the shooting occurred, and who was present immediately following the shooting.

The SAC alleges that "[d]efendants threaten[ed] [Daisy] Flores [the eyewitness] with jail time if she w[ould] not positively identify [plaintiff] as the killer" and that "[w]hen that didn't work, she was threatened with what eventually made her succumb – deportation. Her description of the perpetrators to Boyle is not of two black males, as expressed at the crime scene; it is of two males, Hispanic." The SAC goes on to allege that Flores was then shown a photo array in which "the picture of [plaintiff] [wa]s circled" and that at that point, Flores "does what she is told" and points to his photo.[4] Flores was then interviewed a third time, by defendant Klaimitz.[5]

According to the SAC, defendants Boyle and Klaimitz then threatened a second witness, Annie Burnell, a crack addict, with incarceration "unless [plaintiff] is positively identified as the

---

[4] Although this conduct alleged with respect to Flores is attributed to "[d]efendants," it appears from the paragraphs that follow these allegations that only defendant Boyle was involved in this alleged threat and suggestive photo array.

[5] The parties vehemently dispute the inferences to be drawn from certain alleged omissions by defendant Klaimitz in her questioning. Because I find that plaintiff has adequately alleged that Klaimitz was complicit in fabricating other statements, as discussed below, I do not rely on any such omissions in deciding the instant motion.

3

killer." Defendant Boyle recorded her statement on a form DD-5 informational, of which I take judicial notice.[6] According to that document, Burnell stated that shortly after the shooting,

> she was approached by [plaintiff and his brother] who proceeded to engage her in conversation. At one point [plaintiff] dropped a sawed off shotgun from the front of his pants onto the floor in front of him. . . . [S]he bent down and looked at the gun and on the side were the words pump shotgun. . . . [Plaintiff] became very nervous and asked her why she spoke to the Police. . . . [T]hree male blacks walked by, and [plaintiff] stated to them "it's done".

Burnell then identified a photo of plaintiff as the man she had seen. Klaimitz then took a recorded statement from Burnell, who was never contacted again.

On September 5, 1989, plaintiff appeared at the Precinct "after hearing he was being sought" and was not arrested. However, according to the SAC, "nearly a month after the murder . . . pressure had begun to build for an arrest." On September 29, 1989, Janet Chapman, a prostitute with a $200 a day crack habit, was arrested on unrelated charges. Defendants Boyle and Krudis told her that "[i]f you do not identify [plaintiff] as the killer, you will face prosecution, incarceration and be denied crack cocaine." According to the SAC, Chapman then signed a statement claiming to have partially witnessed the shooting and inculpating Lopez. She then made a photo array identification. On October 10, 1989, Chambers was arrested and incarcerated until after plaintiff's trial. On October 17, 1989, defendants Boyle and Klaimitz executed a takeout order on plaintiff, and Chambers positively identified him in a lineup. He was indicted on October 20, 1989.

As set forth in detail in the Habeas Decision, Chapman's testimony was central to the prosecution's case against plaintiff. As the SAC explains, she has since recanted her testimony,

---

[6] Defendant Boyle's DD-5s are referred to in the SAC, and it is defendant who urges me to take judicial notice of them. Taking judicial notice of a DD-5 informational is appropriate because they are public records, and there is clearly no dispute here as to authenticity. See Liang v. City of New York, No. 10-cv-3089, 2013 WL 5366394 (E.D.N.Y. Sept. 24, 2013) (taking judicial notice of DD-5s in considering motion to dismiss); Obilo v. City Univ. of City of New York, No. 01-cv-5118, 2003 WL 1809471 (E.D.N.Y. Apr. 7, 2003) (same). Of course, I consider them for the fact of what is stated therein, not for the truth of such statements. See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66 (2d Cir. 1998).

4

stating among other things that "[a]lthough I never saw anything such as the assistant district attorney suggested, I readily agreed to make the statement because I wanted to get out of jail." Her trial testimony also was the subject of a cooperation agreement, the existence of which defendant Allen is alleged to have withheld from the court, the jury, and plaintiff's criminal defense attorney. In addition, a jailhouse companion of Chapman's named Earline Cafield sent a letter to the prosecuting ADAs that they received between plaintiff's conviction and sentencing. That letter informed the prosecution that Chapman had told Cafield that someone other than plaintiff was the shooter.

## DISCUSSION

### I. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). That standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept all factual allegations [in the complaint] as true and draw all reasonable inferences in favor of plaintiff." Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 249 (2d Cir. 2014) (internal quotation omitted). In other words, if it would be reasonable for a jury to infer a fact from those alleged, I will accept it as true for purposes of this motion.

### II. Falsification of Evidence

A criminal defendant's right to a fair trial is violated when an investigating official "creates false information likely to influence a jury's decision and forwards that information to

5

prosecutors." Ricciuti v. New York City Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997).[7] Unlike a malicious prosecution claim, discussed further below, there is no requirement that plaintiff allege an absence of probable cause for his prosecution. See Ricciuti, 124 F.3d at 130. Courts recognize this cause of action as arising from the coercion by officials of false non-party witness statements. See Bailey v. City of New York, No. 14-cv-2091, 2015 WL 220940 (E.D.N.Y. Jan. 15, 2015) (denying summary judgment on due process fabrication claim because of coerced eyewitness statement); Blake v. Race, 487 F. Supp. 2d 187 (E.D.N.Y. 2007) (same).

In order to have a cognizable claim for denial of the right to a fair trial under § 1983, however, a plaintiff must establish a causal connection between the fabricated evidence and a deprivation of liberty. See Zahrey v. Coffey, 221 F.3d 342, 348 (2d Cir. 2000) ("The manufacture of false evidence, in and of itself . . . does not impair anyone's liberty, and therefore does not impair anyone's constitutional right.").

The causation standard is a familiar one – proximate cause. In Zahrey, analyzing whether a prosecutor's immunized use of fabricated evidence before a grand jury was "traceable back even further to his earlier investigatory act of fabrication, for which he enjoy[ed] only qualified immunity," id. at 352, the Second Circuit held that if the defendant had "fabricated evidence in his investigative role, it was at least *reasonably foreseeable* that in his advocacy role he would later use that evidence before the grand jury, with the likely result that [the plaintiff] would be indicted and arrested." Id. at 353-54 (emphasis added). The Court therefore held that the complaint adequately alleged that a deprivation of liberty "was the legally cognizable result of [the defendant]'s alleged misconduct in fabricating evidence." Id. at 354.

---

[7] This right is grounded in the protections of the Fifth, Sixth and Fourteenth Amendments. See Zahrey v. City of New York, No. 98-cv-4546, 2009 WL 1024261 (S.D.N.Y. Apr. 15, 2009).

6

Although not every act of fabrication alleged in the SAC is sufficiently connected to plaintiff's indictment and conviction to give rise to liability under this standard, there are sufficient facts plead to support the inference that defendants Boyle, Klaimitz, Krudis, and Grimaldi fabricated evidence that was "likely to influence a jury's decision." The SAC alleges that defendant Boyle threatened the only clear eyewitness to the murder with jail time if she would not identify plaintiff as the perpetrator. She thereafter changed her description of the shooter significantly to match plaintiff's appearance. Although Flores never made an in-court identification of plaintiff before the jury that convicted him, and the nature of her testimony to the grand jury is not alleged, she is alleged to have testified before both.

The SAC also alleges specifically that defendants Boyle and Krudis threatened Janet Chapman if she would not identify plaintiff as the shooter. Chapman is alleged to have testified at plaintiff's criminal trial in a manner consistent with the statements she made to Boyle, Krudis, and presumably Klaimitz, allegedly under their coercion. (That she was prosecuted and incarcerated anyway – allegedly to secure her trial testimony – is if anything further support for that view.)

I also cannot overlook the SAC's allegations relating to Annie Burnell, despite the fact that she did not testify at plaintiff's trial. In a case such as this, where plaintiff alleges that every witness against him was coerced to testify falsely, it is reasonable to conclude that any false witness statement that was part of the case against him played a part in his ultimate deprivation of liberty. For example, it would be quite reasonable to infer from the facts actually alleged that defendant Boyle's DD-5 recording her statement – which is not only alleged to have been coerced, but is implausible on its face – was before the grand jury.

7

Finally, defendant Grimaldi is alleged to have sworn to a criminal complaint containing information that he knew to be false.

Focusing specifically on the alleged coercion of Chapman's testimony, defendants protest that "in none of the statements attributed to Chapman throughout the [SAC] does she ever claim that detectives told her what to say or pressured her to testify falsely." It is helpful, for purposes of understanding exactly what defendants mean by this, to distinguish between coercion of testimony and falsification of testimony. Simply put, in the context of assessing the conduct of an official (rather than that of the witness herself), the latter is a subset of the former. When false testimony is knowingly elicited by an investigating official, that act can be viewed as the creation of false evidence for purposes of this inquiry; coercion of a true statement is not. See Fields v. Wharrie, 740 F.3d 1107, 1110 (7th Cir. 2014) ("Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.").

Defendants' motion, in this regard, relies heavily on pointing out that the record evidence does not show that Chapman was pressured to testify falsely. To the extent that defendants' argument is that defendant Boyle pressured her to testify, but not necessarily to any falsehood, that argument conflates evidence and allegation. Plaintiff need not, at this stage, proffer a statement by Chapman that expressly and unambiguously admits to testimony that was both false and coerced. See id. Plaintiff need only allege that it was so. This much the SAC does. The statements attributed to Chapman in the complaint do more than enough to support a plausible inference of coerced false testimony.

8

**III.     Malicious Prosecution**

In order to state a claim for malicious prosecution on the part of any of the individual defendants, plaintiff must allege that that defendant (1) initiated or continued a criminal proceeding against him; (2) that it was terminated in his favor; and (3) that there was no probable cause for the criminal proceeding. Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010). Plaintiff must also show "actual malice," which can be inferred from *inter alia* the absence of probable cause or from facts suggesting that a defendant acted with reckless disregard for his rights. Id. at 163.

Plaintiff sufficiently alleges that his prosecution for the murder of Elvin Zorilla was terminated in his favor when he was released following the grant of his petition for *habeus corpus* by Judge Garaufis.

    A.     Presumption of Probable Cause

The fact that plaintiff was indicted by a grand jury creates a presumption of probable cause for his prosecution. See Savino v. City of New York, 331 F.3d 63 (2d Cir. 2003). Thus, for plaintiff's malicious prosecution claims to survive, he must allege that the indictment was "procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Id. at 72 (quotation omitted). For purposes of this analysis, it is not necessary for plaintiff to allege improper conduct in connection with the indictment by every defendant. All he has to do is overcome the presumption by alleging that it was procured by improper means.

The most significant problem with respect to plaintiff's claim for malicious prosecution is that the SAC simply does not set forth any facts relating to the evidence that was before the grand jury. Plaintiff argues that he has adequately pleaded the "fabrication and coercion of witnesses," and – as discussed in Section II above – indeed he has. Plaintiff must show, of course, that such fabrication led to his indictment.

Plaintiff's brief in opposition to the instant motion is of no help; he contends that he has adequately overcome the presumption of probable cause because the complaint alleges that the NYPD defendants "withheld exculpatory material, fabricated statements, [and] acted in bad faith when presenting evidence to the Grand Jury while knowing Flores described shooter [sic] as tall, black, and dark" when he is, in fact, 5'7" and light-skinned. Not only do the opposition's citations to the SAC fail to correctly identify the paragraphs that they seem intended to cite, but nothing in those paragraphs (or the SAC as a whole) says anything about the evidence before the grand jury. Finally, it is true that, in order to *prove* his case, plaintiff will not be able to rely on conjecture to establish that his indictment was procured improperly. See Rothstein v. Carriere, 373 F.3d 275 (2d Cir. 2004).

Nevertheless, at this stage of the case, the SAC sets forth enough facts to overcome the presumption. I consider plaintiff's allegations in light of the fact (on which the parties appear to agree) that Daisy Flores was the only eyewitness to testify before the grand jury. On its face, the SAC sufficiently alleges that defendants Boyle and Klaimitz, if not others, coerced her into making fabricated statements that inculpated plaintiff and put a fabricated photo identification into the record prior to his indictment.

Plaintiff's allegations concerning the inconsistency in Daisy Flores' statements to police and at trial, coupled with specific allegations that her description of the shooter was fabricated at the behest of investigators, support a reasonable inference that she also misled the grand jury. Even in the absence of a specific allegation, it is also reasonable to infer that defendant Boyle's DD-5 recording her testimony was before the grand jury, or at the very least that she did not contradict it in whatever testimony she gave.

Moreover, the case law is clear that it is sufficient to allege that exculpatory evidence was withheld from the grand jury. See Manganiello, 612 F.3d at 163 (affirming denial of JMOL after verdict finding of malicious prosecution where, among other things, evidence supported the inference that police "declined to inform the ADA of, or to document, any exculpatory evidence or inconsistencies in the statements of witnesses who agreed to inculpate" the plaintiff).

The SAC alleges that during the investigation of the Zorilla shooting, the person in whose apartment it occurred was "placed at the scene of the murder by Chapman" and had even "rifled through the victims [sic] pockets at the crime scene" but was never interviewed. Plaintiff alleges that three days before plaintiff's grand jury, a line-up was conducted in which Flores – the principal eyewitness to the murder – was not asked to participate. These allegations, taken as true, suffice to create a plausible inference that police and prosecutors deliberately avoided presenting exculpatory evidence to the grand jury.

B.   Initiation of Prosecution

Having surpassed that threshold hurdle, plaintiff must also allege that any individual defendant "initiated or continued" his prosecution without probable cause. Plaintiff argues that the NYPD defendants are sufficiently alleged to have initiated his prosecution because that requirement can be met by "having the plaintiff arraigned, by filling out complaining and corroborating affidavits, and by signing felony complaints." However, the only allegation that would give rise to a claim under that view is that defendant Grimaldi swore out the criminal complaint that initiated plaintiff's prosecution, while knowing that it contained false information.

Nevertheless, a defendant can also be held liable for initiating a prosecution when that defendant fabricates evidence, and forwards that evidence to prosecutors. See, e.g., Manganiello, 612 F.3d at 163 (sufficient evidence to find initiation or continuation where police

officer, among other things, "actively elicited inculpatory statements from witnesses . . . whose veracity in making such statements was circumstantially suspect" and forwarded them to DAs).

As discussed above, the SAC sufficiently alleges that defendants Boyle, Klaimitz and Krudis were personally involved in coercing false witness statements from Chapman, Flores, Burnell, and even Rodriguez that were forwarded to prosecutors in the days prior to plaintiff's indictment. There is no requirement for purposes of this analysis that such conduct led to a deprivation of liberty (as required for a malicious prosecution claim) or an indictment (as required to overcome the presumption of probable cause). All that is necessary is that plaintiff allege that each individual was responsible for putting false information into the record, and the SAC does that.

Defendants argue, in a footnote, that (in effect) it is impossible to allege the initiation of a prosecution by both police and prosecutors, because liability for investigators does not extend to a situation in which the prosecutor acts in concert with police, knowing the fabricated evidence to be so. See Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999) (observing that "the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment . . . [a]t least . . . in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment"). I disagree. As the Second Circuit noted in Zahrey, 221 F.3d at 352, a case cited by defendants on this point, "[e]ven if the intervening decision-maker (such as a prosecutor . . .) is not misled or coerced, it is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty." Defendants' theory would require that if a police investigator foists

12

fabricated evidence on an unsuspecting ADA, he can be liable for malicious prosecution, but that if he acts in concert with an equally culpable ADA to put that evidence before the jury, he cannot. I decline defendants' invitation to view Townes as requiring that bizarre result. See Zahrey, 221 F.3d 342, 352 (2d Cir. 2000) (quoting Barts v. Joyner, 865 F.2d 1187, 1197 (11th Cir. 1989), for the proposition that intervening acts break chain of causation "in the absence of a showing that the police officers deceived the court officials or unduly pressured them *or that the court officials themselves acted with malice and the police joined with them*" (emphasis added)).

## IV.  Absolute Immunity and Monell Claims

Prosecuting attorneys accused of wrongdoing are entitled to absolute immunity from civil suit for actions taken in their capacity as advocates. Dory v. Ryan, 25 F.3d 81 (2d Cir. 1994). Plaintiff does not appear to dispute that defendant Allen is entitled to absolute immunity for all of the alleged misconduct set forth in the SAC. This is with good reason, because the entire extent of plaintiff's allegations against defendant Allen concern her role as lead trial prosecutor. Indeed, the SAC does not contain a single factual allegation concerning defendant Allen that occurred prior to plaintiff's indictment. Defendants' motion is therefore granted with respect to any claim against defendant Allen individually, and she is dismissed from this case.

Her dismissal as an individual defendant does not mean that her alleged misconduct at trial is irrelevant to the remaining claims in this case. Defendants do not argue – and I am aware of no authority that would suggest – that her entitlement to absolute immunity as an individual defendant means *per se* that any violation of § 1983 cannot give rise to a claim against the City under Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978), assuming that the other requirements for pleading such a claim are met.[8]

---

[8] Defendant Allen's immunity does mean, however, that the City is immune from *respondeat superior* liability as to her conduct on any of plaintiff's state-law claims.

Of course, defendants move to dismiss plaintiff's Monell claims based on alleged policies and practices of, or deliberate indifference toward, constitutional violations by the NYPD and Kings County DA's office. I reserve judgment on defendants' motion with respect to those claims, pending further clarity as to whether one or both sides will seek to resolve the individual claims in this case by summary judgment, trial, or other means at the close of discovery.

I therefore need not decide whether plaintiff's allegations would be sufficient to state a claim for individual constitutional misconduct against defendant Allen.

## V. Remaining State Law Claims

Plaintiff's claims for intentional infliction of emotional distress and abuse of process are untimely. I agree with plaintiff that the applicable statute of limitations is one year plus 90 days under New York General Municipal Law § 50-i. See, e.g., Matthews v. City of New York, 889 F. Supp. 2d 418, 425 (E.D.N.Y. 2012). However, the SAC's only allegations concerning that time period are that defendants "continually lied to and defrauded every court that reviewed [his] conviction," and plaintiff argues that this vague allegation supports a theory of continuing violation that would have delayed the accrual of the statute of limitations on his IIED and abuse of process claims until he was ordered released in March 20, 2013. Plaintiff was not ordered released until that time, but Judge Garaufis entered the Habeas Decision granting plaintiff's petition in January 2013. The docket in that case suggests no taking of evidence from the defendants here after that grant. Even if plaintiff's theory of a continuing violation were valid in the abstract, which I need not decide, his IIED and abuse of process claims accrued at the *absolute latest* on January 16, 2013. Plaintiff's second and third causes of action are therefore dismissed. However, plaintiff's state-law malicious prosecution claim – which did not mature until his indictment was ordered dismissed on March 20, 2013 – is timely.

14

Plaintiff's claims for fraud and negligent misrepresentation are not sufficiently plead. Plaintiff is correct that these causes of action are available outside the commercial setting, but defendants are correct that reliance is an essential element of both. See Lerner v. Fleet Bank, N.A., 459 F.3d 273 (2d Cir. 2006); Hydro Investors, Inc. v. Trafalgar Power, Inc., 227 F.3d 8 (2d Cir. 2000). Plaintiff concedes that he has only colorably alleged reliance on a fraudulent representation with respect to defendant Allen's representation that Janet Chapman was not testifying subject to a plea deal. Because she is entitled to qualified immunity, plaintiff's fourth and fifth causes of action are dismissed.

## CONCLUSION

Defendants' [19] motion to dismiss is granted and part and denied in part to the extent set forth herein. Plaintiff's second, third, fourth, and fifth causes of action are dismissed. Decision is reserved on plaintiff's claims under Monell. The Clerk of Court is directed to terminate defendant Tess Allen.

**SO ORDERED.**

                                                          U.S.D.J.

Dated: Brooklyn, New York
       April 28, 2015